Eric J. Shimanoff (ejs@cll.com)
Joelle A. Milov (jam@cll.com)
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, New York 10036
(212) 790-9200
*Attorneys for Plaintiffs Barclays PLC and Barclays Capital Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

| | | |
|---|---|---|
| BARCLAYS PLC and BARCLAYS CAPITAL INC. | : | Civil Action No. 20-cv-8437 |
| | : | |
| Plaintiffs, | : | **COMPLAINT** |
| | : | |
| -against- | : | **JURY TRIAL DEMANDED** |
| | : | |
| VLADIMIR "VAL" SKLAROV, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; OSMAN QUREISHI, individually and dba "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "LEHMAN BROTHERS," "SHEARSON LEHMAN BROTHERS INVESTMENT BANKING" and "SHEARSON LEHMAN INVESTMENT BANKING"; BLACK ROCK CAPITAL LLC; NEWBURGH CAPITAL LTD.; LINCOLN CAPITAL LTD.; JAITEGH "JT" SINGH; JOHN DOES 1-10; and XYZ CORPORATIONS 1-10, | : : : : : : : : | |
| Defendants. | : | |

-------------------------------------------------------------- x

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

NATURE OF THE ACTION ............................................................................................10

THE PARTIES...................................................................................................................10

JURISDICTION AND VENUE .......................................................................................13

FACTS ...............................................................................................................................14

    Lehman Brothers' Long Use of the LEHMAN Names and Marks ........................14

    Barclays' Use of the LEHMAN Names and Marks................................................21

    The LEHMAN Names and Marks Have Long Been and Still Are Famous...........24

    Barclays' Protection of the LEHMAN Names and Marks .....................................30

    Defendant Sklarov's History of Criminal and Alleged Civil Fraud ......................34

    The *Rothschild* Trademark Injunction against Sklarov and Black Rock...............38

    Defendants' Unlawful Use of the LEHMAN Names and Marks ...........................43

    Defendants' Unlawful Registration of the Infringing Names and Marks..............56

    Defendants' Other Unlawful Acts that Seek to Create False Connections with
        Famous Financial Services Names and Brands ................................................63

    Defendants Have Refused to Stop their Unlawful Activities .................................68

CAUSES OF ACTION......................................................................................................71

Plaintiffs Barclays PLC and Barclays Capital Inc. (collectively, "Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against Vladimir "Val" Sklarov, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," Osman Qureishi, individually and dba "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," Black Rock Capital LLC, Newburgh Capital Ltd., Lincoln Capital Ltd., Jaitegh "JT" Singh and John Does 1-10 and XYZ Corporations (collectively, "Defendants"), allege as follows:

## INTRODUCTION

1.      Lehman Brothers is one of the most famous firms and names associated with financial services.

2.      Operating continuously for nearly 170 years under company names, domain names and trademarks containing or comprising LEHMAN, including at times LEHMAN BROTHERS and SHEARSON LEHMAN BROTHERS (collectively, the "LEHMAN Names and Marks"), Lehman Brothers was the nation's fourth largest investment bank with hundreds of billions of dollars' worth of assets when it filed for the largest bankruptcy in U.S. history in 2008.

3.      As part of the bankruptcy, Barclays purchased many of Lehman Brothers' assets, including the LEHMAN Names and Marks, which Barclays then licensed back to Lehman Brothers for use in connection with the firm's continuing business and operations.

4.      Since 2008, Lehman Brothers has continued to engage with clients, existing counterparties, market participants, creditors, employees and numerous others, all under the LEHMAN Names and Marks.  Lehman Brothers' activities over the past 12 years have included

investing in, managing and selling its sizable real estate, equity, debt and other assets, settling its vast portfolio of derivative swaps, managing and reporting on its bankruptcy plan and maintaining and defending numerous litigations.

5.     While the LEHMAN Names and Marks had become household names prior to 2008, Lehman Brothers' financial troubles and bankruptcy in 2008 made the LEHMAN Names and Marks some of the most ubiquitous monikers thereafter.  Each and every detail of Lehman Brothers' pre-financial crisis activities, financial troubles, bankruptcy and subsequent business activities has been widely publicized in the press and reflected in popular culture, including as the subject of two recent Academy-award winning films and a recent Broadway play.

6.     Myriad articles concerning Lehman Brothers' continuing business operations and financial dealings since 2008 have consistently appeared in widely disseminated, major publications across the country.  One such article from *Bloomberg BusinessWeek* entitled "Welcome to Lehman Brothers. We're Open for Business" reported that Lehman Brothers "is an operating company" that "still controls tens of billions in assets" and "its lawyers and traders will gladly take your business."

7.     Public recognition of the LEHMAN Names and Marks in connection with financial services is just as strong today as it was at the time of Lehman Brothers' bankruptcy.

8.     Given this strong consumer recognition, several third parties have attempted to misappropriate the LEHMAN Names and Marks as their own and cause consumer confusion. Barclays thus has vigorously protected the LEHMAN Names and Marks against misuse by third parties worldwide.

9.      In one such recent action where a third party sought to register the mark LEHMAN BROTHERS in connection with its own goods and services, the United States Patent and Trademark Office rejected the application based on Barclays' prior rights, finding:

> Barclays has common law rights in the LEHMAN BROTHERS trademark and tradename [which are] still being used [pursuant to license] in connection with activities pertaining to winding down [Lehman Brothers] . . . . Moreover, in view of the well-known reputation established in LEHMAN BROTHERS by Barclays' predecessor, the more likely a sufficient residual goodwill remains in the LEHMAN BROTHERS trademark, especially when Barclays' acts have not been of such character as to cause the mark to lose its significance as an indication of origin.  In view of the foregoing, we find that LEHMAN BROTHERS continues to function as a mark for Barclays.

10.      Intentionally seeking to take a free ride on the consumer recognition in the LEHMAN Names and Marks and to pass themselves off as the legitimate Lehman Brothers, Defendants have engaged in a scheme to mislead and to deceive consumers by purporting to offer financial services under names and marks containing or comprising "Lehman Brothers" and/or "Shearson Lehman" (collectively, the "Infringing Names and Marks").

11.      The Infringing Names and Marks misappropriated by Defendants include "Lehman Brothers," "Shearson Lehman Brothers," "Shearson Lehman," "Shearson Lehman Brothers Investment Banking," "Shearson Lehman Investment Banking" and <shearsonlehmanbrothers.com>.

12.      Defendants frequently present the Infringing Names and Marks in a font long used by the legitimate Lehman Brothers and in a stylization identical to that used and registered by Lehman Brothers when it was known as SHEARSON LEHMAN BROTHERS, including as shown below:







13.     Defendants have used the Infringing Names and Marks in connection with purported financial services, including securities-backed loans, *inter alia* on a website located at www.shearsonlehmanbrothers.com, in email and oral communications, in marketing and recruiting flyers and in press releases, including as shown below:

-4-







28827/162/3557472









14.     To further deceive consumers and create a false connection with the legitimate Lehman Brothers, Defendants represent numerous times in various media that they are a "Lehman Brothers company," claim as their current address the former New York offices of Lehman Brothers and use language that would be associated with or would describe the legitimate Lehman Brothers and its long history of offering financial services, including: "We have managed billions of dollars of client assets . . . for more than 100 years" and "We invented investment banking."

15.     Although Defendants use some of the Infringing Names and Marks in connection with some aspect of their fraudulent scheme, and other Infringing Names and Marks in connection with other aspects of their fraudulent scheme, often inconsistently, for ease of reference, Plaintiffs shall refer herein to Defendants' purported companies simply as the "Fake 'Shearson Lehman Brothers.'"

16.     Defendant Vladimir "Val" Sklarov is a convicted felon for Medicare fraud.  A federal Court recently enjoined Sklarov against impersonating the famous financial services firm Rothschild & Co.  Several other third parties have sued Sklarov for fraud in connection with unlawfully and prematurely selling borrowers' public shares pledged as collateral for securities-backed loans that Sklarov never provided to the borrowers.  Sklarov is the apparent "ring-leader" of the fraudulent scheme to impersonate Lehman Brothers and has directed and controlled most if not all of the unlawful actions described herein.  Upon information and belied, Sklarov typically engages in his unlawful actions through one or more "shell" companies that he controls and directs, including Defendants Black Rock Capital LLC, Newburgh Capital Ltd., Lincoln Capital Ltd.  Sklarov has used these shell companies here in an unlawful attempt to officially register as trademarks several of the Infringing Names and Marks, including in the U.S.

17.     Defendant Osman Qureishi, who previously worked for Sklarov at "America 2030," one of Sklarov's companies sued numerous times for fraud, is the "Senior Executive Vice President, Wealth Management" and the public face of Defendants' Fake "Shearson Lehman Brothers." Qureishi responds to inquiries to the Fake "Shearson Lehman Brothers" including via the website at www.shearsonlehmanbrothers.com. Qureishi also recruits potential brokers, agents and borrowers, and creates and distributes marketing materials, press releases and agreements for, the Fake "Shearson Lehman Brothers."

18.     Defendant Jaitegh "JT" Singh for many years has served as attorney for Sklarov and the companies he controls, including in defense of numerous litigations alleging fraud, and has represented himself as an officer of one or more of the corporate defendants. Ostensibly to assist Sklarov and Qureishi in their impersonation of Lehman Brothers and in an attempt to provide an air of legitimacy to the Fake "Shearson Lehman Brothers," Singh filed trademark applications for the Infringing Names and Marks, knowing that Defendants were not entitled to register or use such names and marks and that the use and registration of such names and marks would cause consumers to mistakenly believe that Defendants were affiliated or associated with the legitimate Lehman Brothers.

19.     On behalf of Sklarov and his shell companies, Singh also filed trademark applications for myriad other trademarks containing or comprising famous names and marks associated with financial services, with which Defendants clearly have no affiliation or association, including: Credit Suisse First Boston; Samuel Walton Capital; UBS Paine Webber; Price Waterhouse Coopers; Arthur Andersen; John D. Rockefeller; Andrew Carnegie; Bear Stearns; George Soros Capital; Warren Buffet Capital; Dean Witter Reynolds and Salomon Smith Barney.

28827/162/3557472

20.    Not surprisingly, the United States Patent and Trademark Office rejected each and every one of these trademark applications filed by Singh on behalf of Sklarov, finding the marks therein would deceive consumers and falsely suggest connections with unaffiliated third parties, including Lehman Brothers and Barclays.

21.    Not satisfied with merely impersonating Rothschild & Co and Lehman Brothers, Sklarov apparently is involved in a similar scheme to defraud consumers by impersonating the former financial services firm Bear Stearns, including by purporting to offer financial services under a logo that is identical to that long used by the legitimate firm:



22.    Despite numerous demands by Barclays, Defendants have refused to cease and desist from their unlawful activities.  Instead, with full knowledge of Barclays' rights in the LEHMAN Names and Marks, and Barclays' trademark and related claims, Defendants have actually increased their unlawful activities and doubled down on their efforts to deceive consumers and to pass themselves off as affiliated with the legitimate Lehman Brothers.

23.    Given Sklarov's history of criminal and civil fraud lawsuits and Defendants' blatant disregard for the intellectual property rights of third parties, consumers and the public at large are at a significant risk not only of likely confusion that Defendants are associated or affiliated with Lehman Brothers, but also that they will be defrauded by Defendants in their purported financial dealings.  As such, Defendants' unlawful actions must be stopped.

## NATURE OF THE ACTION

24.     This is an action for false designation of origin, cybersquatting and trademark dilution under the Lanham Act of 1946, as amended, 15 U.S.C. § 1501 *et seq*. (the "Lanham Act") and trademark dilution, deceptive trade practices and unfair competition under the laws of the state of New York.

## THE PARTIES

25.     Plaintiff Barclays PLC is a public limited company organized and existing under the laws of England and Wales with offices at 1 Churchill Place, Canary Wharf, London E14 5HP, United Kingdom.

26.     Plaintiff Barclays Capital Inc. is a corporation organized and existing under the laws of the state of Connecticut with offices located at 745 Seventh Avenue, New York, New York 10019.

27.     Upon information and belief, Defendant Vladimir "Val" Sklarov ("Sklarov") is an individual currently residing in the state of Florida.  Upon information and belief, Sklarov is doing business under the names "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers," "Shearson Lehman Brothers Investment Banking" and "Shearson Lehman Investment Banking," including in the United States and in New York, New York, with a claimed address at 200 Vesey Street, New York, New York 10281.  Upon information and belief, Sklarov has directed, controlled, ratified, participated in, and/or was the moving force behind all the infringing and unlawful acts and activities alleged herein, and is therefore personally liable for such acts.

28.     Upon information and belief, Defendant Osman Qureishi ("Qureishi") is an individual currently residing in Texas.  Upon information and belief, Qureishi is doing business under the names "Shearson Lehman Brothers," "Shearson Lehman," "Lehman Brothers" and

"Shearson Lehman Investment Banking," including in the United States and in New York, New York, with a claimed address at 200 Vesey Street, New York, New York 10281.

29.     Upon information and belief, Defendant Black Rock Capital LLC ("Black Rock") is a limited liability company organized and existing under the laws of the Bahamas with an address at Old Fort #4 - Western Road, SP-63 771 Nassau, New Providence Bahamas.

30.     Upon information and belief, Defendant Newburgh Capital Ltd. ("Newburgh") is a limited company organized and existing under the laws of Belize with an address at New Horizon Building, Ground Floor, 3 ½ Miles Philip S.W. Goldson Highway, Belize City, Belize.

31.     Upon information and belief, Defendant Lincoln Capital Ltd. ("Lincoln") is a limited company organized and existing under the laws of Belize with an address at New Horizon Building, Ground Floor, 3 ½ Miles Philip S.W. Goldson Highway, Belize City, Belize.

32.     Upon information and belief, Black Rock, Newburgh and Lincoln are "shell" companies formed at the direction of and controlled by Sklarov as vehicles to perpetuate many of the infringing, deceptive and unlawful acts set forth herein.  Upon information and belief, Sklarov exercises dominion and control over Black Rock, Newburgh and Lincoln, and disregards the separateness of those legal entities to such an extent that these entities are used by Sklarov as a mere instrumentality for Sklarov to perpetrate his unlawful and deceptive schemes, as described below, and to evade liability for his acts.  Upon information and belief, all acts undertaken through Black Rock, Newburgh and Lincoln, including the infringing and wrongful acts alleged herein, were directed by Sklarov.  As such, the Court should disregard the independent existence of those entities, rendering such entities subject to this Court's personal jurisdiction if they are not otherwise subject thereto, and rendering Sklarov personally liable for acts purportedly undertaken through such corporate entities.

28827/162/3557472

33.     Upon information and belief, Defendant Jaitegh "JT" Singh ("Singh") is an individual residing in the state of New York and an attorney licensed to practice in the state of New York with offices at 10 Grand Central, 155 E. 44th Street, 6th Floor, New York, New York 10017.  Upon information and belief, Singh materially contributed to, encouraged and actively participated in the other Defendants' unlawful acts and activities alleged herein, while specifically knowing such actions violated Barclays' intellectual property rights and were likely to deceive and confuse consumers, including by taking infringing actions as an officer of Black Rock, Lincoln and Newburgh and by continuing to facilitate and file infringing trademark application on behalf of the other Defendants, including Black Rock, Lincoln, Newburgh and Sklarov.

34.     Upon information and belief, Defendants John Does 1-10 are individuals who reside or do or transact business in this District, and have engaged and participated in, directly or contributorily, the unlawful acts set forth herein.  The true identities of Defendants John Does 1-10 are not presently known to Plaintiffs.  Plaintiffs will amend their complaint upon discovery of the identities of such Defendants.

35.     Upon information and belief, Defendants XYZ Corporations 1-10 are businesses that reside or do or transact business in this District, and have engaged and participated in, directly or contributorily, the unlawful acts set forth herein.  The true identities of Defendants XYZ Corporations 1-10 are not presently known to Plaintiffs.  Plaintiffs will amend their complaint upon discovery of the identities of such Defendants.

36.     Upon information and belief, Defendants, while engaging and participating in the unlawful acts set forth herein, were agents and collaborators of one another.  Indeed, as described herein, Defendants each knowingly and willfully materially contributed to a scheme to pass themselves off as affiliated or associated with the famous Lehman Brothers firm and the LEHMAN

Names and Marks and to mislead consumers about the source, affiliation and nature of their purported (and potentially fraudulent) financial services.

## JURISDICTION AND VENUE

37.    This Court has subject matter jurisdiction over the federal false designation of origin, trademark dilution and cybersquatting claims arising under the Lanham Act pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

38.    This Court has personal jurisdiction over Defendants pursuant to NY CPLR 301 because Defendants purport to do business and maintain offices in the state of New York, including in this District.  Moreover, upon information and belief, Defendant Singh resides in the state of New York, is a licensed attorney in New York and has offices in New York, including in this District.

39.    This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(1) because Defendants purport to transact business in the state of New York, including in this District.

40.    This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(2) because Defendants have committed torts of false designation of origin, unfair competition, trademark dilution, cybersquatting and deceptive trade practices within the state of New York, including in this District.

41.    This Court has personal jurisdiction over Defendants pursuant to NY CPLR 302(a)(3) because Defendants have committed torts of false designation of origin, unfair competition, trademark dilution, cybersquatting and deceptive trade practices without the state of New York, causing injury to Plaintiffs within the state of New York, including in this District.

28827/162/3557472

Defendants also regularly do or solicit business in the state of New York, including in this District, have engaged in a persistent course of conduct within the state of New York, including in this District, should reasonably expect their tortious acts herein to have consequences in the state of New York, including in this District, and claim to derive substantial revenue from interstate or international commerce.

42.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c).

## FACTS

### Lehman Brothers' Long Use of the LEHMAN Names and Marks

43.     Nearly 170 years before Defendants began their unlawful acts described herein, Lehman Brothers Holdings Inc. ("LBHI"), its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns (collectively, "Lehman Brothers") began using the LEHMAN Names and Marks in connection with a wide variety of financial services, including investment banking, equity and fixed-income trading, credit and lending, research, investment management and private banking services.

44.     Founded by brothers Henry, Emmanuel and Mayer Lehman in 1850, Lehman Brothers became a member of the New York Stock Exchange in 1887 and underwrote its first public offering in 1889.

45.     Beginning many decades ago and continuing to the present, Lehman Brothers consistently and continuously has presented the LEHMAN Names and Marks in a serif font identical or similar to the font shown below:

## LEHMAN BROTHERS

(the "Lehman Font").

46.     During the mid-1980s through the mid-1990s, when Lehman Brothers was owned by American Express, the firm used and was referred to by names and marks containing or comprising SHEARSON LEHMAN, including SHEARSON LEHMAN and SHEARSON LEHMAN BROTHERS (collectively, the "SHEARSON LEHMAN Names and Marks"), including in the following stylizations:

**SHEARSON LEHMAN BROTHERS**   

These stylizations are referred to as the "Shearson Lehman Stylizations," and include the SHEARSON LEHMAN Names and Marks presented in an all caps version of the Lehman Font with the "S" at the beginning of "Shearson" dipping below the rest of the mark and a line underneath the mark.

47.     During this time, Lehman Brothers owned several federal trademark registrations for the SHEARSON LEHMAN Names and Marks, including in Shearson Lehman Stylizations, in connection with various financial services, including as follows:

| Mark | Registration No. | Services | Registration Date |
|---|---|---|---|
| SHEARSON LEHMAN BROTHERS | 1417691 | 36: securities brokerage, financial and investment consulting, and investment banking services | November 18, 1986 |
| SHEARSON LEHMAN BROTHERS | 1714151 | 36: securities brokerage, financial and investment consulting, and investment banking services | September 8, 1992 |

| | | | |
|---|---|---|---|
| **SHEARSON LEHMAN BROTHERS** | 1714152 | 36: securities brokerage, financial and investment consulting, and investment banking services | September 8, 1992 |
| SHEARSON LEHMAN HUTTON | 1534622 | 36: securities brokerage, financial and investment consulting, and investment banking services | April 11, 1989 |

48.    American Express spun off Lehman Brothers in or about 1994 and Lehman Brothers resumed operations under the name and mark LEHMAN BROTHERS, including in the Lehman Font.

49.    By 2008, Lehman Brothers had become the fourth largest investment bank in the United States, with hundreds of billions of dollars' worth of assets under management and over 25,000 employees in offices worldwide, including at its headquarters in a then recently-built thirty-two story office building located 745 Seventh Avenue, New York, New York 10019, which prominently displayed the LEHMAN Names and Marks, including as shown in the images below:

 

50.    Like other major financial firms that invested heavily in subprime mortgage backed securities, Lehman Brothers began experiencing financial difficulties in 2007.  Unable to satisfy its obligations, LBHI filed for Chapter 11 bankruptcy protection on September 15, 2008.  Several

LBHI subsidiaries and affiliates, including its brokerage subsidiary Lehman Brothers Inc. ("LBI"), filed for bankruptcy protection later in 2008 and in 2009. The Lehman Brothers bankruptcy was and remains the largest bankruptcy in U.S. history.

51.     Plaintiff Barclays PLC (with its affiliates, including its ultimately wholly owned subsidiary Plaintiff Barclays Capital Inc., collectively, "Barclays") is one of the world's oldest and leading providers of financial and related services. Founded over 300 years ago, Barclays operates in dozens of countries, including in the United States since 1932, and engages in a wide range of financial services, including commercial and corporate banking, retail banking, credit and lending, investment banking, research, private banking, cash management, credit and debit cards and mortgage banking.

52.     Pursuant to an asset purchase agreement dated September 16, 2008 (the "APA"), Barclays purchased several of Lehman Brothers' businesses and other assets for approximately $1.3 billion. As part of the APA, Lehman Brothers assigned to Barclays all of Lehman Brothers' rights in the LEHMAN Names and Marks, including LEHMAN BROTHERS, all trademark applications and registrations therefor, and the goodwill associated therewith.

53.     Pursuant to the APA, as amended, Barclays granted Lehman Brothers a perpetual, worldwide, non-exclusive license to use the LEHMAN Names and Marks for any of Lehman Brothers' then-existing goods and services and in connection with Lehman Brothers' retained and continuing businesses and operations. Under the APA, all goodwill and consumer recognition arising from Lehman Brothers' use of the LEHMAN Names and Marks inures to Barclays' benefit.

54.     Since 2008, Lehman Brothers continuously and consistently has maintained its operations and engaged in myriad financial and business activities and transactions, all under the LEHMAN Names and Marks.

55.     When Lehman Brothers filed for bankruptcy, the financial institution held hundreds of billions of dollars' worth of assets.

56.     Since 2008, Lehman Brothers has invested in, improved, maintained, managed and sold its sizable assets, including billions of dollars' worth of commercial real estate properties and securities.

57.     Since 2008, Lehman Brothers also has engaged in trades pursuant to, and is settling its vast portfolio of, derivative swap agreements and managed and reported its bankruptcy plan, in addition to its general corporate operations.

58.     Since 2008, Lehman also has maintained and sold its interests in various commercial loans and private equity investments.

59.     Since 2008, Lehman Brothers also has maintained and defended numerous litigations.

60.     Since 2008, Lehman Brothers has continued to engage with clients, existing counterparties, market participants, creditors, employees and numerous others in business and financial transactions.

61.     The LEHMAN Names and Marks, including LEHMAN BROTHERS, have surrounded every aspect of these dealings.

62.     LBHI has employed numerous employees over the past 12 years and has maintained corporate headquarters in various offices in New York City.

63.     Beginning in or about 2009 and continuing through in or about 2017, LBHI maintained offices in the Time & Life Building, 1271 Avenue of the Americas, New York, New York 10020.  These offices contained reception areas featuring prominent signage branded with the LEHMAN BROTHERS name and logo.



64.     When members of the public telephoned LBHI at these offices, the receptionist identified the company as LEHMAN BROTHERS HOLDINGS.

65.     In connection with its continuing business, LBHI's employees have utilized business cards, stationery and other forms and documents that contain the LEHMAN BROTHERS name and mark, including as shown below:

 

66.     LBHI employees also have utilized and continue to utilize email addresses that end with the domain name @lehmanholdings.com and have used the LEHMAN BROTHERS name and in their email signature blocks.

67.     Some employees at LBHI have worn uniforms branded with the LEHMAN BROTHERS name and logo.  LBHI employees also have carried and sometimes have worn security identification badges branded with the LEHMAN BROTHERS name and logo.

68.     When engaging in business and financial transactions since 2008, LBHI employees have represented themselves as such and frequently have utilized the LEHMAN Names and Marks, including LEHMAN BROTHERS, in both written and oral communications, contracts and other business materials.

69.     Since 2008, Lehman Brothers has maintained filings with various regulatory agencies and the states of New York and Delaware.

70.     Through a third-party vendor, Lehman Brothers maintains websites that prominently and frequently utilize the LEHMAN Names and Marks, including LEHMAN BROTHERS, and provide information about Lehman Brothers' business dealings, including the status of assets, derivative swap settlements, litigations, the bankruptcy proceedings and payments to creditors.    The websites are located at   https://dm.epiq11.com/case/lehman/info   and https://dm.epiq11.com/case/lehmantrustee/info.

71.     LBI owns and utilizes the domain name LEHMANTRUSTEE.COM, which resolves to the LBI bankruptcy website and has been used since 2008 in connection with numerous bankruptcy-related documents and communications.

72.     LBHI emerged from bankruptcy in 2012 and continues many of its above-described operations and financial and business activities and transactions today, with dozens of employees at offices at 277 Park Avenue, 46th Floor, New York, New York 10017.

73.     LBHI just signed a new multi-year lease for office space at 110 East 42nd Street, New York, New York 10017, to begin on or about November 1, 2020.

74.     All of the goodwill and consumer recognition derived from Lehman Brothers' continued use of the LEHMAN Names and Marks inures to Barclays, as the owner and licensor of the names and marks.

**Barclays' Use of the LEHMAN Names and Marks**

75.     Lehman Brothers is not the only entity that legitimately, continuously and consistently has used the LEHMAN Names and Marks since 2008.

76.     Since 2008, Barclays itself has used the LEHMAN Names and Marks in connection with its own financial services.

77.     Although Barclays rebranded most of the assets it acquired from Lehman Brothers, including the LEHMAN-branded indices, until about early-2010, Barclays continued to operate and provide clients with access to LEHMAN LIVE, an online portal offering research, analytics and other reports, guides and materials across a broad range of Barclays' financial divisions, including equities, commodities, securitization and indices.

78.     Since 2008, Barclays has maintained, utilized, offered and distributed to its clients and others in the financial industry legacy LEHMAN BROTHERS research, analytics and other reports, guides and materials, including the well-known *Guide to the Lehman Brothers Global Family of Indices*, a singular "super index primer" guide to all of the indices transferred from Lehman Brothers to Barclays.

  

79.     Since 2008, Barclays continuously has maintained: (a) until in or about 2020, a website at www.lehman.com, which provided information about and links to LBHI's bankruptcy

website and websites related to other transferred Lehman Brothers businesses; (b) the Market Participant Identifier (MPID) code LEHM, short for LEHMAN, in connection with executing broker trades regulated by the Financial Industry Regulatory Authority (FINRA); and (c) domain name registrations worldwide for the LEHMAN Names and Marks;

80.     Since 2008, Barclays continuously has maintained numerous trademark registrations worldwide for the LEHMAN Names and Marks, including in major jurisdictions such as the European Union, China, Brazil, Canada, Hong Kong, Japan, the United Kingdom, the United Aram Emirates and India.  Attached hereto as **Exhibit 1** is a list of Barclays' current trademark registrations and applications worldwide for the LEHMAN Names and Marks, most of which date back to the 1990s.

81.     In or about December 2015, Barclays agreed to sell to Bloomberg LP Barclays' bond indices business known as Barclays Risk Analytics and Index Solutions Ltd. (BRAIS), an asset Barclays mostly acquired from Lehman Brothers.  Pursuant to that agreement, Barclays maintained ownership of the LEHMAN Names and Marks and licensed such marks to Bloomberg for use in connection with the bond index business, including in connection with Bloomberg's own use and distribution of legacy LEHMAN BROTHERS research materials.

82.     Since Barclays' acquisition of the LEHMAN Names and Marks, at least one third party has approached Barclays seeking to license the LEHMAN BROTHERS mark.

83.     Lehman Brothers previously was the owner of two federal trademark registrations for the mark LEHMAN BROTHERS, including one in the Lehman Font, as shown below:

| Mark | Registration No. | Services | Registration Date |
|---|---|---|---|
| LEHMAN BROTHERS | 1717171 | 36: securities brokerage services; investment consulting services; investment banking services; and merchant banking services | September 15, 1992 |
| LEHMAN BROTHERS | 1755687 | 36: securities brokerage services; investment consulting services; investment banking services; and merchant banking services | March 02, 1993 |

(the "Prior LEHMAN BROTHERS Registrations").  Attached hereto as **Exhibit 2** are the official United States Patent and Trademark Office ("USPTO") status records for the Prior LEHMAN BROTHERS Registrations.  Barclays acquired the Prior LEHMAN BROTHERS Registrations in 2008 pursuant to the APA.

84.     Although the Prior LEHMAN BROTHERS Registrations lapsed due to oversight, on October 2, 2013, Barclays filed with the USPTO new Application Serial No. 86081143 to register the mark LEHMAN BROTHERS for "Securities brokerage services; investment consulting services; investment banking services; merchant banking services; financial and investment management services; financial planning and investment advisory services; financial research services; administration and valuation of financial investments; financial sponsorship of sporting, charitable and educational events; providing consultancy, information and advisory services relating to all the foregoing" in International Class 36 (the "New LEHMAN BROTHERS Application").

85.    Barclays overcame the USPTO's surname refusal under Section 2(e) of the Lanham Act, 15 U.S.C. § 1052(e), regarding the New LEHMAN BROTHERS Application, by establishing that the LEHMAN BROTHERS mark had significant acquired distinctiveness and consumer recognition as the source of financial services.

86.    The USPTO recently rejected a third-party challenge to the New LEHMAN BROTHERS Application and to Barclays' rights in the LEHMAN BROTHERS mark, finding:

> Barclays has common law rights in the LEHMAN BROTHERS trademark and tradename [which are] still being used [pursuant to license] in connection with activities pertaining to winding down [Lehman Brothers] . . . . Moreover, in view of the well-known reputation established in LEHMAN BROTHERS by Barclays' predecessor, the more likely a sufficient residual goodwill remains in the LEHMAN BROTHERS trademark, especially when Barclays' acts have not been of such character as to cause the mark to lose its significance as an indication of origin.  In view of the foregoing, we find that LEHMAN BROTHERS continues to function as a mark for Barclays.

Attached hereto as **Exhibit 3** is a copy of the USPTO's opinion.

**The LEHMAN Names and Marks Have Long Been and Still Are Famous**

87.    As a result of Leman Brothers' long-term, wide-spread and exclusive use and promotion of the LEHMAN Names and Marks in connection with a broad range of financial services, the LEHMAN Names and Marks had developed substantial public recognition among members of the consuming public and had become some of the most famous monikers among the general public in connection with financial services well prior to the early 2000s.

88.    Between 1850 and mid-2008, Lehman Brothers and its financial and other services offered under the LEHMAN Names and Marks were the subject of significant unsolicited media attention.  During this time period, various media organizations, including such prominent and widely circulated publications as *The New York Times* and *The Wall Street Journal*, published thousands of news articles about Lehman Brothers.  These articles detail numerous financial

-24-

services provided by Lehman Brothers under the LEHMAN Names and Marks.  Articles dating back as early as 1895 refer to Lehman Brothers as a "prominent" financial services firm.  A February 17, 1897 article from *The New York Times* referred to Lehman Brothers as "one of the wealthiest and best-known firms in the trade."  An August 3, 1913 article in *The New York Times* referred to Lehman Brothers as "one of New York's largest private banking firms."

89.   While the LEHMAN Names and Marks had been the subject of significant long-term and wide-spread media coverage during Lehman Brothers' first one-hundred and fifty-eight years of providing financial services, Lehman Brothers' financial troubles in 2007 through 2008, which culminated in its filing for the largest bankruptcy in U.S. history and selling much of its U.S. investment banking businesses to Barclays, exponentially heightened Lehman Brothers' presence in the media and recognition among consumers.

90.   During 2007-2008, a staggering number of news articles concerning Lehman Brothers and its services, financial difficulties, bankruptcy and asset sale to Barclays appeared in such highly-regarded and widely-circulated media outlets such as *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune*.  For significant periods of time, articles concerning Lehman Brothers and its financial services appeared on the front pages of these publications.

91.   Lehman Brothers' business operations, financial transactions, derivative swap deals, asset management and sales, payments to creditors, bankruptcy plans and reporting and litigations frequently have been reported in the media since 2008.  Thousands of articles concerning these topics have appeared in prominent and widely circulated media publications such as *The Wall Street Journal*, *The New York Times*, *The Washington Post*, *Bloomberg Businessweek*, *Fortune*, *CNN*, *The Los Angeles Times* and *The Chicago Tribune*.

28827/162/3557472

92.     For example, a July 12, 2012 article in *Bloomberg Businessweek* reported:

Today the offices of Lehman Brothers are tucked away on two floors in the Time & Life Building, half a block away, where about 430 workers labor to unwind derivatives trades and sell illiquid assets . . . . While Lehman Brothers' bankruptcy filing—the largest ever in the U.S.—froze credit markets and plunged the economy into the deepest slump since the Great Depression, it didn't kill the company.

Attached hereto as **Exhibit 4** is a copy of this article.

93.     On September 21, 2012, *Bloomberg BusinessWeek* published an article entitled "Welcome to Lehman Brothers. We're Open for Business," noting that Lehman Brothers "is an operating company" with "deals to do." The article noted that Lehman Brothers "still controls tens of billions in assets, and if you would like to purchase any of it—a real estate property, say, or part of a private equity deal—its lawyers and traders will gladly take your business." The article also described the conditions observed at Lehman Brothers' then New York offices:

Lehman occupies one-and-a-half nondescript floors of the skyscraper, looking more or less like any other investment bank, minus some of the polish and most of the bustle. Employees work in Excel spreadsheets on dual monitors. Cubicles and offices are decorated with sports memorabilia, children's artwork, and the odd bit of gallows humor . . . . Private equity staffers, seen huddling in a conference room, have a portfolio of 200 investments to manage. The real estate team tracks Lehman's $10 billion worth of properties around the world. On Wednesday, Bloomberg reported that the company sold its interest in eight Texas office buildings. In August, it filed papers to take its largest asset, the apartment building colossus Archstone, public. The derivatives group works at unpacking a tangle of 8,000 contracts with 6,500 counterparties—a collection that once held a notional value of $39 trillion. The work is so complicated that at its peak, this was the bankrupt bank's largest division, with 250 employees.

Attached hereto as **Exhibit 5** is a copy of this article.

94.     On September 11, 2012, *The New York Times* published an article that begins:

Lehman Brothers is having a great year. The bank, which almost destroyed the global economy four years ago this week, recently emerged from bankruptcy, resolved a third of its debts and executed the largest U.S. real estate deal of the year. Today, the company appears an awful lot like a normal investment bank. Its trading floor — on one of the two floors Lehman occupies in the Time & Life Building in Midtown Manhattan — is filled with dozens of young people who stare at financial

-26-

graphs on Bloomberg terminals and talk in the hallways about the deals they're working on.

Attached hereto as **Exhibit 6** is a copy of this article.

95.     A September 16, 2013 article from *CNN Money* reported that "Lehman Brothers is still big," and similarly detailed Lehman Brothers' continued operations and business dealings. Attached hereto as **Exhibit 7** is a copy of this article.

96.     On September 30, 2014, *The New York Times* published an article on the front page of its Business section entitled "Revisiting the Lehman Brothers Bailout That Never Was," which chronicled Lehman Brothers' financial services, economic difficulties, bankruptcy and continued operations.  Attached hereto as **Exhibit 8** is a copy of this article.

97.     On September 18, 2015, *Fortune* published an article entitled "Here are the crazy stocks Lehman Brothers is still trading," which detailed Lehman Brothers' management and sales of significant equities holdings over the past years and also included a photo of Lehman Brothers' then New York headquarters.  Attached hereto as **Exhibit 9** is a copy of this article.

98.     Numerous articles about Lehman Brothers and its business and financial dealings still appear in many prominent and widely circulated media publications to this day.

99.     Millions of webpages reference Lehman Brothers and the LEHMAN Names and Marks, many of which webpages are devoted specifically to detailing Lehman Brothers' financial services, bankruptcy and history.  These webpages derive from popular websites such as those maintained by Wikipedia, Investopedia, Bloomberg and Harvard University.

100.    On LinkedIn, approximately 50,000 employee pages have listed Lehman Brothers in their employment history.

101.    A search of YouTube for "Lehman Brothers" has yielded over 44,000 videos that have been viewed by millions of people.

102.   Lexis-Nexis news database searches similarly have yielded many thousands of articles since 2008 concerning Lehman Brothers and its continued operations.

103.   Harvard Business School maintains the "Lehman Brothers Collection" as part of its permanent Contemporary Business Archives.  The collection consists of company business records and deal books, which document many of Lehman Brothers' investment projects from the 1920s to the 1980s.  Harvard describes the collection as "an important resource for the study of modern business history and provides scholars with a rare opportunity to access twentieth-century corporate records."

104.   Lehman Brothers and its financial services, business dealings, financial troubles and bankruptcy also have been the subject of several recent major films, television shows and plays, including: *Inside Job* (Sony Pictures Classics, 2010), which won an Academy Award for Best Documentary; *The Last Days of Lehman Brothers* (BBC/CNBC 2010);  *Too Big to Fail* (HBO 2011); *Margin Call* (Lionsgate 2011), which portrayed a fictionalized Wall Street firm based on and likened in the press to Lehman Brothers; *The Case Against Lehman Brothers* (CBS 60 Minutes 2012); *The Big Short* (Paramount, 2015), which was nominated for a 2016 Academy Award for Best Picture and won a 2016 Academy Award for Best Adapted Screenplay; and the recent off-Broadway play, *The Lehman Trilogy*, which was slated to open on Broadway in March 2020, but postponed its opening due to mandatory COVID-19 theatre closures in New York City.

105.   Since 2008, numerous books have been written about Lehman Brothers, including: *The Murder of Lehman Brothers, An Insider's Look at the Global Meltdown* (2009); *Lehman Brothers' Dance with Delusion: Wrestling Wall Street* (2010); *Lehman Brothers: Politics, Law & Business* (2010); *The Devil's Casino: Friendship, Betrayal, and the High Stakes Games Played Inside Lehman Brothers* (2011); *Street Freak: Money and Madness at Lehman Brothers* (2011);

*The Last of the Imperious Rich: Lehman Brothers, 1844-2008* (2012); and *Gorillas, markets and the search for economic values - Rethinking Lehman Brothers and the Global Financial Crises. A Nyenrode Perspective* (2013).

106.    Lehman Brothers consistently has been parodied in various media since 2008.  For example, a 2009 Black Eyed Peas lyric states: "Imma be a brother, but my name ain't Lehman." In the 2010 film *Despicable Me*, the lead character visits a bank for super-villains named the "Bank of Evil."  As he enters the bank, above the doors and beneath the name of the bank hangs a sign that states: "FORMERLY LEHMAN BROTHERS."  In 2012, a YouTube user published a video entitled "Lehman in too Deep (We could have had a bail-out)," set to the music of and sung in the style of Adele's "Rolling In The Deep," which satires Lehman Brothers' pre-bankruptcy business dealings and financial troubles.  In the 2016 animated film *Zootopia*, the primary characters visit the "Lemming Brothers Bank."  And the 2019 Showtime series *Black Monday* presented as recurring characters two fictional identical twin "Lehman" brothers, who head the real investment firm in the fictional series.

107.    Consumer recognition today of the LEHMAN Names and Marks, including LEHMAN BROTHERS, in connection with financial services is just as strong as (or even stronger than) it was at the time of the Lehman Brothers bankruptcy, when the firm was one of the largest financial institutions in the world.  The LEHMAN Names and Marks, which still are legitimately used today, are still famous among the general consuming public and operate as unique source identifiers associated with Barclays and its licensee Lehman Brothers.

108.    Moreover, the LEHMAN Names and Marks have been famous since long before Defendants began their unlawful activities as described herein.

109.    Even if Lehman Brothers and Barclays had not continuously and consistently used the LEHMAN Names and Marks since 2008, given the long-term and wide-spread use and promotion of the names and marks for over 150 years, culminating with the then-largest bankruptcy filing in U.S. history, the names and marks still would be famous to consumers and possess significant residual goodwill and serve as unique source identifiers in connection with financial services.

**Barclays' Protection of the LEHMAN Names and Marks**

110.    Because of the continuing world-wide fame and consumer recognition in the LEHMAN Names and Marks, various third parties have sought to unlawfully misappropriate the monikers to create a false connection with Lehman Brothers and/or sought to deprive Barclays of its legal right in such names and marks.  In response to these unlawful acts, Barclays has taken firm action to protect the LEHMAN Names and Mark and to avoid consumer confusion.

111.    For example, seeking to take a free-ride on the fame of the LEHMAN Names and Marks, third party Tiger Lily Ventures Ltd. ("Tiger Lily") filed in the USPTO Application Serial Nos. 85868892 and 86298069 to register the mark LEHMAN BROTHERS in connection with "Beer" in International Class 32, "Spirits" in International Class 33 and "Bar services; Restaurant services" in International Class 43 ("Tiger Lily's Applications").

112.    The USPTO twice rejected Application Serial Nos 85868892 (which Tiger Lily filed a year before filing Application Serial No. 86298069), finding the mark would falsely suggest a connection with the financial institution Lehman Brothers in violation of Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).  The USPTO specifically found:

> In this case, the applied-for mark 'LEHMAN BROTHERS' appears in the identical spelling as the mark 'Lehman Brothers' used by the investment firm.  Therefore, the applied-for mark would be uniquely and unmistakably recognized by consumers to refer to the former investment firm.  Although the investment firm

> did not distribute or produce beer or spirits, the institution associated with the 'Lehman Brothers' name is so famous that a connection to the firm would be presumed if the applicant were to use the mark in connection with its goods . . . . [T]he fact that Lehman Brothers has declared bankruptcy does not diminish the connection drawn to the investment firm . . . .

Attached hereto as **Exhibit 10** are copies of the USPTO's office actions initially refusing to register Tiger Lily's Application Serial No. 85868892 for the mark LEHMAN BROTHERS.

113.    After the USPTO eventually allowed Tiger Lily's Applications to proceed to publication, Barclays filed in the USPTO's Trademark Trial and Appeal Board ("TTAB") Opposition Nos. 91219477 (Parent) and 91219478 against both of Tiger Lily's Applications, including based on likelihood of confusion under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

114.    On or about September 30, 2020, the TTAB issued final judgement in favor of Barclays, rejecting the Tiger Lily Applications.  Finding Tiger Lily's Applications were likely to cause confusion with the LEHMAN BROTHERS mark, the TTAB held that: (1) Barclays had continuing common law rights in the LEHMAN BROTHERS mark, including based on Lehman Brothers' continued use of the mark since 2008 as Barclays' licensee; and (2) "LEHMAN BROTHERS is still sufficiently known . . . such that Tiger Lily's use of LEHMAN BROTHERS would lead to a presumption that Barclays and Tiger Lily are somehow connected."  *See* Exhibit 3 hereto.

115.    The LEHMAN Names and Marks, including LEHMAN BROTHERS, are so well-known that the dispute with Tiger Lily has been the subject of several news articles, including a February 8, 2016, article on the front page of *The Wall Street Journal*.

116.    On or about November 11, 2014, third party Trademarkers N.V. filed a revocation proceeding against Barclays' European Trademark No. 83261 for Barclays' registered LEHMAN BROTHERS mark in the European Union Intellectual Property Office ("EUIPO") based on alleged abandonment.

-31-

117.    On or about September 30, 2016, the EUIPO denied the revocation against the

LEHMAN BROTHERS mark in Class 36 for "Financial services; securities brokerage services;

investment consulting services; investment banking services; merchant banking services,"

maintaining the registration for those services.  Finding "that genuine use was shown for all the

services in Class 36," the Cancellation Division of the EUIPO held:

> The evidence filed not only proves that LBIE traded during the relevant period
> being in administration. It also shows that for every category of services in this
> class - financial services; securities brokerage services; investment consulting
> services; investment banking services; merchant banking services - (which actually
> overlap) the sign LEHMAN BROTHERS was genuinely used. It has been proved
> that the LEHMAN BROTHERS sign was used in connection with recovering and
> returning trust property, admitting unsecured creditor's claims and making
> distribution to creditors, recovering and/or realising House Assets on a managed
> basis, derivatives, financial transactions, prime brokerage accounts, securities
> trading and exchange traded derivatives etc. (e.g. the Administrators' report under
> VGM4) which are included in the listed services above and are generally classified
> as financial services and, as a subcategory, investment services.

Attached hereto as **Exhibit 11** is copy of the EUIPO's opinion.

118.    On or about September 5, 2017, Barclays filed oppositions in the Portuguese

Institute of Industrial Property ("INPI") against applications to register the marks LEHMAN

BROTHERS ASSET MANAGEMENT (Portugal Application No. 578171) and LEHMAN

BROTHERS ENCORE (Portugal Application No. 578166), both filed by third party Fashion

International Limited ("Fashion International") for financial services in International Class 36.  In

both instances, the INPI issued decisions affirming Barclays' rights to the LEHMAN BROTHERS

name and mark and sustaining the oppositions.  Attached hereto as **Exhibit 12** are copies of the

INPI's opinions with certified translations.

119.    On or about February 20, 2018, Barclays filed an opposition in the United Kingdom

Intellectual Property Office ("UKIPO") against an application to register the mark LEHMAN

BROTHERS ENCORE filed by Fashion International for services in International Classes 38 and

28827/162/3557472

43 (UK Application No. 3252222).  Fashion International failed to file its counterstatement to that opposition and, on or about May 8, 2018, and May 30, 2018, the UKIPO sustained the opposition as conceded.  Attached hereto as **Exhibit 13** are copies of the UKIPO's decisions.

120.    On or about January 29, 2018, Barclays filed an opposition in the Benelux Office for Intellectual Property ("BOIP") against an application to register the mark LEHMAN BROTHERS ASSET MANAGEMENT, filed by third party CKL Holdings N.V. ("CKL") for services in International Classes 35, 36, and 38 (Benelux Application No. 1359661). The application proceeded to registration after CKL deleted International Class 36 (financial services) from the application, but Barclays filed an application to invalidate the registration on or about May 13, 2020.  To date, Barclays continues its prosecution of that invalidation proceeding, which remains pending before the BOIP.

121.    On or about October 29, 2018, Barclays field an opposition in the Mexican Institute of Industrial Property ("MIIP") against an application to register the mark LEHMAN BROTHERS for financial services in International Class 36 (Mexico Application No. 2100116), filed by third party Carlos Megias ("Megias"), and later assigned to Marcelino Garcia Flores in an attempt to avoid liability after Barclays sent a cease and desist letter to Megias, a resident of Florida.

122.    On or about August 26, 2020, the MIIP sustained the opposition and refused to register the third-party application, finding:

> as is apparent from the proposed symbol, it consists of the name LEHMAN BROTHERS, that is, identical to the name of the financial institution LEHMAN BROTHERS founded by the Lehman brothers in 1850 in the United States and which in 2008 was purchased by the BARCLAYS CAPITAL, INC. company; In such a way, the inappropriateness of the registration is evident, since MARCELINO GARCIA FLORES is a person who does not have the corresponding rights for its legal use, since its symbol is likely to mislead or induce the public to make a mistake by constituting false indications as to the business origin of the services intended, consisting precisely of financial matters,

Attached hereto as **Exhibit 14** is a copy of the MIIP's opinion with a certified translation.

**Defendant Sklarov's History of Criminal and Alleged Civil Fraud**

123.    Defendant Sklarov is a convicted criminal, who served time in federal prison after pleading guilty to felony charges of fraud.  Attached hereto as **Exhibit 15** is a copy of the docket sheet for *USA v. Sklarov, et al.*, 97-cr-00176 (DJL) (W.D. Pa.).

124.    Sklarov also has been sued by multiple parties for civil fraud in connection with the purported offering of securities-backed loans.

125.    Although Sklarov has used various shell companies to perpetuate each alleged fraud, the fact patterns underlying each of the schemes are nearly identical: a Sklarov-related entity promises to provide a loan to a borrower backed by securities owned by the borrower; the borrower pledges the shares as collateral to the Sklarov-controlled entity; the Sklarov-controlled entity provides little if any of the promised loan funds to the borrower and then sells or attempts to sell the shares proffered only as collateral, and retains the proceeds.

126.    For example, in *Satterfield v. VStock Transfer*, Index No. 650311/2019 (Sup. Ct., N.Y. County), Brent Satterfield ("Satterfield") filed suit for fraud against Sklarov, his companies America 2030 Capital, LLC ("America 2030"), America 2030 Capital Ltd. ("America 2030 Ltd.") and Bentley Rothschild Capital Ltd. Corp. ("Bentley Rothschild"), and an unaffiliated broker, VStock Transfer LLC ("VStock").

127.    Satterfield alleged that, after he pledged 2 million shares of stock in Co-Diagnostics, Inc. as collateral for a $3.5 million loan, Sklarov and his related entities: began selling Satterfield's stock collateral before Satterfield received the loan; realized over $1.1 million from selling Satterfield's shares; provided to Satterfield less than $67,000 of the promised loan; and demanded more shares as collateral once the shares had decreased in value due to Sklarov's premature "dumping" of the shares.

128.    The *Satterfield* complaint further details legal proceedings in Hong Kong, Singapore and the United Kingdom, in which proceedings Sklarov allegedly perpetrated similar fraudulent securities-backed loan schemes.  Attached hereto as **Exhibit 16** is copy of the complaint in *Satterfield*.

129.    The *Satterfield* Court issued temporary restraining orders enjoining the transfer agent, America 2030 and/or Bentley Rothschild, were "from selling, transferring, assigning, encumbering or otherwise disposing of any shares of Co-Diagnostics, Inc."  Attached hereto as **Exhibit 17** are copies of the temporary restraining orders issued by the *Satterfield* Court.

130.    Despite the temporary restraining orders, Sklarov and his companies later allegedly attempted to dispose or transfer shares of the Satterfield's stock.   In granting a preliminary injunction against Sklarov and his companies and finding irreparable harm, the *Satterfield* Court found: "informing this Court's decision is the possibility that someone is not just threatening to do, but actually violating this Court's order and actually doing the thing that the plaintiff is asking them to not do."  Attached hereto as **Exhibit 18** are copies of the transcript on the hearing on the motion for preliminary junction and the Court's preliminary injunction order in the *Satterfield* case.

131.    In ruling on subsequent motions, the *Satterfield* Court found that Sklarov and his companies had engaged in actions that evidenced a fraudulent scheme: "[d]ocumentary evidence corroborates that the [stock loan agreement] was amended to avoid the SEC's jurisdiction over the shares and transactions here which evidences a fraudulent scheme;" "the court finds that the second addendum signed by Satterfield containing the St. Kitts & Nevis arbitration provision was permeated with fraud."  Attached hereto as **Exhibit 19** are copies of these decisions in *Satterfield*.

132.   In one of those decision, the *Satterfield* Court found it had personal jurisdiction over Sklarov acting as a principal through his corporate agents: "[t]he record indicates either explicitly or implicitly that Sklarov controls [America 2030] because he is the only individual directing the LLC's activities."  The Court additionally found that it had jurisdiction over Bentley Rothschild, a St. Kitts & Nevis corporation, because it allegedly conspired with America 2030 and Sklarov to commit torts in New York.

133.   Upon information and belief, the *Satterfield* litigation currently is stayed pending arbitration in New York.

134.   In *Two Rivers Water & Farming Co. v. America 2030 Capital Limited et al.*, No. 19-cv-1640 (D. Col.), Two Rivers Water & Farming Company ("TRWF") alleged that Sklarov's companies, America 2030 Ltd. and Bentley Rothschild Capital Limited, agreed to lend TRWF $1.1 million secured by 6.8 million shares of stock, that TRWF transferred the shares to Sklarov's companies, that the companies did not provide TRWF the loan and then the companies sought to remove the restricted legends on the stock certificates to prepare their liquidation.

135.   The Court issued two temporary restraining orders enjoining the removal of the restricted legend on the shares.  Finding that TRWF was likely to succeed on the merits of its fraud claims, the Court held it was likely that the "that [the loan] contract is void and unenforceable [as] procured through fraud" and that TRWF was a victim of "unfair trade practices."  Attached hereto as **Exhibit 20** are copies of the *Two Rivers Water & Farming* Court's temporary restraining orders. The Court eventually converted its temporary restraining orders into a preliminary injunction.

136.   In *America 2030 Capital Limited v. Prescient Investment Limited*, Case No. 1:18-cv-04875-AT (N.D. Ga.), a Sklarov-controlled company, America 2030 Ltd., filed suit against Prescient Investment Limited ("Prescient") and Maximum Success Capital Partners Brokerage

Ltd. ("Maximum Success") for breach of contract and related claims, alleging that Prescient executed a loan agreement for $117 million whereby Prescient was required to pledge as collateral $200 million in stocks.

137.    In response, Prescient claimed that, before the loan was made, America 2030 Ltd., through Sklarov, ordered a broker to sell shares deposited with Maximum Success and to place the proceeds in a brokerage account owned by America 2030 Ltd. and later to an America 2030 Ltd. bank account.

138.    Upon information and belief, Prescient received an interlocutory injunction from a Hong Kong Court to prevent Maximum Success from disposing of the shares, and Sklarov, through America 2030 Ltd., filed the federal lawsuit to harass Prescient and Maximum Success and avoid his legal obligations and the Hong Kong injunction.  Maximum Success moved to dismiss the complaint and moved for sanctions against America 2030 Ltd. and its counsel.

139.    In response to Maximum Success's motion to dismiss and for sanctions, the parties entered into a consent order, whereby the Court dismissed with prejudice America 2030 Ltd.'s claims against Maximum Success and granted in part Maximum Success's motion for sanctions. The Consent Order is signed by Sklarov as "Officer of Plaintiff America 2030 . . . Limited, and of Plaintiff's Affiliates, on behalf of himself personally and those entities."  Attached hereto as **Exhibit 21** is a copy of the Consent order.

140.    In support of the consent order, the parties jointly submitted a memorandum, which stated that "[t]he Plaintiff and the lender are both controlled by Val Sklarov . . . as part of the America 2030 group of companies. . . .  He signed the loan documents . . . and controls this litigation."  Attached hereto as **Exhibit 22** is a copy of that memorandum.

-37-

141.    In *Fortunate Drift Ltd. v. America 2030 Capital, LLC*, Index No. 652158/2018 (Sup. Ct., N.Y. County), Fortunate Drift Limited ("FDL") and Yangtze River Port and Logistics Limited ("YRIV") filed suit for fraud against America 2030 and third party broker VStock.  FDL, an investment company that was one of the largest YRIV shareholders, alleged that America 2030 agreed to lend FDL $8 million secured by 2 million shares in YRIV.  FDL averred that it pledged the shares to America 2030, but America 2030 did not provide the promised loan.  FDL then cancelled the loan agreement.  America 2030, however, then asked YRIV's agent, VStock, to transfer the shares to America 2030's account so America 2030 could sell them to third parties, causing YRIV's stock price to drop.  Attached hereto as **Exhibit 23** is a copy of the verified petition in the *Fortunate Drift Ltd.* action.

142.    FDL sought a preliminary injunction and temporary restraining order to prevent America 2030, VStock and related individuals and entities from disposing of the shares pending determination of an arbitration before the Hong Kong International Arbitration Center concerning the parties' dispute.

143.    The parties later entered into a Stipulation of Settlement whereby America 2030 and VStock agreed that America 2030 and VStock would not to dispose of YRIV shares pending the remainder of a 30-day contractual settlement negotiation period, or, should such negotiations be unsuccessful, a Hong Kong arbitration.  Attached hereto as **Exhibit 24** is a copy of that Stipulation.

**The *Rothschild* Trademark Injunction against Sklarov and Black Rock**

144.    As noted above, in connection with some of his alleged fraudulent securities-backed loan schemes, Sklarov has acted through companies using names and marks containing or comprising ROTHSCHILD, including the corporate names "Bentley Rothschild Capital Limited"

and "Bentley Rothschild Financial LLC," the domain name bentleyrothschild.com (and the corresponding website www.bentleyrothschild.com) and the mark BENTLEY ROTHSCHILD (the "Bentley Rothschild Marks").

145.    Upon information and belief, names and marks containing or comprising ROTHSCHILD (the "ROTHSCHILD Marks") have been used for over 200 years by financial services firms associated with or traced back to the famous European Rothschild banking family (collectively, the "Rothschild Companies").

146.    Upon information and belief, Sklarov and his companies are not affiliated in any manner with the Rothschild Companies.

147.    After learning of Sklarov's use of the Bentley Rothschild Marks in connection with allegedly fraudulent financial services, several of the Rothschild Companies sued Sklarov, Black Rock and four other companies controlled by Sklarov for *inter alia* trademark infringement, trademark dilution, unfair competition and deceptive trade practices under federal and state law. Attached hereto as **Exhibit 25** is a copy of the complaint (without exhibits) in *Rothschild & Co Continuation Holdings A.G. v. Sklarov*, 19-cv-03561 (N.D. Ga.).

148.    Among other things, the Rothschild Companies alleged that Sklarov and his companies were: (1) offering purported financial services, including securities-backed loans, using the intentionally confusingly similar Bentley Rothschild Marks; and (2) making explicitly and/or impliedly false representations in marketing materials that Sklarov and his companies were affiliated or associated with the legitimate Rothschild Companies.

149.    For example, a purported term sheet for securities backed loans offered by the purported "Bentley Rothschild," stated:

> Rothschild family started offering securitized financing in the early part of the 19th century.  Bentley Rothschild Capital Limited is honored to continue to engage in

the tradition of global finance by offering loans against publicly traded securities for our high-net worth clients located throughout the world.  Our service is as exceptional now as it has been by the Rothschild dynasty during the past 250 years.

Attached hereto as **Exhibit 26** is a copy of the term sheet.

150.    The term sheet also listed in its copyright notice: "Rothschild Family of Companies ©1986-2019 All Rights Reserved."  Upon information and belief, the Rothschild Companies went public and reorganized under the name Rothschild & Cie in 1986, the first year in the copyright notice listed on the "Bentley Rothschild" term sheet.

151.    Upon information and belief, Sklarov made these false and misleading statements and used the Bentley Rothschild Marks with intent to usurp the goodwill and consumer recognition in the ROTHSCHILD Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Sklarov and his companies are somehow affiliated or associated with the Rothschild Companies and/or its services, and/or the ROTHSCHILD Marks.

152.    Upon information and belief, in furtherance of his scheme to impersonate the Rothschild Companies, Sklarov instructed Defendant Singh to file (through Sklarov's foreign shell company Black Rock) USPTO Application Serial No. 88457938 to register the mark BENTLEY ROTHSCHILD for various financial services in International Class 36 (the "BENTLEY ROTHSCHILD Application").

153.    Upon information and belief, when filing the BENTLEY ROTHSCHILD Application, Sklarov, Black Rock and Singh copied and pasted therein the description of financial services as set forth exactly in the legitimate Rothschild Companies Trademark Registration No. 3447667 for the mark ROTHSCHILD, and merely added "stock loans," to create the false impression that the BENTLEY ROTHSCHILD Application was connected with the legitimate trademark registration owned by the Rothschild Companies.

154.    After the Rothschild Companies filed their complaint and their motion for a preliminary injunction, upon information and belief, Sklarov instructed Singh to file (through Sklarov's foreign shell company Lincoln) new USPTO Application Serial No. 88568356 for the mark MAYER AMSCHEL ROTHSCHILD CAPITAL for various financial services in International Class 36 (the "MAYER AMSCHEL ROTHSCHILD Application").

155.    Upon information and belief, MAYER AMSCHEL ROTHSCHILD is the name of the founder of the Rothschild banking dynasty that now does business as the Rothschild Companies under the ROTHSCHILD Marks.

156.    Upon information and belief, Sklarov, Lincoln and Singh filed the MAYER AMSCHEL ROTHSCHILD Application to usurp the goodwill and consumer recognition in the ROTHSCHILD Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Sklarov and his companies are somehow affiliated or associated with the Rothschild Companies and/or its services, and/or the ROTHSCHILD Marks.

157.    During the hearing on the Rothschild Companies' motion for a preliminary injunction, the Court directly questioned Singh about his filing of the MAYER AMSCHEL ROTHSCHILD Application—especially since the mark in the application contained the exact name of the founder of the Rothschild Companies and the application was filed well after the Rothschild Companies had sent several demand letters, filed their complaint and sought preliminary injunctive relief.  Singh responded:

> With regards to what is in the application, it was asked by the company for me to put it that way.  I did advise them against it.  They wanted to continue forward with the language that is in there.  So therefore it was submitted.  However, after the fact, I do believe the company is looking to actually withdraw those applications. And it just hasn't been proceeded by my office yet.  But they are looking to withdraw those applications.

158.    Upon information and belief, neither Sklarov, Singh, Black Rock nor Singh expressly withdrew the MAYER AMSCHEL ROTHSCHILD Application or the BENTLEY ROTHSCHILD Application.  Instead, the USPTO rejected both applications, finding such marks were likely to cause confusion with the Rothschild Companies' registered ROTHSCHILD Marks. The USPTO also found registration of the mark MAYER AMSCHEL ROTHSCHILD would falsely suggest a connection with the founder of the Rothschild Companies.  Attached hereto as **Exhibit 27** are copies of these office actions.

159.    The Court in the *Rothschild* litigation granted the Rothschild Companies' motion for a preliminary injunction, enjoining Sklarov's and his companies' and agents' use and registration of names, marks and domain names containing or comprising ROTHSCHILD. Attached hereto as **Exhibit 28** is a copy of the Court's Preliminary Injunction Order and Memorandum in the *Rothschild* litigation.

160.    Finding that the Rothschild Companies were likely to succeed on the merits of their trademark infringement and related claims, the Court found:

> substantial evidence in the record that Defendants Sklarov [and related entities] deliberately adopted and used the 'Bentley Rothschild' mark in order to profit from the substantial goodwill Plaintiffs have created in the ROTHSCHILD Marks . . . . [s]uch deliberately infringing conduct creates a substantial likelihood of confusion, tarnishment of the ROTHSCHILD Marks, and harm to Plaintiffs."

161.    The Court further found that "[i]rreparable injury and tarnishment also arise from the number of lawsuits charging Bentley Rothschild entities with allegedly having participated in stock loan fraud. . . . The risk of tarnishment of the 'Rothschild' name caused by association with allegations of fraud cannot be fully compensated for by money damages."

162.    Over the objections of Sklarov and his companies, the Court held the injunction should apply extraterritorially, including over Black Rock, which is a Bahamian company.  The Court found that such extraterritorial relief was available under the Lanham Act because Sklarov,

-42-

a participant in all acts of infringement, resided in the United States, and two U.S.-based Bentley Rothschild entities operated in conjunction with the foreign-based Bentley Rothschild entity; the Rothschild Companies sufficiently alleged that the Sklarov's and his shell companies' extraterritorial actions had a substantial impact on domestic commerce; and applying the injunction extraterritorially would not affect another country's sovereignty.  The Court further held that the Rothschild Companies' irreparable injury could only be stopped by an extraterritorial injunction.

163.    The Court also denied Black Rock's motion to dismiss for lack of personal jurisdiction, finding sufficient the Rothschild Companies' allegations that Black Rock transacted business in the state of Georgia.

164.    After the Court issued its preliminary injunction order, Sklarov, Black Rock and his other shell companies entered into a Consent Order for Permanent Injunction permanently enjoining their use of the ROTHSCHILD Marks.  Attached hereto as **Exhibit 29** is a copy of that Consent Order.

**Defendants' Unlawful Use of the LEHMAN Names and Marks**

165.    Undeterred by the injunctions in the *Rothschild* litigation and other civil fraud actions, Sklarov and his shell companies, along with Defendants Singh and Qureishi, are engaging in nearly identical unlawful activities in connection with the purported offering of securities-backed loans—this time using names and marks that are confusingly similar to, dilutive of and create a false association with the LEHMAN Names and Marks.

166.    Defendants have used in commerce in connection with purported financial services the Infringing Names and Marks, including: "LEHMAN BORTHERS," "SHEARSON LEHMAN BROTHERS," "SHEARSON LEHMAN," "SHEARSON LEHMAN BROTHERS

-43-

INVESTMENT BANKING," "SHEARSON LEHMAN INVESTMENT BANKING" and the domain name <shearsonlehmanbrothers.com>.

167.    Upon information and belief, Sklarov, either directly, or through one or more companies he directs and controls, registered the domain name <shearsonlehmanbrothers.com> in or about June 2019.  Upon information and belief, Sklarov utilized Domains By Proxy, LLC, a proxy service, to mask the true identity and contact information of the owner of the domain name in an effort to prevent discovery of his unlawful acts.  Attached hereto as **Exhibit 30** is a copy of the WhoIs records for the domain name <shearsonlehmanbrothers.com>.

168.    At some point thereafter, upon information and belief, Sklarov caused the domain name <shearsonlehmanbrothers.com> to resolve to an active website located at www.shearsonlehmanbrothers.com, for the Fake "Shearson Lehman Brothers" (the "Infringing Website").  The Infringing Website currently is active today.  Attached hereto as **Exhibit 31** are screenshots of the Infringing Website, an excerpt of which appears below:

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

28827/162/3557472



169.    The Infringing Website purports to offer financial services, including for wealth and investment management, financial advisory and asset management solutions, investment banking, securities and mutual funds, credit, lending and financing, including in the United States ("Defendants' Purported Services").

28827/162/3557472

170.    In a clear attempt to pass itself off as the same as or affiliated with the legitimate Lehman Brothers and the legitimate LEHMAN Names and Marks owned by Barclays, the Infringing Website uses the name and mark "Shearson Lehman Brothers"—the former name and registered mark used by the legitimate Lehman Brothers for many years when the firm was owned by American Express—as well as other "Lehman" and "Shearson Lehman" formative names and marks, including "Lehman Brothers."

171.    The Infringing Website falsely claims that the Fake "Shearson Lehman Brothers" is "a Lehman Brothers Company."

172.    The Infringing Website presents several of the Infringing Names and Marks in the Lehman Font and Shearson Lehman Stylizations.



| Marks Used and Previously Registered by Lehman Brothers | The Infringing Names and Marks |
|---|---|

173.    The Infringing Website lists 200 Vesey Street, New York, New York 10281 as the United States address for the purported "Shearson Lehman Brothers," as shown below:



174.    As noted above, 200 Vesey Street, New York, New York 10281 is the former address of the legitimate Lehman Brothers when the firm was owned by American Express.

175.    The Infringing Website uses language that would be associated with or would describe the legitimate Lehman Brothers and its long history of offering financial services, including:

- "With more than 100 years of industry presence . . ."

- "We invented investment banking."

- "Decades of experience as a market leader, the old is behind us, the new is here.  The New Shearson Lehman Brothers Investment Banking. We invented investment banking."

- "We have managed billions of dollars of client assets and have provided consistent and secure portfolio management services for our clients for more than 100 years"

- "We have provided these and other wealth management services for our clients for more than 100 years."

176.    Upon information and belief, the Fake "Shearson Lehman Brothers" has not been active for more than 1-2 years, does not have billions of dollars' worth of assets under management and does not provide wealth management or investment banking services.

177.    Defendant Qureishi represents himself as "Senior Executive Vice President, Wealth Management," of the Fake "Shearson Lehman Brothers."  Qureishi also claims to have been a "Senior Loan Advisor" at the Sklarov-controlled America 2030 company.  Attached hereto as **Exhibit 32** is a copy of Qureishi's LinkedIn profile, an excerpt of which appears below:



178.    Upon information and belief, Qureishi responds to inquires made to the Fake "Shearson Lehman Brothers" via the Infringing Website, including from persons in the United States, and purports to represent the company and its purported business.

179.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the Infringing Website, or expressly instructed others to do so and then approved of and endorsed the Infringing Website, its design and content, and adopted it as their own.

180.    Upon information and belief, Defendants Sklarov and Qureishi caused the Infringing Website to be programmed such that it would not be directly accessible from an IP address in the United States, in an effort to prevent Barclays and their attorneys in the United States

from discovering the site.  The site, however, is accessible from the United States using simple and common tools such as a VPN (virtual private network).

181.    Upon information and belief, Qureishi uses the below signature line and the email address Osman.Qureishi@ShearsonLehmanBrothers.com in email communications to prospective clients of and others interested in doing business with the fake "Shearson Lehman Brothers":

> **Osman Qureishi**
>
> *Senior Executive Vice President*
>
> Wealth Management Division
>
> Telephone: 332.228.0152
>
> Direct: 212.208.0900
>
> Yoll Free: 888.418.7999
>
> Cell Phone: 917.704.3276
>
> Fax: 212.428.6707
>
> Email:Osman.Qureishi@shearsonlehmanbrothers.com

182.    Upon information and belief, Qureishi has represented to prospective agents and brokers of the Fake "Shearson Lehman Brothers," including in the United States, that the firm currently *only* offers security loans borrowed against assets of investment portfolios and does not currently offer investment or wealth management services or any of the other of Defendants' Purported Services promoted and advertised on the Infringing Website.

183.    Upon information and belief, Qureishi has represented to prospective agents and brokers for the Fake "Shearson Lehman Brothers" that the firm:

•    Offers security loans within the United States.

•    Uses custodian accounts within the United States to facilitate loans.

-49-

- Has offices in New York, New York.

- Has the ability to do title transfer loans in the United States and recently secured a resource within the United States to assist with such transfers.

- Has been in business only for three years.

184.    Upon information and belief, Qureishi has sent to prospective agents and brokers for the Fake "Shearson Lehman Brothers," including in the United States, a form "Securities Lending Referral Agreement" (the "SLRA"), which is attached hereto as **Exhibit 33**, the cover and back of which are shown below:

 

185.    Upon information and belief, the purpose of the SLRA is to engage independent agents to refer "prospective borrowers to [the fake] Shearson Lehman for the purpose of obtaining Loans backed by Securities."

186.    The SLRA uses multiple times the Infringing Names and Marks <shearsonlehmanbrothers.com>, "Shearson Lehman Brothers Investment Banking," "Shearson

-50-

Lehman" and "Lehman Brothers," the latter two marks presented prominently in the Lehman Font and Shearson Lehman Stylizations on the front and back covers and at the top of each page of the agreement.

187.    Upon information and belief, Qureishi has sent the SLRA to prospective agents and brokers who contact the Fake "Shearson Lehman Brothers" via the website www.shearonlehmanbrothers.com or via an email address using the domain name <shearsonlehmanbrothers.com>.

188.    The SLRA also lists on its front and back covers 200 Vesey Street, New York, New York 10281 as the United States address for the purported Fake "Shearson Lehman Brothers."  As noted above, this was the address for the legitimate Lehman Brothers when the firm was owned by American Express.

189.    The SLRA also lists a telephone number with a New York, New York area code and the email address us.office@shearsonlehmanbrothers.com.

190.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the SLRA, or expressly instructed others to do so and then approved of and endorsed the SLRA, its design and content, and adopted it as their own.

191.    Upon information and belief, Qureishi also has published and distributed to potential referral agents for the Fake "Shearson Lehman Brothers," including in the United States, a Broker Affiliate Dealer flyer (the "Broker Flyer"), a copy of which is attached hereto as **Exhibit 34**, and which is reproduced below:



192.    Qureishi publicly posted the Broker Flyer on his LinkedIn account, including at the

URL   https://www.linkedin.com/posts/osman-qureishi-ab2434100_broker-dealers-world-wide-we-are-funding-activity-6663894856533979136-0gsS/.

193.    The Broker Flyer uses the Infringing Names and Marks "Shearson Lehman," "<shearsonlehmanbrothers.com> and "Shearson Lehman Investment Banking," the latter presented in the Lehman Font and Shearson Lehman Stylizations.

194.    The Broker Flyer also claims that that the fake "Shearson Lehman" is an "investment banking firm" that provides "wealth management" services "worldwide."

195.    Like the Infringing Website and the SLRA, the Broker Flyer lists telephone numbers with New York, New York area codes.

196.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the Broker Flyer, or expressly instructed others to do so and then approved of and endorsed the Broker Flyer, its design and content, and adopted it as their own.

197.    Upon information and belief, Qureishi has also distributed to potential agents, brokers and borrowers of the Fake "Shearson Lehman Brothers," including in the United States, a flyer entitled "Direct Lender for Global Securities Backed Lending Program" (the "Direct Lender Flyer"), a copy of which is attached as **Exhibit 35** hereto and which is reproduced below:



198.    The Direct Lender Flyer, which advertises and promotes purported securities backed lending services offered by Defendants, uses the Infringing Names and Marks "<shearshonlehmanbrothers.com>", "Shearson Lehman" and "Lehman Brothers," the latter two presented in the Lehman Font and Shearson Lehman Stylizations.

-53-

199.    The Direct Lender Flyer also claims the Fake "Shearson Lehman Brothers" is "A Lehman Brothers Company," lists the former address of the legitimate Lehman Brothers—200 Vesey Street, New York, New York 10281—as its own address and lists a telephone number with a New York area code.

200.    Upon information and belief, Sklarov and Qureishi designed and provided all content for the Direct Lender Flyer, or expressly instructed others to do so and then approved of and endorsed the Direct Lender Flyer, its design and content, and adopted it as their own.

201.    Upon information and belief, Qureishi has published, including in the United States, several press releases for the Fake "Shearson Lehman Brothers" and its purported financial services (the "Press Releases").  Attached hereto as **Exhibit 36** are copies of the Press Releases.

202.    The Press Releases—entitled "Shearson Lehman is Entering into Negotiations to Invest $250 million in Alternative Energy" (March 20, 2020), "Shearson Lehman Brothers Investment Banking Broker Dealer Affiliate Program is Available World Wide" (April 7, 2020), "Shearson Lehman Adds a New Local Custodian and Eases SBL Requirements in Hong Kong!" (May 1, 2020) and "Asia's Alternative Energy Sector Becomes Front-Page News as Shearson Lehman Vows to Invest Millions" (August 24, 2020)—purport to report on potential multi-million-dollar investments "Shearson Lehman" is making or has made in various industries and touts the company's purported wealth management and investment banking services.

203.    These Press Releases use the Infringing Names and Marks "Shearson Lehman Brothers Investment Banking," "Shearson Lehman," "Lehman Brothers" and "<shearsonlehmanbrothers.com>."

204.    Each of these Press Releases uses the Infringing Names and Marks "Shearson Lehman" and/or "Shearson Lehman Brothers Investment Banking" in its title and prominently

displays the Infringing Name and Mark "Shearson Lehman Brothers Investment Banking" in the

Lehman Font and Shearson Lehman Stylizations, including as shown below:



205.    One of these Press Releases lists Qureishi as the "Media Contact" for the Fake

"Shearson    Lehman    Brothers,"    each    lists    an    email    address    of

wealthmanagement@shearsonlehmanbrothers.com for the purported firm and one explicitly lists

a web address of www.shearsonlehmanbrothers.com for the purported firm.

206.    One of the Press Releases refers twice to the Fake "Shearson Lehman Brothers" as

"a Lehman Brothers company."

207.    Upon information and belief, Sklarov and Qureishi designed and provided all

content for the Press Releases, or expressly instructed others to do so and then approved of and

endorsed the Press Releases, their design and content, and adopted them as their own.

208.    Defendants do not have (and never have had) permission from Barclays or Lehman

Brothers to use the Infringing Names and Marks or to engage in any of the unlawful activities

described herein.

209.    Barclays established rights in the LEHMAN Names and Marks—including as assignee of Lehman Brothers' prior rights from use of the names and marks dating back to 1850 and licensor of Lehman Brothers' use since 2008 of the names and marks—long before Defendants began their unlawful activities described herein.

210.    Defendant's use the Infringing Names and Marks is likely to cause consumer confusion as to the source and origin of Defendants' Purported Services and to cause mistake, or to deceive the public by misleading consumers into believing that Defendants' Purported Services emanate from, are approved, authorized, endorsed or sponsored by, or are in some way associated or connected with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

211.    Upon information and belief, Defendants acted with intent to usurp the goodwill and consumer recognition in the LEHMAN Names and Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Defendants are somehow affiliated or associated with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

212.    Upon information and belief, despite their representations to the contrary in commercial advertising, including in the Infringing Website, the SLRA, the Broker Flyer, the Direct Lending Flyer and the Press Releases, the Defendants do not provide any financial services other than security backed loans and have not made any of the investments set forth therein.

**Defendants' Unlawful Registration of the Infringing Names and Marks**

213.    Upon information and belief, in furtherance of their scheme to impersonate Lehman Brothers and to create a false association with the LEHMAN Names and Marks, and in an attempt to provide an air of legitimacy to Defendants' unlawful actions, Defendants have registered and

attempted to register the Infringing Names and Marks as trademarks in the United States and certain foreign jurisdictions.

214.   Upon information and belief, Sklarov, through his shell company Black Rock, caused Singh to file with the USPTO intent to use applications to register the following marks:

| Mark | Application No. | Services | Application Date |
|------|------|------|------|
| SHEARSON LEHMAN | 88457946 | 36: Financial services, namely, advising corporations on debt and financial restructuring, bankruptcy reorganization and divestitures, namely, sales of entities and their stock and assets; strategic planning and capital raising for corporations, start-ups, emerging companies, private equity fund and other similar corporate entities; stock loans; arranging financing for start-ups, emerging companies, private equity funds and other similar corporate entities; merchant banking; investment banking; underwriting, namely, underwriting offers of securities as manager, co-manager or syndicate member; private placements; investment management and advice; financial consultancy, planning, research and appraisal of corporate entities; financial evaluation and other wealth management services, namely, for high net worth individuals, for pension and other institutional accounts; trading and dealing in stocks, securities and other financial products, namely, bonds and advisory services relating thereto; brokerage and dealer services in the field of stocks and securities; providing financial news and information via a global communication network; financial investment and financial advisory services in the field of real estate; leasing of real estate; real estate acquisition services; real estate appraisal; real estate equity sharing, namely, managing and arranging for co-ownership of real estate; | June 3, 2019 |

| | | and real estate investment and real estate management | |
| --- | --- | --- | --- |
| SHEARSON LEHMAN HUTTON | 88536436 | 36: Financial services, namely, corporate workout, debt restructuring, receivership, and loan resolution for commercial loans | July 25, 2019 |

(the "Infringing Applications").  Attached hereto as **Exhibit 37** are copies of the Infringing Applications.

215.    Singh signed both Infringing Applications as "General Counsel" of Black Rock.

216.    Singh also listed his own name as affiliated with the Black Rock name and address as Correspondent of Record for the Infringing Application Serial No. 88536436.

217.    Thus, upon information and belief, when filing the Infringing Applications, Singh was acting as an officer of Black Rock.

218.    At the time Singh filed each of the Infringing Applications, he was required to sign a declaration that:

> the applicant believes the applicant is entitled to use the mark in commerce on or in connection with the goods or services specified in the application [and t]o the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

(the "Trademark Declaration").

219.    Upon information and belief, at the time Singh signed the Trademark Declaration for each of the Infringing Applications, Singh knew of Barclays' superior and prior rights in the LEHMAN Names and Marks and that Black Rock's and Sklarov's registration and use of the marks SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON would cause consumers to mistakenly believe that BlackRock and Sklarov were somehow affiliated or associated with Lehman Brothers, Barclays and/or the LEHMAN Names and Marks.

28827/162/3557472

220.     Indeed, as discussed below, Barclays already had sent a cease and desist letter to Singh before he filed Infringing Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON.  Moreover, the LEHMAN Names and Marks are some of the most famous names and marks associated with financial services and still are used today by Lehman Brothers and Barclays, as would be evidenced by a simple Internet search.  It would be implausible for any of the Defendants, including Singh, to claim ignorance of Barclays' and Lehman Brothers' prior and current rights in the LEHMAN Names and Marks.

221.     As noted above, Singh has admitted in at least one other context that he knowingly filed a trademark application with the USPTO when he knew another party had superior rights and that the mark in the application was likely to cause confusion with that senior mark and/or create a false suggestion of a connection with that other party.  Specifically, Singh willingly testified before the Court in the *Rothschild* litigation that he knew of Rothschild's superior rights in the ROTHSCHILD Marks when Sklarov instructed him to file the infringing application for MAYER AMSCHEL ROTHSCHILD CAPITAL, advised Sklarov that he should not file the application, yet filed it anyway.

222.     Thus, upon information and belief, in furtherance of Defendants' scheme to impersonate Lehman Brothers and to commit fraud upon the public and on the USPTO, Singh made material misrepresentations to the USPTO with the intent to deceive the USPTO into granting registration of the SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON marks in the Infringing Applications, which Black Rock and Sklarov were not entitled to register.

223.     Shortly after Singh filed the Infringing Applications, Singh, upon information and belief, at the direction and instruction of Sklarov, sought to amend Infringing Application Serial No. 88457946 to list Sklarov's shell company Lincoln as the current applicant.  The USPTO did

-59-

not accept this amendment.  Upon information and believe, Singh was acting as an officer of Lincoln when he attempted to amend Application Serial No. 88457946.

224.    Barclays filed Letters of Protest against the Infringing Applications, accompanying each of which were news and Internet articles about Lehman Brothers, including its former use of the SHEARSON LEHMAN Names and Marks, and information about Barclays' prior-filed pending Application Serial No. 86081143 for the mark LEHMAN BROTHERS in International Class 36 (the "Letters of Protest").

225.    The USPTO accepted the Letters of Protest and referred Barclays' news and Internet articles to the examining attorneys for the Infringing Applications, noting "evidence submitted by the protestor is relevant and may support a reasonable ground for refusal in ex parte examination," namely, "[p]ossible false association" with Barclays and/or Lehman Brothers.

226.    The USPTO also instructed the examining attorney to consider Barclays' prior-filed pending Application Serial No. 86081143 for the mark LEHMAN BROTHERS in International Class 36 as a potential obstacle to Infringing Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON.

227.    The USPTO ultimately issued office actions rejecting the Infringing Applications. In each office action, the examining attorney cited Barclays' prior-filed pending application for the LEHMAN BROTHERS mark as a potential bar to registration based on a likelihood of confusion between the Barclays' LEHMAN BROTHERS marks and the marks in the Infringing Applications in violation of Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

228.    Recognizing the fame of the SHEARSON LEHMAN and SHEARSON LEHMAN HUTTON marks, the USPTO also required Black Rock to provide information concerning its connection with Lehman Brothers:

-60-

> Due to the renown of the institution . . . named in the mark . . ., and the fact that
> there is no information in the application record regarding a connection with
> applicant, applicant must specify whether the . . . institution named in the mark has
> any connection with applicant's . . . services, and if so, must describe the nature
> and extent of that connection.

Attached hereto as **Exhibit 38** are copies of these office actions.

229.    Black Rock, Sklarov and Singh failed to respond to these office actions and the USPTO ultimately rejected the Infringing Applications as abandoned.  Attached hereto as **Exhibit 39** are copies of the current status records from the USPTO for the Infringing Applications.

230.    Undeterred by the USPTO's rejection of the Infringing Applications and Barclays' demand letters, Sklarov, through his shell companies, filed applications to register the marks LEHMAN BROTHERS, SHEARSON LEHMAN BROTHERS and SHEARSON LEHMAN in at least two foreign jurisdictions.

231.    Upon information and belief, Newburgh, at the direction of Sklarov, filed applications in the Office of Trademarks of the Principality of Andorra ("OTPA") to register the marks LEHMAN BROTHERS and SHEARSON LEHMAN for "Brokerage; repayment; loan (finance); secured loans; financing services" in International Class 36.  Upon information and belief, the OTPA does not publish trademark applications for opposition by third parties prior to granting registration.  Nor is Andorra a member of the EUIPO, which recently has recognized the continuing validity of Barclays' LEHMAN BROTHERS mark.  Upon information and belief, Sklarov and Newburgh intentionally chose to register marks in this jurisdiction to make it more difficult for Barclays to enforce its legitimate rights.

232.    Upon information and belief, in February 2020, the OTPA granted registration to Newberg to the marks LEHMAN BROTHERS (Andorra Registration No. 41125) and SHEARSON LEHMAN (Andorra Registration No. 41044 ) (the "Andorra Registrations").  Upon information and belief, the Andorra Registrations were first made public in or about March 2020,

a month after the applications matured to registrations.  Barclays first learned about the Andorra Registrations on or about April 22, 2020.  Attached hereto as **Exhibit 40** are copies from the official OTPA records showing the status of the Andorra Registrations.

233.    Upon information and belief, on or about January 30, 2020, Lincoln, at the direction of Sklarov, filed Application Serial No. M279372-01 in the Directorate General of the Industrial Property Registry - Ministry of Commerce and Industries in Panama ("DIGERPI") to register the mark SHEARSON LEHMAN BROTHERS & Design (using the Lehman Font as follows: SHEARSON LEHMAN BROTHERS ) for "Collateralized loans; financing services; securities brokerage; stock brokerage" in International Class 36 (the "Panama Application").  Upon information and belief, the Panama Application was first made public and published by the DIGERPI on or about July 9, 2020.  Barclays first learned about the Panama Application on or about July 24, 2020. Attached hereto as **Exhibit 41** are copies from the official DIGERPI records showing the status of the Panama Application.  Barclays has filed an opposition against the Panama Application.

234.    Upon information and belief, Defendant Sklarov instructed and directed each of these foreign trademark filings and Singh coordinated with and instructed local counsel in the relevant jurisdictions to effectuate the filings, all as part of a continuing and intentional scheme to deceive consumers and sow confusion in the marketplace.

235.    Defendants do not have (and never have had) permission from Barclays or Lehman Brothers to file the Infringing Applications, the Andorra Registrations or the Panama Application.

236.    Barclays established rights in the LEHMAN Names and Marks—including as assignee of Lehman Brothers' prior rights from use of the names and marks dating back to 1850 and licensor of Lehman Brothers' use since 2008 of the names and marks—long before Defendants

first sought to file the Infringing Applications, the Andorra Registrations or the Panama Application.

237.     Defendants' filing of and attempts to file the Infringing Applications, the Andorra Registrations and the Panama Application, are likely to cause consumer confusion as to the source and origin of Defendants' Purported Services and to cause mistake, or to deceive the public by misleading consumers into believing that Defendants' Purported Services emanate from, are approved, authorized, endorsed or sponsored by, or are in some way associated or connected with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

238.     Upon information and belief, Defendants filed the Infringing Applications, the Andorra Registrations and the Panama Application with intent to usurp the goodwill and consumer recognition in the LEHMAN Names and Marks and to sow consumer confusion in the marketplace such that consumers would mistakenly believe that Defendants are somehow affiliated or associated with Barclays and/or its services, Lehman Brothers and/or its services and/or the LEHMAN Names and Marks.

**Defendants' Other Unlawful Acts that Seek to Create False Connections with Famous Financial Services Names and Brands**

239.     The LEHMAN Names and Marks and the ROTHSCHILD Marks are not the only famous financial services names and marks with which Defendants have falsely sought to associate themselves in an apparent attempt to cause confusion in the marketplace and mislead consumers.

240.     At or about the same time Singh filed the Infringing Applications on behalf of Black Rock and at the direction of Sklarov, Singh also filed applications in the names of Black Rock, Lincoln and Newburgh, seeking to register trademarks containing or comprising famous names

and marks associated with financial services, with which those defendants clearly had no affiliation or association, including:

Lincoln:      CREDIT SUISSE FIRST BOSTON; BNP PARIBAS FORTIS; FORTIS N.V.; ASTOR CAPITAL; MAYER AMSCHEL ROTHSCHILD CAPITAL; SAMUEL WALTON CAPITAL; LAZARD FRERES & CO.

Black Rock:  UBS PAINE WEBBER; PRICE WATERHOUSE COOPERS; ARTHUR ANDERSEN; CORNELIUS VANDERBILT; JOHN D. ROCKEFELLER; ANDREW CARNEGIE; SAL. OPPENHEIM; OPPENHEIM; BENTLEY ROTHSCHILD; PENN STATE FINANCIAL; WASHINGTON MUTUAL; BEAR STEARNS; DREYFUS FINANCIAL.

Newburgh:   GEORGE SOROS CAPITAL; WARREN BUFFET CAPITAL; DEAN WITTER REYNOLDS; SALOMON SMITH BARNEY; PRUDENTIAL – BACHELOR; DL & J DONALDSON, LUFKIN, & JENRETTE; BACHE & CO.

(the "Other Infringing USPTO Marks"). Attached hereto as **Exhibit 42** are copies of the USPTO status records for the applications for the Other Infringing USPTO Marks.

241.     Upon information and belief, Sklarov directed Singh to file applications for the Other Infringing USPTO Marks on behalf of Black Rock, Lincoln and Newburgh.

242.     When filing each of the applications for the Other Infringing USPTO Marks, Singh listed his own name as affiliated with the respective shell company name and address as Correspondent of Record. He signed several of the applications for the Other Infringing USPTO Marks Infringing Applications as "General Counsel" of the respective shell company. Thus, upon information and belief, when filing the Other Infringing USPTO Marks, Singh was acting as an officer of the respective company in whose name the application was filed.

243.     As with the Infringing Applications, at the time Singh filed each of the applications for the Other Infringing USPTO Marks, he was required to sign the Trademark Declaration.

244. Upon information and belief, at the time Singh signed the Trademark Declaration for each of applications for the Other Infringing USPTO Marks, he knew of third parties' superior and prior rights in those name and marks and that Black Rock's, Newburgh's, Lincoln's and Sklarov's registration and use of Other Infringing USPTO Marks would cause consumers to mistakenly believe that BlackRock, Newburgh, Lincoln and Sklarov were somehow affiliated or associated with each of those third parties.

245. Thus, upon information and belief, in furtherance of Defendants' scheme to commit fraud upon the public and the USPTO, Singh made material misrepresentations to the USPTO with the intent to commit fraud and to deceive the USPTO into granting the registration for the Other Infringing USPTO Marks, to which Black Rock, Newburgh, Lincoln and Sklarov were not entitled to register.

246. The USPTO rejected each and every one of the applications for the Other Infringing USPTO Marks based on potential or actual likely confusion or false suggestion of a connection with the name or brand that each of the Other Infringing USPTO Marks sought to impersonate.

247. Upon information and belief, Sklarov, through his shell companies Lincoln and Newburgh, also filed applications to register in foreign jurisdictions, including Andorra and Panama, trademarks containing or comprising famous names and marks associated with financial services, with which Defendants' clearly have no legitimate affiliation or association.

248. Many of these applications are identical or nearly identical to the Other Infringing USPTO Marks rejected by the USPTO, and include:

Andorra:    ANDREW CARNEGIE GLOBAL CAPITAL LT; BEAR STEARNS
            COMPANIES;   CORNELIUS   VANDERBILT   CAPITAL
            MANAGEMENT LT; DREYFUS CORPORATION; EUROBANC
            FINANCIAL;    FIDELITY    INVESTMENTS;    JOHN    D
            ROCKEFELLER INVESTMENTS LIMITED LTD; LUXEMBOURG
            CAPITAL   PARTNERS;   SALOMON   BROTHERS;   WARREN

BUFFET CAPITAL; ARTHUR ANDERSEN FINANCIAL; BACHE & CO SECURITIES; BANC ONE FINANCIAL; BENTLEY ROTHSCHILD CAPITAL LIMITED; DLJ, DONALDSON, LUFKIN & JENRETTE AND DESIGN; GUGGENHEIM; J. PAUL GETTY; PRICE WATERHOUSE COOPERS; SAL. OPPENHEIM; WESTINGHOUSE

Panama:    BEAR STEARNS COMPANIES; DREYFUS CORPORATION; SAL. OPPENHEIM

Benelux:    BENTLEY ROTHSCHILD CAPITAL LIMITED

Chile:    CORNELIUS VANDERBILT

Ireland:    SAL. OPPENHEIM

(the "Other Foreign Infringing Marks").

249.    Upon information and belief, Defendant Sklarov instructed and directed each of the trademark filings for the Other Foreign Infringing Marks and Singh coordinated with and instructed local counsel in the relevant jurisdictions to effectuate these filings, all as part of a continuing and intentional scheme to deceive consumers and sow confusion in the marketplace.

250.    Upon information and belief, Defendant Sklarov, either directly, or through a company he directs and controls, also is purporting to do business as "Bear Stearns" and attempting to intentionally mislead consumers to mistakenly believe that he and his purported services are affiliated with or originate from the global investment bank The Bear Stearns Companies, Inc. ("Bear Stearns"), which was acquired by JPMorgan Chase in 2008.

251.    Upon information and belief, Sklarov, either directly, or through a company he directs and controls, registered the domain name <bearstearnscompanies.com> in or about June 2019.  Upon information and belief, Sklarov utilized Domains By Proxy, LLC, a proxy service, to mask the true identity and contact information of the owner of the <bearstearnscompanies.com> domain name in an effort to shield himself from liability for his unlawful acts.  Attached hereto as **Exhibit 43** is a copy of the WhoIs records for the domain name <bearstearnscompanies.com>.

252.    The <bearstearnscompanies.com> and the <shearsonlehmanbrothers.com> domain names were registered on the same date with the same registrar, utilize the same proxy service to mask the true identity of the registrant, use the same nameservers, and resolve to websites hosted by the same Internet service provider.

253.    At some point thereafter, upon information and belief, Sklarov caused the <bearstearnscompanies.com> domain to resolve to a currently active website located at www.bearstearnscompanies.com, for a financial services company that purports to be named "Bear Stearns" (the "Fake Bear Stearns Website").

254.    Attached hereto as **Exhibit 44** are screenshots from the Fake Bear Stearns Website, an excerpt of which appears below:



255.    A pop-up window on the home page of the Fake Bear Stearns Website falsely claims the owners of the site have a registered trademark for BEAR STEARNS in the United States and cite to USPTO Application Ser. No. 88457949, which is the application filed by Sklarov, Black Rock and Singh that was rejected by the USPTO.

> Registration: Bear Stearns is a registered trademark applicant with the United States of America Patent and Trademark Office, registration number 88457949

256.    The Fake Bear Stearns Website purports to offer financial services, including investment banking and asset management, references numerous times the legitimate Bear Stearns, calls itself the "New Bear Stearns" and utilizes a logo identical to that long used and previously registered by the legitimate Bear Stearns:

| *Logo Used and Previously Registered by Bear Stearns* | *Defendants' Logo* |
| --- | --- |
|  |  |

257.    Defendants' registration of and/or attempts to register the Other USPTO Infringing Marks and the Other Foreign Infringing Marks, Defendants' current impersonation of Bear Stearns and Defendants' prior impersonation of Rothschild all are strong evidence of Defendants' bad faith intent and pattern to usurp the goodwill and consumer recognition in existing famous financial names and trademarks with which Defendants' have no legitimate affiliation and to sow consumer confusion in the marketplace, including with respect to Lehman Brothers and the LEHMAN Names and Marks.

**Defendants Have Refused to Stop their Unlawful Activities**

258.    Despite Barclays' multiple demands, Defendants have refused to cease and desist from, and instead have intentionally increased, their unlawful activities.

28827/162/3557472

259.    Shortly after learning that Black Rock and Singh had filed the first of the Infringing Applications with the USPTO (Application Serial No. 88457946 for the mark SHEARSON LEHMAN), on or about July 22, 2019, Barclays sent a letter to Black Rock and Singh demanding that they cease and desist from all attempts to register and use any mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, including SHEARSON LEHMAN, and abandon Application Serial No. 88457946.

260.    Instead of complying with Barclays' demands, three days later, Black Rock and Singh increased their infringing activities by filing the second of the Infringing Applications with the USPTO (Application Serial No. 88536436 for the mark SHEARSON LEHMAN HUTTON).

261.    When Black Rock and Singh formally responded to Barclays' demand letter on July 29, 2020, they falsely claimed that Lehman Brothers was no longer an active company, refused to comply with Barclays' demands and, in an astonishing display of bad faith, offered to sell the SHEARSON LEHMAN mark and application to Barclays.

262.    On August 8, 2020, Barclays reiterated its demands, with which Black Rock and Singh again refused to comply.

263.    After the USPTO accepted Barclays' Letters of Protest and rejected the Infringing Applications, in or about March 2020, Barclays saw no evidence that Defendants were using the Infringing Marks.

264.    Unbeknownst to Barclays at that time, Sklarov, though his shell companies, had already obtained the Andorra Registrations, filed the Panama Application and were using the Infringing Names and Marks in connection with purported financial services, all despite Barclays' notice and demands months prior.

-69-

265.   Shortly after Barclays learned about the Andorra Registrations, on or about April 28, 2020, Barclays sent a letter to Sklarov (and his shell companies) and Singh, demanding again that they cease and desist from all attempts to register and use any mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, including LEHMAN BROTHERS and SHEARSON LEHMAN and abandon the Andorra Registrations.

266.   Despite several additional correspondence between the parties, Sklarov and Singh refused to comply with Barclays' demands.

267.   Attached hereto as **Exhibit 45** are copies of the correspondence between Barclays and Defendants concerning Barclays' demands.

268.   Upon information and belief, Sklarov and/or Singh informed Qureishi of Barclays' prior rights in the LEHMAN Names and Marks and demands to cease and desist from use and registration of the Infringing Names and Marks.

269.   Sklarov and Singh did not disclose in any correspondence, including a letter sent as recent as July 27, 2020, that Defendants actually were and for many months had been using the Infringing Names and Marks, including through the Infringing Website, the SLRA, the Broker Flyer, the Direct Lending Flyer, the Press Releases and Qureishi's actions and representations described above.   Upon information and belief, Defendants intentionally hid and attempted to conceal their unlawful activities from Barclays and its counsel.   Barclays independently learned about these activities shortly before initiating this action.

270.   Upon information and belief, unless and until Defendants are enjoined from any further unauthorized use and registration of the Infringing Names and Marks or any name or mark containing, comprising or confusingly similar to the LEHMAN Names and Marks, Defendants will continue to use and to register the Infringing Names and Marks, to intentionally attempt to

deceive, confuse and mislead consumers that they are affiliated with Lehman Brothers and to violate Barclays' valuable trademark rights.

271.    Upon information and belief, by virtue of their unlawful conduct described above, Defendants have made or will make substantial profits and gains to which they are not in law or equity entitled.

272.    Upon information and belief, Defendants' unlawful conduct described above has resulted caused damage to Barclays and its LEHMAN Names and Marks.

273.    Upon information and belief, as a result of Defendants' unlawful actions described above, Plaintiffs have been or will be damaged and have suffered, and will continue to suffer, immediate and irreparable injury for which Plaintiffs have no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### (False Designation of Origin, Lanham Act, §43(a)(1)(A))

274.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-273 above with the same force and effect as if set forth fully herein.

275.    Defendants' conduct as described above constitutes false designations of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A).

### COUNT II
### (Cybersquatting, Lanham Act, §43(d))

276.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-275 above with the same force and effect as if set forth fully herein.

277.    Defendants have registered, trafficked in and used the domain name <shearsonlehmanbrothers.com>, which is identical to or confusingly similar to the LEHMAN Names and Marks.

278.    The LEHMAN Names and Marks were distinctive at the time Defendants registered the domain name <shearsonlehmanbrothers.com>.

279.    As described herein, Defendants' acts were committed with a bad faith intent to profit from and to cause confusion with Plaintiffs' LEHMAN Names and Marks.

280.    Defendants' conduct as described above constitutes cybersquatting in violation of Section 43(d) of the Lanham Act, 15 U.S.C. §1125(d).

## COUNT III
### (Federal Dilution, Lanham Act §43(c))

281.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-280 above with the same force and effect as if set forth fully herein.

282.    The LEHMAN Names and Marks are famous among the general consuming public and distinctive and enjoyed such fame and distinctiveness since long prior to Defendants' use of the Infringing Names and Marks.

283.    Defendants' conduct as described above is likely to cause dilution of the distinctive quality of the famous and distinctive LEHMAN Names and Marks, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

284.    Defendants' conduct as described above also is likely to cause dilution by tarnishment by harming the reputation of the famous and distinctive LEHMAN Names and Marks, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

## COUNT IV
### (State Law Dilution, New York General Business Law §360-l)

285.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-284 above with the same force and effect as if set forth fully herein.

28827/162/3557472

286.    The LEHMAN Names and Marks are famous and distinctive in the state of New York and enjoyed such fame and distinctiveness in the state of New York since long prior to Defendants' use of the Infringing Names and Marks.

287.    Defendants' conduct as described above causes a likelihood of injury to Plaintiffs' business reputation and dilution of the distinctive quality of the LEHMAN Names and Marks in violation of New York General Business Law § 360-l.

## COUNT V
### (Unfair Competition – New York Law)

288.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-287 above with the same force and effect as if set forth fully herein.

289.    Defendants' conduct as described above constitutes unfair competition under the common law of the state of New York.

## COUNT VI
### (Deceptive Trade Practices  – New York General Business Practices § 349)

290.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-289 above with the same force and effect as if set forth fully herein.

291.    Defendants' conduct as described above constitutes a significant risk of harm to the public interest in the state of New York.

292.    Defendants' conduct as described above constitutes deceptive trade practices in violation of New York General Business Practices § 349.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor and against Defendants as follows:

28827/162/3557472

A.      Ordering that Defendants and their agents, servants, representatives, employees, successors and assigns, and all those persons or entities in active concert or participation with any of them who receive actual notice of the injunctive order: (1) be enjoined, preliminarily and permanently, from (a) using, registering or seeking to register the Infringing Names and Marks or any name or mark containing, comprising or confusingly similar to the LEHMAN Names and Marks worldwide; and (b) from making any statements or taking any actions likely to cause consumers to believe mistakenly that Defendants are affiliated or associated with Lehman Brothers and/or Barclays; (2) transfer to Plaintiffs the domain name <shearsonlehmanbrothers.com> and any other domain name containing, comprising or confusingly similar to the LEHMAN Names and Marks; and (3) expressly withdraw and abandon the Andorra Registrations and the Panama Application and any other trademark applications owned or controlled by Defendants for the Infringing Names and Marks or for marks that contain, comprise or are confusingly similar to the LEHMAN Names and Marks.

B.      Ordering that Defendants be directed to file with the Court and serve upon Plaintiffs, within 30 days after entry of final judgment, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the provisions set forth in Paragraph A above.

C.      Ordering Defendants to account to Plaintiffs for all gains, profits and advantages derived from Defendants' wrongful acts, together with interest therein.

D.      Ordering Defendants pay to Plaintiffs any damages sustained by Plaintiffs by reason of Defendants' wrongful acts in an amount to be determined at trial, together with interest thereon.

E.      Ordering Defendants pay to Plaintiffs trebled damages.

F.      Ordering that Plaintiffs recover their reasonable attorneys' fees from Defendants, together with the costs of this action.

G.      Ordering that Plaintiffs be granted such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable as such.

Dated:   October 9, 2020

Respectfully submitted,
COWAN, LIEBOWITZ & LATMAN, P.C.

By: _____
Eric J. Shimanoff (ejs@cll.com)
Joelle A. Milov (jam@cll.com)
114 West 47th Street
New York, New York 10036
(212) 790-9200
*Attorneys for Plaintiffs Barclays PLC and Barclays Capital Inc.*