# EXHIBIT 3

> This Opinion is not a
> Precedent of the TTAB

Oral Hearing: January 22, 2020                    Mailed: September 30, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

____

TRADEMARK TRIAL AND APPEAL BOARD

____

*Barclays Capital Inc.*
*and Barclays PLC*
*v.*

*Tiger Lily Ventures Ltd.*

Opposition Nos. 91219477[1] (parent) and 91219478

____

*Tiger Lily Ventures Ltd.*
*v.*

*Barclays Capital Inc.*
*and Barclays PLC*

Opposition No. 91219549

____

Eric J. Shimanoff of Cowan, Liebowitz & Latman, P.C. for Opposers/Counterclaim-
    Defendants, Barclays Capital Inc. and Barclays PLC.

Robert Garson of Garson, Ségal, Steinmetz, Fladgate LLP for
    Applicant/Counter-Opposer, Tiger Lily Ventures Ltd.[2]

____

[1] The record in these consolidated proceedings is maintained in Opposition No. 91219477 and all citations are to that proceeding unless otherwise noted.

[2] Trial briefs and other documents filed on behalf of Applicant/Counter-Opposer Tiger Lily Ventures Ltd. identify its counsel as "Attorneys for Defendant/Counter Opposer Tiger Lily, Ltd." while the ESTTA sheet identifies Defendant as "Tiger Lily Ventures Ltd." Additionally, the Applicant for Application Serial No. 85868892 is identified as "Tiger Lily Venture Ltd." while the Applicant for Application Serial No. 86298069 is identified as "Tiger Lily Ventures Ltd." Accordingly, this decision applies to the Applicant(s) of Serial Nos. 85868892 and 86298069, regardless of which legal name identifies the Applicant(s).

Serial No. 88242849

Before Taylor, Mermelstein and Kuczma,
    Administrative Trademark Judges.

Opinion by Kuczma, Administrative Trademark Judge:

In 2008, Lehman Brothers was the fourth largest investment bank in the United States, with hundreds of billions of dollars of assets under management and over 25,000 employees in offices worldwide when it filed for protection under the U.S. bankruptcy laws, the largest bankruptcy in United States history.[3] A day later, Lehman Brothers sold several of its businesses and other assets, including its LEHMAN BROTHERS trademarks and the accompanying goodwill, to Opposer, Barclays Capital Inc. (Barclays), "one of the world's oldest and leading providers of financial services" for approximately $1.3 billion. Lehman Brothers assigned to Barclays all of Lehman Brothers' rights in the LEHMAN names and trademarks, including LEHMAN BROTHERS, and the goodwill associated therewith.[4]

Shortly thereafter, pursuant to amendments to their agreement, Barclays granted Lehman Brothers a worldwide, non-exclusive license to use the LEHMAN tradenames and trademarks in connection with Lehman Brothers' retained and

---

[3] Barclays' Trial Testimony Declaration of Alexander L. Greenberg, Esq., Director, Legal (formerly, Vice-President, Legal) for Barclays Capital Inc., ¶¶ 3, 6 (86 TTABVUE 6-7).

All cites to the record are to the record in Opposition No. 91219477 unless otherwise noted. Record citations are to TTABVUE, the Board's publically available electronic docket history system. The number preceding TTABVUE corresponds to the docket entry number(s), and any number(s) following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear. For material or testimony that has been designated confidential, the TTABVUE docket entry number where such material or testimony is located is referenced.

[4] The term "trademarks" in this decision includes service marks.

continuing businesses and operations. The term of the trademark license was limited to "two years for use in connection with certain Lehman businesses, namely, Lehman Brothers' investment banking and capital markets businesses. . . . the amendment does not alter the perpetual license granted to Lehman Brothers for its other businesses or continuing operations."[5]

Several years later, on March 6, 2013, Tiger Lily Ventures Ltd. (Tiger Lily) filed an application to register LEHMAN BROTHERS (standard characters) for beer and spirits in International Classes 32 and 33, and filed a second application to register the same mark for bar services and restaurant services in International Class 43, on June 2, 2014, Application Nos. 85868892 and 86298069, respectively.[6]

Meanwhile, after allowing all of the U.S. trademark registrations for the LEHMAN and LEHMAN BROTHERS marks it acquired to expire, Barclays filed trademark application, Application Serial No. 86081143, on October 2, 2013 for the mark LEHMAN BROTHERS (standard characters)[7] for:

> Securities brokerage services; investment consulting services; investment banking services; merchant banking services; financial and investment management services; financial planning and investment advisory services; financial research services; administration and valuation of financial investments; financial sponsorship of sporting, charitable and educational events; providing consultancy,

---

[5] Greenberg Testimony Declaration ¶¶ 7-9 (86 TTABVUE 7-9) and Exhibits 3-5 thereto titled Intellectual Property Assignment Agreement (86 TTABVUE 159-226); Confidential (88 TTABVUE 6-79).

[6] Tiger Lily's Trial Testimony Declaration of Chaim Aaron James Green, founder and director of Tiger Lily Ventures, Ltd., ¶¶ 8, 11, 17 (124 TTABVUE 4-6); Barclays' First Notice of Reliance Exhibits 1-2 (77 TTABVUE 6-12, 13-17).

[7] Greenberg Testimony Declaration ¶ 45 (86 TTABVUE 16).

> information and advisory services relating to all the
> foregoing, in International Class 36.[8]

A year later, on November 24, 2014, Barclays filed Notices of Opposition, Opposition Nos. 91219477 and 91219478, against Tiger Lily's LEHMAN BROTHERS applications Serial Nos. 86298069 and 85868892.[9] The Board subsequently consolidated those two Oppositions, designating Opposition No. 91219477 as the "parent case."[10] A day later, Opposition No. 91219549, filed by Tiger Lily, opposing Barclays' Application Serial No. 86081143 for the mark LEHMAN BROTHERS was added to the consolidated proceeding.[11]

Thus, this consolidated proceeding involves Opposition Nos. 91219477 and 91219478 filed by Barclays against Tiger Lily's applications, and Opposition No. 91219549 filed by Tiger Lily against Barclays' application, each involving the identical LEHMAN BROTHERS mark.

---

[8] Application Serial No. 86081143 was filed on October 2, 2013 for the mark LEHMAN BROTHERS based on Barclays' allegation of a bona fide intention to use the mark in commerce under § 1(b) of the Trademark Act, 15 U.S.C. § 1051(b). Acquired distinctiveness is claimed as to the entire mark.

[9] Application Serial No. 85868892 for beer in International Class 32 and spirits in International Class 33 was filed on March 6, 2013 and Application Serial No. 86298069 for bar services, restaurant services in International Class 43 was filed on June 2, 2014; both applications are for the mark LEHMAN BROTHERS and are based on Tiger Lily's allegation of a bona fide intention to use the mark in commerce under § 1(b) of the Trademark Act, 15 U.S.C. § 1051(b). "BROTHERS" is disclaimed in both applications.

[10] 4 TTABVUE.

[11] 5 TTABVUE.

Serial No. 88242849

I.    Opposition Nos. 91219477-78 filed by Barclays

A.    Barclays' Grounds of Opposition

Barclays' Notices of Opposition assert: (1) it is the owner by assignment of the LEHMAN and  LEHMAN BROTHERS common law marks; (2) that such marks are famous; (3) that it has priority of use and there is a likelihood of confusion under § 2(d) of the  Trademark Act, 15 U.S.C. § 1052(d), between Barclays' previously used marks and Tiger Lily's mark; (4) that registration of Tiger Lily's mark dilutes the distinctive quality of Barclays' marks long associated with the Lehman Brothers financial institution and allegedly owned and used by Barclays and used by Lehman Brothers and third parties pursuant to license, in violation of § 43(c) of the Trademark Act, 15 U.S.C. § 1125(c)[12]; (5) that Tiger Lily's mark falsely suggests a connection between Tiger Lily and Barclays (or Lehman Brothers, the predecessor-in-interest of Barclays) in violation of § 2(a) of the Trademark Act, 15 U.S.C. § 1052(a); and (6) that at the time Tiger Lily filed its applications, it did not have a *bona fide* intent to use the mark in commerce.[13]

---

[12] Barclays' Notice of Opposition plead dilution under § 13(a) of the Trademark Act, 15 U.S.C. § 1063(a).

[13] Opposition No. 91219477, 1 TTABVUE; Opposition No. 91219478, 1 TTABVUE.

B.    Tiger Lily's Answer and Affirmative Defenses

Tiger Lily denies the allegations in its Amended Answer and Answer to the

Notices of Opposition[14] except for the following admissions:

- Barclays maintains the www.lehman.com website, paragraph 43, (Opposition No. 91219478, 7 TTABVUE 10), (Opposition No. 91219477, 12 TTABVUE 10);

- Barclays is owner of Application Serial No. 86081143, paragraph 44, (Opposition No. 91219478, 7 TTABVUE 10), (Opposition No. 91219477, 12 TTABVUE 11);

- On March 6, 2013, Tiger Lily filed Application Serial No. 85868892 for the mark LEHMAN BROTHERS on an intent-to-use basis under § 1(b) of the Trademark Act for "beer" in International Class 32 and "spirits" in International Class 33; Tiger Lily did not use the LEHMAN BROTHERS Mark for the goods in United States commerce prior to its constructive first use dates of March 6, 2013 and June 2, 2014, paragraph 46, (Opposition No. 91219478 7 TTABVUE 11), (Opposition No. 91219477, 12 TTABVUE 11);

- Its proposed services in Application Serial No. 86298069 are services that consumers would perceive as being related to, similar to or an extension of the goods and services that have been, could be and are used, offered in connection or associated by consumers with Opposer's LEHMAN Marks, including the mark LEHMAN BROTHERS; paragraph 47, (Opposition No. 91219477, 12 TTABVUE 11);

- Its LEHMAN BROTHERS Mark should be refused registration under § 2(a) of the Trademark Act as falsely suggesting a connection between Tiger Lily,

---

[14] Tiger Lily filed an Amended Answer in Opposition No. 91219477 on February 19, 2015 (Opposition No. 91219477, 12 TTABVUE) and an Answer in Opposition No. 91219478 on February 13, 2015 (Opposition No. 91219478, 7 TTABVUE).

Serial No. 88242849

and Barclays (and/or Lehman Brothers). More specifically: (a) Tiger Lily's LEHMAN BROTHERS Mark is identical to the name or identity previously used by Lehman Brothers, namely, the famous LEHMAN BROTHERS name and mark; (b) Tiger Lily's LEHMAN BROTHERS Mark would be recognized as being associated with Barclays and/or Lehman Brothers because it points uniquely and unmistakably to Barclays and/or Lehman Brothers; (c) Barclays and Lehman Brothers are not connected with the activities intended to be performed by Tiger Lily under Tiger Lily's LEHMAN BROTHERS Mark; and (d) the fame and reputation of Lehman Brothers' and Barclays' LEHMAN BROTHERS Mark is such that, when Tiger Lily's LEHMAN BROTHERS Mark is used with its proposed goods, a connection with Barclays (and/or Lehman Brothers) would be presumed. Lehman Brothers' and Barclays' LEHMAN BROTHERS Marks are so famous that they unmistakably would point to Lehman Brothers and/or Barclays regardless of the goods and services offered in connection with the mark, paragraph 51, (Opposition No. 91219478, 7 TTABVUE 11).

In addition, Tiger Lily alleges failure to state a claim and the following affirmative defenses: that Barclays is not damaged by the registration of Tiger Lily's mark; unclean hands; laches, waiver and estoppel,[15] none of which were pursued at trial. Accordingly, they are waived. *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1753 (TTAB 2013), *aff'd*, 565 Fed. App'x 900 (Fed. Cir. 2014) (mem.); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 801.01 (2020).

---

[15] *See* Tiger Lily's Amended Answer paragraph nos. 55-59 (Opposition No. 91219477, 12 TTABVUE 12-13) and its Answer paragraph nos. 55-60 (Opposition No. 91219478, 7 TTABVUE 11-12).

Serial No. 88242849

## II.    Opposition No. 91219549 filed by Tiger Lily

### A.  Tiger Lily's Grounds of Opposition

As Opposer in Opposition No. 91219549, opposing Barclays' application Serial No. 86081143 for LEHMAN BROTHERS, Tiger Lily alleges priority and likelihood of confusion of the LEHMAN BROTHERS mark, that Barclays had no bona fide intent to use the LEHMAN BROTHERS mark for the applied-for services, abandonment and fraud.[16]

### B.    Barclays' Answer and Affirmative Defenses

Barclays denies the salient allegations in Tiger Lily's Second Amended Notice of Opposition. It also alleges failure to state a claim and affirmative defenses of estoppel, waiver and/or acquiescence,[17] which were not pursued at trial. Accordingly, these are waived. *Alcatraz Media v. Chesapeake Marine Tours*, 107 USPQ2d at 1753; TBMP § 801.01.

On August 17, 2018 the Board granted Barclays Capital Inc.'s Motion on Consent to Join requesting that Barclays PLC, a public limited company organized and existing under the laws of England and Wales, be joined as Opposer in Opposition Nos. 91219477 and 91219478, and as Applicant in Opposition No. 91219549. Barclays Capital Inc. represents that pursuant to an agreement dated August 31, 2017, it

---

[16] *See* Tiger Lily's Second Amended Notice of Opposition filed in Opposition No. 91219549 (filed in Opposition No. 91219477, 111 TTABVUE).

[17] *See* Barclays Capital Inc.'s Answer and Affirmative Defenses to Tiger Lily Ventures Ltd.'s Second Amended Notice of Opposition in Opposition No. 91219549 (filed in Opposition No. 91219477 under 111 and 112 TTABVUE).

assigned all rights, title and interest to the LEHMAN BROTHERS marks, including Application Serial No. 86081143, to Barclays PLC. Barclays PLC and Barclays Capital Inc. executed a confirmatory assignment dated March 7, 2018 which was recorded in the Assignment Division of the USPTO on March 12, 2018 at Reel/Frame: 6289/0791.[18]

## III.  Evidentiary Objections

### A.  Evidentiary Objections to Notices of Reliance

Barclays objects to Tiger Lily's Notice of Reliance No. 2, consisting of state and foreign registration documents, offered into evidence to support Tiger Lily's claims that the LEHMAN BROTHERS mark does not uniquely and unmistakably point to a financial institution, Barclays' lack of intent to use, absence of actual confusion in the marketplace and abandonment. (134 TTABVUE 2-5). Barclay's objection is granted in part and denied in part.

A New York state registration issued in the name of LBW LLC[19] and the record is devoid of evidentiary support establishing Tiger Lily's connection to and control of, or by, the registrant entity. *Cf. Kraft, Inc. v. Balin*, 209 USPQ 877, 879 (TTAB 1981). Additionally, both Chinese Registration No. 19762364.[20] owned by Tiger Lily, and French Registration No. 4123417[21], owned by "M. David Tordjman, Agissant pour le compte de la société 'lehman brothers' en cours de formation," for the mark LEHMAN

---

[18] 113 and 129 TTABVUE.

[19] Tiger Lily's Exhibit 14 (120 TTABVUE 2, 5-6).

[20] Tiger Lily's Exhibit 15 (120 TTABVUE 2-3, 7-8).

[21] Tiger Lily's Exhibit 16 (120 TTABVUE 3, 9-12).

BROTHERS, are insufficient evidence of use or ownership of the mark in the United States and are, therefore, immaterial and not relevant to Tiger Lily's rights to the mark LEHMAN BROTHERS in the United States. *Nabisco, Inc. v. George Weston Ltd.*, 179 USPQ 503, 507 (TTAB 1973); *see also S.A. Marne et Champagne v. Myers*, 250 F.2d 374, 116 USPQ 153, 156 (CCPA 1957). Additionally, the French registration document retrieved from TM VIEW, believed to be a free online trademark search database maintained by the European Union Intellectual Property Office ("EUIPO"), and offered into evidence lacks the necessary information regarding its Internet source (e.g., URL) required by 37 C.F.R. § 2.122(e). *Safer, Inc. v. OMS Investments, Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010), and does not indicate ownership by Tiger Lily. Therefore, the New York registration (Exhibit 14) and the French registration (Exhibit 16)[22] are stricken from the record and the Chinese registration (Exhibit 15) is admissible but will be considered within its exceedingly limited scope of relevance.

Tiger Lily introduced internet articles related to Lehman Brothers' bankruptcy and sale of certain businesses through Exhibits 17-20,[23] which Barclays seeks to strike from the record. (149 TTABVUE 5). Barclays' objections are denied in part and granted in part as the articles are admissible but Tiger Lily cannot rely on them for the truth of the matters contained therein. The internet articles were submitted through Tiger Lily's Notice of Reliance No. 3 pursuant to 37 C.F.R. § 2.122(e), showing

---

[22] This French registration was also marked as Exhibit E in the Testimony Deposition of Alexander Greenberg pp. 200:16-205:2 (116 TTABVUE 201-206) and was objected to by Barclays' attorney pp. 203-204 (116 TTABVUE 204-205).

[23] 121 TTABVUE 2-5, 8-24, 25-63, 64-72, 73-208.

the date the materials were accessed and their source (URL). *See also* TBMP § 704.08(b)(2). Barclays is correct that such articles, unaccompanied by testimony, cannot be considered for the truth of the matter asserted therein but only for what they show on their face. *Ricardo Media Inc. v. Inventive Software, LLC*, 2019 USPQ2d 311355, at *2 (TTAB 2019). Since the evidence was properly submitted, it will not be stricken but it will be considered within its limited scope, including demonstrating the "public perception of the marks by others." *Harry Winston, Inc. v. Bruce Winston Corp.*, 111 USPQ2d 1419, 1427 (TTAB 2014).

As to Exhibit 26 introduced in Tiger Lily's Notice of Reliance No. 4[24], the Board will not address previously settled evidentiary matters. Therefore, Exhibit 26 (Barclays' Responses to Tiger Lily's First Set of Document Requests) is stricken from the record since "none of Barclays responses to Tiger Lily's requests for production state that no responsive documents exist." (132 TTABVUE 8-9).

Barclays moves to strike Exhibit 27[25] to Tiger Lily's Amended Notice of Reliance No. 5 consisting of copies of Tiger Lily's motion to compel, supporting legal memorandum, declaration and exhibits, and the District Court for the Southern District of New York's order denying the motion.[26] The motion to compel sought answers from Ignacio Duran, Barclays' witness, to questions which were objected to on the basis of privilege during his cross-examination. The Southern District of New

---

[24] 122 TTABVUE 2, 15-28.

[25] 149 TTABVUE 5-6.

[26] 123 TTABVUE 2, 5-63 and 137 TTABVUE.

Serial No. 88242849

York denied Tiger Lily's motion to compel on the ground that the court lacked jurisdiction. *Tiger Lily Ventures Ltd. v. Barclays Capital Inc.*, 1:17 mc-00499-GBD-KNF (S.D.N.Y.). The notice of testimony deposition served on Duran stated that it was served pursuant to 37 C.F.R. § 2.123 (and not by a subpoena pursuant to 35 U.S.C. § 24) which provides for objections raised at depositions noticed thereunder to be decided at the final TTAB hearing.[27] *Health-Tex Inc. v. Okabashi (U.S.) Corp.*, 18 USPQ2d 1409, 1411 (TTAB 1990) (questions are generally answered subject to any objection which has been made; objections concerning a deponent's refusal to answer questions in connection with oral depositions under Trademark Rule 2.123 are not considered until final hearing; a refusal to answer may, if the objection is not well taken, be construed against the non-answering party). Inasmuch as we are now at the final hearing stage, and the testimonial cross-examination of Ignacio Duran has been made of record (117 TTABVUE; Confidential 118 TTABVUE), we grant Barclays' objection to Tiger Lily's Exhibit 27 and strike it from the record as its content is of no relevance and has no evidentiary value.

Based on Fed. R. Evid. 403 for needlessly presenting cumulative evidence, Tiger Lily has asked the Board to strike the following Exhibits submitted through Barclays' Notices of Reliance (151 TTABVUE 18): First Notice of Reliance (Exhibit 9);[28] Second Notice of Reliance (Exhibits 2-4);[29] Third Notice of Reliance (Exhibit 9);[30] and Fourth

---

[27] 123 TTABVUE 62.

[28] 77 TTABVUE 4; 78 TTABVUE 37-368.

[29] 79 TTABVUE 8-110, 248-915; 80 TTABVUE 3-2112, 2113-2236.

[30] 81 TTABVUE 10-20, 267-1982.

Notice of Reliance (Exhibit 4).[31] Tiger Lily's objection is denied. "[A]s part of the Board's longstanding practice, parties are permitted to submit a representative sample of relevant articles obtained from an Internet database search." *Alcatraz Media v. Chesapeake Marine Tours*, 107 USPQ2d at 1758. The Exhibits were properly entered into evidence through a notice of reliance pursuant to 37 C.F.R. § 2.122(e) and will be reviewed by the Board for the limited probative value the documents present on their face and not for the truth of the matters therein. *See* TBMP § 704.08(b). Additionally, the Board had already ruled on Tiger Lily's present objections and denied the same in regards to Barclays' First Notice of Reliance (Exhibit 9) and Fourth Notice of Reliance (Exhibit 4) because it found Barclays' descriptions to be sufficiently narrow. (98 TTABVUE 7). Furthermore, the Board granted Barclays leave to cure its Second Notice of Reliance (Exhibits 1-4) and Third Notice of Reliance (Exhibit 9), which were amended and resubmitted under 99 TTABVUE and 100 TTABVUE, respectively.

B.    Testimonial evidence

Barclays moved to strike certain testimony in the Declaration of Chaim Green, Tiger Lily's Director (124 TTABVUE), based on lack of personal knowledge, hearsay, and lay opinion testimony; and Tiger Lily moved to strike the Declarations of Alexander Greenberg, Director, Legal (formerly, Vice-President, Legal) of Barclays Capital Inc. (86 TTABVUE), and Ignacio Duran, former paralegal for Barclays'

---

[31] 84 TTABVUE 3-4, 95; Confidential 85 TTABVUE 37-1491.

outside counsel and attorneys in this case (89 TTABVUE), on the basis that "[b]oth declarations seek to justify their own work and research, are self-serving, and are not capable of carrying any weight on the ultimate question of whether the consuming public have any cognizance of any residual goodwill." (151 TTABVUE 6).

The Board does not usually strike testimony but considers its probative value in light of the objections raised. *Krause v. Krause Publ's, Inc.*, 76 USPQ2d 1904, 1907 (TTAB 2005); TBMP 707.03(c). TTAB proceedings are heard by Administrative Trademark Judges who are not easily misled, confused or prejudiced by irrelevant evidence and capable of assessing the weight of the testimony, taking into consideration the imperfections surrounding its admissibility. "The Board does not ordinarily strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, such objections are considered by the Board in its evaluation of the probative value of the testimony at final hearing." *Alcatraz Media v. Chesapeake Marine Tours*, 107 USPQ2d at 1755. After considering the probative value, the Board will "disregard any opinion testimony regarding the ultimate disposition of the claims asserted." *Id*. Therefore, both parties' motions to strike the testimony of Barclays' witnesses Duran and Greenberg, and Tiger Lily's witness Green are denied, but the Board will consider the same in light of all objections raised and determine their probative value accordingly.

Tiger Lily has also raised objections to Barclays' assertion of work product and attorney-client privilege during the depositions of Ignacio Duran and Alexander Greenberg (151 TTABVUE 6-17). "The [work product] doctrine protects a lawyer's

Serial No. 88242849

ability to prepare his client's case, protects against the disclosure of the attorney's mental impressions, conclusions, strategies, or theories." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 184 F.R.D. 49, 52 (S.D.N.Y. 1999). Documents created in view of litigation are protected under the work product privilege, inclusive of materials prepared by the attorney or their agent. *Id*. Tiger Lily contends that privilege was wrongly asserted by Barclays when Barclays' witness Duran refused to answer questions related to the work and research parameters he was provided when working as a paralegal for Barclay attorneys, Cowan, Liebowitz & Latman, P.C., in preparation for this trial.[32] (151 TTABVUE 9). Additionally, Tiger Lily presents a chart with extracts of Alexander Greenberg's deposition where he also refused to answer certain questions based on privilege and per the advice of Barclays' counsel (151 TTABVUE 12-17).

Questions asked during testimony should ordinarily be answered subject to objections. However, a witness may refuse to answer a question asking for information that is privileged. *See* TBMP § 707.03(d). Unlike in federal district courts, the Board does not immediately rule on testimonial objections and there is no mechanism for the parties to obtain a ruling on the same until the final hearing. *Levi Strauss & Co. v. R. Josephs Sportswear, Inc.*, 28 USPQ2d 1464, 1466 (TTAB 1993). "Although a party's witness may refuse to answer a question or, as in the present

---

[32] Although Ignacio Duran was admitted to the bar as a lawyer while employed by Barclays' counsel, he was employed as a paralegal for Barclays' counsel at the time he performed the services he testified to in his Testimony Declaration and his Cross-Examination. Cross-Examination Testimony of Duran p. 21:2-10, 24:3-19 (117 TTABVUE 22, 25).

Serial No. 88242849

case, be instructed by the party's attorney not to answer, a refusal to answer may, if the objection is not well taken, be construed against the non-answering party." *Id.* at 1467.

We have carefully reviewed all of the testimony depositions of Ignacio Duran and Alexander Greenberg. We will not burden this decision by discussing each and every question to which an objection was raised. There is no mechanism for obtaining from the Board, prior to final hearing, a ruling on the propriety of an objection to a question propounded during a testimony deposition. If the Board finds at final hearing that Barclays objections were not well taken, we may presume that the answer would have been unfavorable to the position of Barclays whose witness refused to answer, or may find that the refusal to answer reduces the probative value of the witness's testimony. TBMP 707.03(d). *See Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, 703 F.2d 1372, 217 USPQ 505, 510 (Fed. Cir. 1983) (no error in drawing adverse inference where witnesses inappropriately refused to answer relevant questions), *aff'g*, 213 USPQ 594 (TTAB 1982); *Levi Strauss v. R. Josephs Sportswear*, 28 USPQ2d at 1467 (where opposer's objections were found to be not well taken, Board presumed that the answers would have been adverse to opposer's position.).

C.    Internet evidence

Additionally, both Barclays and Tiger Lily, by way of notices of reliance, submitted printouts from various websites downloaded from the Internet. Although admissible for what they show on their face, Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2), this evidence also contains hearsay that may not be relied upon for the truth of the

Serial No. 88242849

matters asserted unless supported by testimony or other evidence. Fed. R. Evid. 801(c); *Safer v. OMS Invs.*, 94 USPQ2d 1039-40; TBMP § 704.08(b) ("The probative value of Internet documents is limited. They can be used to demonstrate what the documents show on their face. However, documents obtained through the Internet may not be used to demonstrate the truth of what has been printed.").

D.    Evidence Designated "Confidential"

Barclays and Tiger Lily have submitted evidence that has been designated confidential, in part, and filed under seal. We have discussed only in general terms the relevant evidence submitted under seal, if necessary and appropriate. However, to the extent such evidence has improperly been designated as confidential, we may disregard the confidential designation when appropriate. Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("[t]he Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."). *See also Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1461 (TTAB 2014).

E.    Remaining Objections

With regard to any remaining evidentiary objections, we have considered all of the evidence of record, noting the objections and responses. The Board is capable of weighing the relevance and strength or weakness of the objected-to evidence in this case, including any inherent limitations, and this precludes the need to strike the challenged evidence on relevancy grounds. We have accorded the evidence whatever probative value it merits, keeping the parties' objections in mind, and comment as

needed on its probative value elsewhere in this opinion. *See Alcatraz Media v. Chesapeake Marine Tours*, 107 USPQ2d at 1755; *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1104 (TTAB 2007); *see also U.S. Playing Card Co. v. Harbro LLC*, 81 USPQ 1537, 1540 (TTAB 2006) ("[B]ecause an opposition is akin to a bench trial, the Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the imperfections surrounding the admissibility of such testimony and evidence."). Thus, other than the issues decided above, we decline to decide each and every individual objection and base our factual findings herein only on evidence that is admissible, properly of record and probative.

## IV.    The Record

The Appendix found at the end of this decision lists the contents of the entire record in this case. We have carefully considered all of the parties' arguments and admissible evidence in the record even if not specifically discussed herein; the findings of fact are based on such evidence.

Both parties submitted trial briefs and reply briefs in connection with Opposition Nos. 91219477-78 and Opposition No. 91219549,[33] and both parties were represented by counsel at an oral hearing held before the Board.

---

[33] Barclays submitted its opening Brief on Final Hearing in Opposition Nos. 91219477-78 (148 TTABVUE); Tiger Lily submitted a Combined Trial Brief in Position of Defendant in Opposition Nos. 91219477-78 and Opening Brief as Plaintiff in Opposition No. 91219549 (150 TTABVUE); Barclays submitted a Combined Reply Brief on Final Hearing in Opposition Nos. 91219477-78 and its opposing Brief on Final Hearing in Opposition No. 91219549 (152 TTABVUE); and Tiger Lily submitted a Reply Brief as Plaintiff in Opposition No. 91219549 (154 TTABVUE).

Serial No. 88242849

## V.    Statutory Causes of Action

A party is authorized by statute to oppose or seek cancellation of a mark where it has both a "real interest" in the proceedings beyond that of a mere intermeddler as well as a "reasonable basis for its belief of damage." *Empresa Cubana Del Tabaco v. Gen. Cigar Co.,* 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (citing *ShutEmDown Sports, Inc. v. Lacy*, 102 USPQ2d 1036, 1041 (TTAB 2012) citing *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed.Cir.1999)). *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, *3 (Fed. Cir. 2020). A "real interest" is a "direct and personal stake" in the outcome of the proceeding. *Ritchie v. Simpson*, 50 USPQ2d at 1026. One way a belief in likely damage can be shown is by establishing a direct commercial interest. *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

This case involves the mark LEHMAN BROTHERS, a well-known mark at the time that its then-owner filed for the largest bankruptcy in United States history in September 2008. Before and after the bankruptcy filing, Lehman Brothers was featured in a wide range of media, including major U.S. newspapers, magazines, films, books, television shows and music. Additionally, the LEHMAN BROTHERS name and mark were used in connection with a wide range of collateral and promotional goods including clothing and alcohol-related goods including whiskey decanters, wine gift sets, wine books, wine carriers and coasters. Lehman Brothers'

business activities before its financial troubles and bankruptcy, as well as its subsequent business activities, have been widely publicized. Shortly after filing for bankruptcy, Lehman Brothers assigned the LEHMAN BROTHERS trademark and federal registrations and tradename to Barclays. Thus, the LEHMAN BROTHERS trademark and tradename were well-known at the time Barclays acquired them and were still recognized when it filed its Notices of Opposition against Tiger Lily's applications for LEHMAN BROTHERS.

Although the federal registrations have since expired, Barclays has common law rights in the LEHMAN BROTHERS trademark and tradename as a result of its trademark licenses. Additionally, Barclays has made of record its Application Serial No. 86081143 for the mark LEHMAN BROTHERS for securities brokerage, investment banking, and related financial and investment services.

Tiger Lily's LEHMAN BROTHERS application Serial No. 85868892 for beer and spirits was not cited as a bar to the registration of Barclays' identical LEHMAN BROTHERS mark. However, it is not necessary for an applicant's application to be cited as a potential bar to the registration of an opposer's mark for the opposer to establish its commercial interest. The desire for a registration with its attendant statutory advantages is a legitimate commercial interest. *See Spirits Int'l B.V. v. S.S. Taris Zeytin Ve Zeytinyagi Tarim Satis Kooperatifleri Birligi*, 99 USPQ2d 1545, 1548 (TTAB 2011) (citing *Toufigh v. Persona Parfum Inc.*, 95 USPQ2d 1872, 1874 (TTAB 2010), quoting *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982) ("'We regard the desire for a registration with its attendant

statutory advantages as a legitimate commercial interest.' Further, we consider that petitioner has shown a reasonable basis for a belief that he is damaged by the registration sought to be cancelled by virtue of the fact that both parties' marks are identical, and their goods are at least arguably related.")). Thus, evidence of such a refusal is not a requirement to establish commercial interest. Rather, it is sufficient if the circumstances are such that it would be reasonable for an opposer to believe that the existence of the applicant's application, if registered, would damage it, *e.g.*, a reasonable belief that there is a likelihood of confusion between the marks, or that the presence on the register of the applicant's mark may hinder the opposer in using or registering its mark.

The identity of the parties' marks and the arguable relatedness of Tiger Lily's beer and spirits (and bar and restaurant services), to Barclays' various investment and financial services in its pending application and in connection with its acquisition and licensing of the LEHMAN BROTHERS trademark and tradename, is sufficient for us to find that it possesses a real interest in the proceeding, is not an intermeddler and that it has met the statutory requirement of establishing a reasonable belief of damage. The real interest requirement is meant to prevent litigation where there is no real controversy between the parties, "where a plaintiff, petitioner or opposer, is no more than an inter-meddler." *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987). This is not such a case.

Thus, it has established a statutory cause of action. Additionally, because Barclays has established a statutory cause of action to assert a § 2(d) claim, it has the

right to assert any other ground that would bar registration by Tiger Lily including dilution under § 43(c) of the Trademark Act, false suggestion of a connection under § 2(a) of the Trademark Act, and Tiger Lily's lack of a bona fide intent to use the LEHMAN BROTHERS mark at the time it filed its trademark application. *See, e.g.*, *Spirits Int'l v. S.S. Taris Zeytin*, 99 USPQ2d at 1548 (the arguable similarities in the marks and the arguable relatedness of the goods is sufficient for us to find that opposer has met the statutory requirement of establishing a reasonable belief of damage by showing that it possesses a real interest in the proceeding, and is not an intermeddler); *Toufigh v. Persona Parfum*, 95 USPQ2d at 1874.

For the same reason, Tiger Lily has a commercial interest in asserting its claims in Opposition No. 91219549 based on its Application Serial Nos. 85868892 for beer and spirits, and 86298069 for bar and restaurant services against Barclays Application Serial No. 86081143. Therefore, Tiger Lily has a reasonable belief of damage and a real interest in this proceeding, is not an intermeddler, and has established a commercial interest.

Claims of likelihood of confusion that "[are] not wholly without merit," including prior use of a confusingly similar mark, may be sufficient "to establish a reasonable basis for a belief that one is damaged." *Lipton Indus. v. Ralston Purina*, 213 USPQ at 189. Accordingly, the foregoing is sufficient to support Barclays' and Tiger Lily's direct commercial interest in this proceeding. *See Cunningham v. Laser Golf*, 55 USPQ2d at 1844.

## VI.    Statement of Facts

In 2008, Lehman Brothers had become the fourth largest investment bank in the United States, with hundreds of billions of dollars' worth of assets under management and over 25,000 employees in offices worldwide.[34] Like other financial firms who invested heavily in subprime mortgage-backed securities, Lehman Brothers began experiencing financial difficulties in 2007. Unable to satisfy its obligations, Lehman Brothers Holdings Inc. ("LBHI") filed for Chapter 11 bankruptcy protection on September 15, 2008. Several LBHI subsidiaries and affiliates, including its brokerage subsidiary Lehman Brothers Inc. ("LBI"), filed for bankruptcy protection later in 2008 and in 2009. The Lehman Brothers bankruptcy was the largest bankruptcy in United States history.[35]

Pursuant to an Asset Purchase Agreement (APA) dated on September 16, 2008, Barclays purchased several of Lehman Brothers' businesses and other assets, including the LEHMAN BROTHERS trademark and trade name, for approximately $1.3 billion. According to the APA, as amended, Barclays granted Lehman Brothers a perpetual, worldwide non-exclusive license to use the LEHMAN trademarks and tradenames, including LEHMAN BROTHERS, for any of Lehman Brothers' then-existing goods and services and in connection with Lehman Brothers' retained and continuing businesses and operations. Under the APA, all goodwill arising from

---

[34] Greenberg Testimony Declaration ¶ 3 and Exhibit 1 (86 TTABVUE 6-7, 20-136).

[35] Greenberg Testimony Declaration ¶ 6 and Exhibits 10-11 (86 TTABVUE 7, 306-2033).

Lehman Brothers' use of the LEHMAN Names and Marks, including LEHMAN BROTHERS, inures to Barclays' benefit.[36]

Four and a half years after Barclays acquired the Lehman Brothers assets, including the LEHMAN BROTHERS trademarks, Tiger Lily filed intent to use application Serial No. 85868892 on March 6, 2013, for the mark LEHMAN BROTHERS for beer in International Class 32 and spirits in International Class 33.[37] Almost 7 months later, on October 2, 2013, Barclays filed intent to use application Serial No. 86081143 to re-register LEHMAN BROTHERS for:

> Securities brokerage services; investment consulting services; investment banking services; merchant banking services; financial and investment management services; financial planning and investment advisory services; financial research services; administration and valuation of financial investments; financial sponsorship of sporting, charitable and educational events; providing consultancy, information and advisory services relating to all the foregoing, in International Class 36.[38]

---

[36] Greenberg Testimony Declaration, ¶ 8 (86 TTABVUE 8).

[37] Barclays First Notice of Reliance, Exhibit 1, TSDR report for Application Serial No. 85868892 (77 TTABVUE 6-12). Trademark Status & Document Retrieval (TSDR) citations refer to the electronic file database for trademark applications and registrations. All citations to the TSDR database are to the downloadable .pdf version of the documents.

[38] Barclays First Notice of Reliance, Exhibit 6 TSDR report for Application Serial No. 86081143 (78 TTABVUE 12-30). Barclays owns pending Application Serial No. 86081143 filed on October 2, 2013. Its Application was published for opposition on September 30, 2014, and after obtaining an extension of time, Tiger Lily filed its Notice of Opposition on December 1, 2014.

Additionally, on June 2, 2014, Tiger Lily filed intent to use application Serial No. 86298069 for the mark LEHMAN BROTHERS for "bar services; restaurant services" in International Class 43.[39]

Later that year, on November 24, 2014, Barclays filed Opposition Nos. 91219477 and 91219478 against Tiger Lily's LEHMAN BROTHERS applications based on its alleged common law rights in the LEHMAN BROTHERS mark and trade name for securities brokerage and various investment and financial services, for likelihood of confusion under § 2(d) of the Lanham Act, likelihood of dilution under § 43(c) of the Lanham Act, false suggestion of a connection under § 2(a) of the Lanham Act and lack of bona fide intent to use under § 1(b) of the Lanham Act.[40]

Shortly thereafter, Tiger Lily filed Opposition No. 91219549 against Barclays' application for the LEHMAN BROTHERS mark. On December 19, 2014, all three oppositions were consolidated under the parent Opposition No. 91219477.[41] On May 25, 2018, Tiger Lily filed a Second Amended Notice of Opposition in Opposition No. 91219549 which is the operative pleading in that Opposition.

Barclays PLC was joined as a party plaintiff in Opposition Nos. 91219477 and 91219478, and as a party defendant in Opposition No. 91219549 as subsequent assignee of the LEHMAN BROTHERS mark.[42]

---

[39] Barclays First Notice of Reliance, Exhibit 2 TSDR report for Application Serial No. 86298069 (77 TTABVUE 13-17).

[40] Opposition No. 91219477, 1 TTABVUE; Opposition No. 91219478, 1 TTABVUE.

[41] 5 TTABVUE.

[42] 113 TTABVUE.

Serial No. 88242849

## VII.    Barclays' Oppositions to Tiger Lily's Applications

A.  Likelihood of Confusion

Barclays let all of its registrations for LEHMAN BROTHERS, and related marks, lapse and therefore does not own a trademark registration for the LEHMAN BROTHERS mark.[43] However, the Trademark Act permits opposition on the basis of "a mark or trade name previously used in the United States by another and not abandoned," Trademark Act § 2(d), 15 U.S.C. § 1052(d), *i.e.* ownership of a common-law trademark right. Because unregistered marks are not entitled to the presumptions established by statute, *see* Trademark Act § 7(b)-(c), 15 U.S.C. § 1057(b)-(c), in order to show that it has priority, it is Barclays' burden to demonstrate that it owns a trademark or a tradename.

Tiger Lily contends that Barclays abandoned its mark, thereby freeing up the mark for Tiger Lily's adoption and use and, accordingly, negating Barclays' claim of priority. When a mark is abandoned, as Tiger Lily claims occurred in this case, it becomes available for others to adopt and use as a trademark. Thus, we look first to the issue of abandonment.

### 1.    Abandonment

Under § 45 of the Trademark Act, 15 U.S.C. § 1127, a mark is considered "abandoned" if the following occurs:

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall

---

[43] Expired Registration Nos. 1717171 and 1755687 for LEHMAN BROTHERS, Barclays' First Notice of Reliance Exhibit 5 (78 TTABVUE 3-11).

Serial No. 88242849

> be prima facie evidence of abandonment. "Use" of a mark
> means the bona fide use of such mark made in the ordinary
> course of trade, and not made merely to reserve a right in
> a mark.

15 U.S.C. § 1127. Thus, there are two elements to an abandonment claim: nonuse of the mark and intent not to resume use. *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1132 (Fed. Cir. 2015) citing J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 17:26 (4th ed. 2015).

Tiger Lily has the burden to establish a prima facie case of abandonment. *See, e.g., Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 94 USPQ2d 1315, 1316 (Fed. Cir. 2010); *Azeka Bldg. Corp. v. Azeka*, 122 USPQ2d 1477, 1485 (TTAB 2017). While a showing of three years of consecutive nonuse creates a rebuttable presumption of abandonment and shifts the burden of production to Barclays to produce evidence of use or an excuse for its nonuse, the burden of persuasion, i.e., the ultimate burden of proof remains with Tiger Lily to establish the abandonment claim by a preponderance of the evidence. *See On-Line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1476 (Fed. Cir. 2000); *Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1393 (Fed. Cir. 1990); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc*., 892 F.2d 1021, 13 USPQ2d 1307, 1310 (Fed. Cir. 1989).

Barclays' acquisition of the business assets of Lehman Brothers included several federal trademark registrations for marks including the LEHMAN BROTHERS mark. Over time, those registrations came due for renewal but Barclays did not renew

any of them.[44] However, Barclays' failure to renew the LEHMAN BROTHERS registrations does not negate its continuing common law rights in the mark. *Crash Dummy v. Mattel*, 94 USPQ2d at 1316-17 ("cancellation of a trademark registration does not necessarily translate into abandonment of common law trademark rights"). The statutory presumption of abandonment applies not only to registered marks but "to a party's unregistered common-law mark." *Miller Brewing Co. v. Oland's Breweries [1971] Ltd.*, 548 F.2d 349, 192 USPQ 266, 267 (CCPA 1976); *L. & J.G. Stickley, Inc. v. Cosser*, 81 USPQ2d 1956, 1967 (TTAB 2007).[45]

---

[44] See Tiger Lily's Amended Notice of Reliance No. 1 (133 TTABVUE, Exhibits submitted with Notice of Reliance at 119 TTABVUE): Applicant's Trial Exhibits 1-13 Trademark Status & Document Retrieval (TSDR) reports showing cancelled status of: Registration No. 3141963 for LEHMAN BROTHERS ASSET MANAGEMENT (119 TTABVUE 5-7); Registration No. 2832374 for LEHMANLIVE (119 TTABVUE 8-10); Registration No. 2529704 for LEHMAN FUTURES LIVE (119 TTABVUE 11-13); Registration No. 2519808 for LEHMAN BANK (119 TTABVUE 14-16); Registration No. 2539396 for LEHMAN BROTHERS PRIMEPLUS (119 TTABVUE 17-19); Registration No. 2549090 for LEHMAN PRIMEPLUS (119 TTABVUE 20-22); Registration No. 2381464 for LEHMAN BROTHERS BANK (119 TTABVUE 23-25); Registration No. 1755687 for LEHMAN BROTHERS (119 TTABVUE 26-28); Registration No. 1717171 for LEHMAN BROTHERS (119 TTABVUE 29-33); Registration No. 1796071 for LEHMAN-LOGIC (119 TTABVUE 34-36); Registration No. 3552162 for LCX (119 TTABVUE 37-39); Registration No. 3097412 for LMX (119 TTABVUE 40-44); and Registration No. 2656151 for LEHMANLIVE (119 TTABVUE 45-47).

[45] Barclays is asserting its claims alleging common law trademark rights since it does not own any federal registrations for any LEHMAN marks. Although a review of the case law and a leading trademark treatise indicates that there does not appear to be a consensus on whether the rebuttal presumption of abandonment applies to common law ownership of trademarks, the precedent of the Federal Circuit applies the prima facie abandonment rule to common law marks. *See Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 402, 95 USPQ2d 1584 (E.D. Pa. 2009) comparing *Koppers Co. v. Krupp-Koppers GmbH*, 517 F. Supp. 836, 854 (W.D. Pa. 1981) ("The K-T marks are not registered under federal law. Therefore the two-year discontinuance presumption of the Lanham Act does not apply to Koppers Co.'s rights to the marks."), with McCarthy § 17:21 ("This presumption has even been applied to an unregistered common law trademark." (citing *Miller Brewing Co. v. Oland's Breweries (1971), Ltd.*, 548 F.2d 349 (CCPA 1976))); *Gen. Healthcare Ltd. v. Qashat*, 364 F.3d 332, 336 (1st Cir. 2004) (affirming district court's grant of summary judgment on abandonment by applying three year nonuse presumption of abandonment to a common law mark).

Serial No. 88242849

Lehman Brothers was one of the largest financial institutions in the United States with billions of dollars' worth of assets when it filed for the largest bankruptcy in U.S. history in September 2008.[46] At that time, LEHMAN BROTHERS was a well-recognized trademark "with great intrinsic value"[47] associated with securities brokerage services, investment consulting services, investment banking services and merchant banking services. Over the years, the Lehman Brothers bankruptcy has been highly publicized in major U.S. publications.[48]

LBI's liquidation is ongoing and once fully administered, the bankruptcy trustee will seek the Bankruptcy Court's authority to discharge his duties. However, there is no scheduled date for closing the estate.[49] Tiger Lily admits that although Barclays has made no new commercial offering using the LEHMAN BROTHERS mark, LEHMAN BROTHERS is still being used in connection with "activities pertaining to

---

[46] Lehman Brothers Inc. is being liquidated. Prior to the bankruptcy, Lehman Brothers Inc. was the principal U.S. broker-dealer of the Lehman enterprise. Lehman Brothers Holdings, Inc., a U.S. entity, was a bank holding company and the former parent of Lehman Brothers Inc. In accordance with the Bankruptcy Court's Liquidation Order and applicable law, Lehman Brothers Inc. ceased to operate as a broker-dealer in 2008. Trial Testimony Declaration of Christopher Kiplok, partner of the law firm Hughes Hubbard & Reed LLP, and lead counsel to James W. Giddens, the "Trustee" for the liquidation of Lehman Brothers Inc. ¶¶ 1, 5 and 6 (127 TTABVUE 2-3).

[47] In newspaper and online articles dated February 7 and 8, 2016, the Wall Street Journal quoted Tiger Lily's principal, James Green, as saying the LEHMAN BROTHERS mark is "an explosive brand with great intrinsic value." Barclays Second Notice of Reliance Exhibit 6 (80 TTABVUE 2422, 2424, 2427); Barclays Third Notice of Reliance Exhibit 13 (82 TTABVUE 178). Mr. Green testified that the Wall Street Journal article "profil[ed] the dispute on its front page . . . ." Green Testimony Declaration ¶ 13 (124 TTABVUE 5).

[48] Barclays Second Notice of Reliance, Exhibits 2, 3 and 6 (79 TTABVUE 8-27, 27-102, 112, 248-915) (80 TTABVUE 3-2112, 2421-2428).

[49] Statement made as of the August 7, 2018 execution date of the Kiplok Declaration. Christopher Kiplok (attorney for James W. Giddens, Trustee for liquidation of Lehman Brothers Inc.) Testimony Declaration ¶ 8 (127 TTABVUE 3).

winding down the former bank."[50] Thus, LEHMAN BROTHERS is still in use in connection with LBI's business activities while in bankruptcy.

Tiger Lily argues that no public services are being provided in connection with the LEHMAN BROTHERS mark and therefore Barclays cannot rely on any "unlicensed bankruptcy functions" to refute the abandonment, citing *City Nat'l Bank v. OPGI Mgmnt. GP INC./Gestion OPBI INC.*, 106 USPQ2d 1668, 1675 (TTAB 2013), for the proposition that "[a] mark that is only used internally by an applicant is not used 'in commerce, and is therefore not registrable.'"[51] However, key differences between the informational intranet website used by the respondent's own employees in *City Nat'l Bank* and the use of LEHMAN BROTHERS in the highly publicized bankruptcy proceeding, distinguish the internal uses in *City Nat'l Bank* versus the public uses of LEHMAN BROTHERS in connection with the bankruptcy proceeding.[52]

Additionally, while Barclays acknowledges that it rebranded several Lehman Brothers' services under the Barclays' name,[53] Barclays' retained its interest in the

---

[50] Green Testimony Declaration ¶ 17 (124 TTABVUE 6).

[51] Tiger Lily Ventures Ltd.'s Combined Trial Brief in Position of Defendant in Opposition Nos. 91219477 and 91219478 and Opening Brief as Plaintiff in Opposition No. 91219549, pp.34-35 (150 TTABVUE 40-41); this brief will be cited as "Tiger Lily's Opening Brief."

[52] For example, LBI has engaged in trades pursuant to, and settling its vast portfolio, managing and reporting on its bankruptcy plan, in addition to its general corporate operations, maintaining and selling its interests in various commercial loans and private equity investments, engaging with clients, counterparties, market participants, creditors employees and numerous others in business and financial transactions, and maintaining and defending numerous litigations. Greenberg Testimony Declaration ¶ 10 and Exhibits 10-11 (86 TTABVUE 9, 306-2033); Kiplok Testimony Declaration ¶ 4 and Exhibits (127 TTABVUE 3, 14-844).

[53] Barclays Opening Brief p. 11 (148 TTABVUE 18).

LEHMAN BROTHERS mark for licensing and the distribution of materials.[54] Barclays has two licenses regarding use of the LEHMAN BROTHERS name and mark which are licensed to Lehman Brothers Holdings Inc. (LBHI) and to Bloomberg LP.[55]

Since September 2008, Barclays licenses the Lehman Brothers' names and the LEHMAN BROTHERS marks to LBHI, which has emerged from bankruptcy and is no longer involved in bankruptcy proceedings, "for any of the Lehman Brothers then-existing goods and services and in connection with Lehman Brothers' retained and continuing businesses and operations" and on certain materials that continue to be offered to Lehman Brothers' clients.[56] LBHI has been involved investing in improving, maintaining, managing and selling its sizable assets, including hundreds of billions of dollars' worth of commercial real estate property and securities,

---

[54] Greenberg Cross-Examination Testimony Deposition pp. 144:17-21 (116 TTABVUE 145).

In December 2015, Barclays sold the wealth management business it acquired from Lehman Brothers and developed at Barclays, to Stifel Financial Corp. However, Barclays retained a global wealth management business, and Greenberg testified that he was "sure some of former Lehman clients would stay [with Barclays] for the global wealth management business." See Green's Testimony Declaration ¶ 12 (124 TTABVUE 5) and Greenberg's Cross-Examination Testimony pp. 97:18-22, 98:21-99:5, 99:13-18 (116 TTABVUE 98-100).

[55] Greenberg Cross-Examination Testimony Deposition pp. 57:23-59:5, 107:16-24, 108:2-21 (116 TTABVUE 58-60, 108-109, 311).

[56] Greenberg Testimony Declaration, ¶7-9 (86 TTABVUE 7-9); Greenberg Cross-Examination Testimony Deposition pp. 57:22-58:3, 58:19-59:5, 210:14-22 (116 TTABVUE 58-60, 211).

Page 10 of Tiger Lily's Opening Brief indicates that the "www.lehmanbrothers.com website continues to function without a source or indicator of any Lehman Brothers services, and prominently announces that LBHI is in bankruptcy." (150 TTABVUE 16) citing to its Notice of Reliance No. 3 Exhibit 23.1 dated 8/5/18 stating "Lehman Brothers Holdings Inc. has filed for bankruptcy protection in the U.S." (121 TTABVUE 6). However, Barclays' witness, Mr. Greenberg, on March 20, 2017, testified that LBHI is no longer in bankruptcy. Greenberg Trial Declaration ¶ 23 (86 TTABVUE 12).

Serial No. 88242849

engaging in trades pursuant to, and settling its vast portfolio of, derivative swap agreements; managing and reporting on its bankruptcy plan, in addition to its general corporate operations; maintaining and selling its interests in various commercial loans and private equity investments; engaging with clients, existing counterparties, market participants, creditors, employees and others in business and financial transactions; and maintaining and defending numerous litigations.[57] The Asset Purchase Agreement (APA) between Barclays and Lehman Brothers grants a "perpetual, worldwide, nonexclusive, full paid, royalty-free license under the trademarks 'Lehman' and 'Lehman Brothers'" and provides that Barclays "shall have the right to supervise and control the use of the licensed marks by each licensee."[58] On September 20, 2008, Barclays and Lehman Brothers entered into a Letter Agreement to amend and clarify some provisions of the APA, including provisions concerning Lehman Brothers' license of the LEHMAN names and marks, including LEHMAN BROTHERS.[59] The Letter limits the term of the Lehman Brothers' trademark license to two years from the Closing Date of the APA for use in connection with Lehman Brothers' investment banking and capital markets businesses, but also

---

[57] Greenberg Testimony Declaration ¶ 10 and Exhibits 10-11 (86 TTABVUE 9, 306-2033); Greenberg Cross-Examination Testimony pp. 208:9-13, 209:15-19 (116 TTABVUE 209-210); Kiplok Testimony Declaration ¶ 4 and Exhibits (127 TTABVUE 3, 14-844).

[58] Greenberg Cross-Examination Testimony pp. 226-227 (116 TTABVUE 227-228) and Exhibit J (115 TTABVUE 47-48) (part of the Asset Purchase Agreement). In response to a question from Tiger Lily's counsel regarding whether he has "ever seen specimens of use of the license[d] marks" Greenberg testified that he has "seen the specimens in the use of the licensed marks." Greenberg Cross-Examination Testimony Deposition p. 227 (116 TTABVUE 228).

[59] See Letter of clarification Exhibit K to Greenberg Cross-Examination Testimony Deposition (115 TTABVUE 49).

provides that the amendment does not alter the perpetual license granted to Lehman
Brothers for its other businesses or continuing operations, including "the IMD
business," i.e., the "investment management business of [LBHI and LBI] and its
Subsidiaries."[60]

In addition to the licensed use by LBHI, in December 2015, Bloomberg LP
acquired Barclays' financial bond indices business known as Barclays Risk Analytics
and Index Solutions Limited (BRAIS), an asset Barclays mostly acquired from
Lehman Brothers.[61] Pursuant to that agreement, which includes the Barclays Brand
Licence Agreement[62], between Barclays Bank PLC[63] and BRAIS, Barclays maintains
ownership of the LEHMAN names and trademarks, including LEHMAN

---

[60] Greenberg Testimony Declaration ¶ 8 and Exhibit 4 (86 TTABVUE 8, 209-213); Greenberg
Cross-Examination Testimony Deposition pp. 229:11-230:19 (116 TTABVUE 230-231) and
Exhibit K (115 TTABVUE 49); see APA for definition of "IMD" p. 4 (86 TTABVUE 167).

[61] Mr. Greenberg explained that this index business, is a business of producing financial
indices, and was worth $700 million. There are a multitude of financial indices that quantify
performance of various financial instruments or groups of financial instruments and plot that
performance of time creating an index and various financial instruments. Other financial
instruments are then created to track these indices. One of the things that investment
advisers use these indices for is putting together portfolios for their clients. Greenberg Cross-
Examination Testimony Deposition pp. 57:23-59:5, 107:16-24, 108:2-21; 109:3-14 (116
TTABVUE 58-60, 108-110, 311-312).

[62] See Exhibits O and P to Greenberg Cross-Examination Testimony (115 TTABVUE 58-63,
Confidential Filed Under Seal 114 TTABVUE 59-64, 65-97); Greenberg Testimony
Declaration, Exhibit 24 (87 TTABVUE 309, Confidential Filed Under Seal 88 TTABVUE
1658-1780).

[63] Tiger Lily notes that Opposer BCI is not directly a party to this agreement nor a signatory
thereof. Tiger Lily Opening Brief p. 35 (150 TTABVUE 41). Neither is Opposer Barclays PLC.
However, BCI is mentioned in Schedules 1 and 7 in the Long Form and Short Form
Disclaimers in the agreement state that "Barclays Capital is the investment banking division
of Barclays Bank PLC." See Exhibit 24 to Greenberg's Trial Testimony Declaration ¶ 40; (86
TTABVUE 16, 87 TTABVUE 309) (CONFIDENTIAL 88 TTABVUE 1719-20, 1779-80).
Barclays' in-house attorney testified that Barclays Bank PLC is a corporate parent of BCI,
so it could "speak on behalf of the subsidiary." Greenberg Cross-Examination pp. 249:12-23,
250:21-251:4 (116 TTABVUE 250-252, 267, 271-72).

BROTHERS, and licenses the marks to Bloomberg for use in connection with the bond index business, including in connection with Bloomberg's use and distribution of legacy LEHMAN BROTHERS research materials. Barclays also continues to offer and distribute the legacy LEHMAN BROTHERS research materials through its own retained businesses.[64]

Use of a trademark need not always be made directly by the trademark owner and is often made "with the permission" of the owner via a licensing agreement. Indeed, sometimes the only use of a mark is through a licensee. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 78 USPQ2d 1509 (3d Cir. 2006); McCarthy § 18:46 (5th ed. Sept. 2020) ("Ownership rights in a trademark or service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee.").

Even minimal use of a mark may be enough to defeat a claim of abandonment. *See, e.g., Person's Co. Ltd. v. Christman*, 900 F.2d 1565, 14 USPQ2d 1477, 1481-82 (Fed. Cir. 1990) (minimal use post-bankruptcy); *Christian Faith Fellowship Church v. Adidas AG*, 841 F.3d 986, 120 USPQ2d 1640, 1645 (Fed. Cir. 2016) (sale of two

---

[64] Greenberg Trial Testimony Declaration ¶ 39 (86 TTABVUE 15); Greenberg Cross-Examination Testimony Deposition pp. 107:21-108:21 (116 TTABVUE 108-109, 311); "Licensed Barclays Trade Marks" "means . . . (ii) for the purpose of clause 2.2(c), the LEHAMN BROTHERS mark." *See* (CONFIDENTIAL 88 TTABVUE 1665).

Mr. Greenberg confirmed that although "there is no direct reference to the US rights in the Lehman Brothers mark," the worldwide scope of the Agreement and the understanding between the parties included the use of the LEHMAN BROTHERS mark in the United States as set forth in the definition of "Licensed Barclays Trade Marks" and part 2.2(c) of the Agreement which contains an "open-ended reference to Lehman Brothers mark." Greenberg Cross-Examination Testimony Deposition pp. 252:6-24, 259:5-15, 267:12-15 (116 TTABVUE 253, 260, 268).

hats); *Guiding Eyes for the Blind, Inc. v. Guide Dog Found. for the Blind, Inc.*, 384

F.2d 1016, 155 USPQ 462 (CCPA 1967) (internal signage and limited products).

"Abandonment requires complete cessation or discontinuance of trademark use."

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 80 USPQ2d

1161, 1165 (9th Cir. 2006). Even for a business that is "on its way out," "[i]f there is

continued use, a prospective intent to abandon the mark or business does not decide

the issue of abandonment." *Id.* at 1164. Therefore, "[e]ven a declining business

retains, may benefit from, or may continue to build its goodwill until it shuts its doors

or ceases use of its marks." *Id.* at 1166.[65]

As noted by the Board in *Lyon Metal Prods., Inc. v. Lyon Inc.*, 134 USPQ 31, 35

n.5 (TTAB 1962), a case denying the registration of a mark similar to a dormant

trademark with recognized residual good will:

> The substantial good will which accrued to the first party
> because of his extensive promotion and use of his mark
> does not cease immediately upon a decision to discontinue
> the manufacture and sale of the goods associated with said
> good will. There is a residual good will in the mark which
> remains until such time as it can be shown that the
> purchasing public generally no longer is reasonably likely

---

[65] The Supreme Court " . . . has held in the past that even total non-use of a mark for over
four years, and a resulting near-total loss of goodwill, was insufficient under the
circumstances of that case to support a finding of abandonment." *EH Yacht, LLC v. Egg
Harbor*, 84 F. Supp.2d 556, 53 USPQ2d 1640, 1647 (D.N.J. 2000), citing *Beech-Nut Packing
Co. v. P. Lorillard Co.*, 273 U.S. 629, 632 (1927) (Holmes, J.) ("[T]he fact that the good will
once associated with it has vanished does not end at once the preferential right of the
proprietor to try it again upon goods of the same class with improvements that renew the
proprietor's hopes.").

In *Beech-Nut Packing v. Lorillard*, the BEECHNUT trademark was dormant from 1910 until
1915, when Lorillard introduced a new product under that name. Beech-Nut Packing claimed
Lorillard had abandoned the mark. The Court saw "no reason to disturb the finding of two
courts that the right to use the mark had not been lost. The mere lapse of time was not such
that it could be said to have destroyed the right as a matter of law." 273 U.S. at 632.

> to associate the second party's product with the first party. Until that time, there is a continuing likelihood of confusion as to source and where, as in the instant case, the first party is using the mark, albeit on different goods, there is in addition a continuing likelihood of damage or injury to the reputation and character of that party.

Thus, courts have considered the existence of goodwill as evidence in determining abandonment of a mark. *Cf. Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 169 USPQ 590, 593 (CCPA 1971) (goodwill considered in determining "intent not to resume" despite non-use for over eight years). Therefore, a mark is abandoned only when all trademark significance is lost. *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 765, 214 USPQ 327 (CCPA 1982).

Here, the issue is abandonment, i.e., whether Barclays has forfeited all rights because the mark LEHMAN BROTHERS no longer identifies it as a source for financial and investment services. Although Barclays itself appears to have made minimal use of the LEHMAN BROTHERS mark, the record includes evidence of licenses regarding the use of the LEHMAN BROTHERS mark and trade name with Barclays' consent; therefore, this fails to establish the abandonment of Barclays' LEHMAN BROTHERS mark. Moreover, in view of the well-known reputation established in LEHMAN BROTHERS by Barclays' predecessor, the more likely a sufficient residual goodwill remains in the LEHMAN BROTHERS trademark, especially when Barclays' acts have not been of such character as to cause the mark to lose its significance as an indication of origin.

In view of the foregoing, we find that LEHMAN BROTHERS continues to function as a mark for Barclays.

2.    Priority

In light of the consolidated nature of this case, involving oppositions brought by both Barclays and Tiger Lily, both have alleged priority of use of their respective common law rights in the LEHMAN BROTHERS mark. Because its registrations have been cancelled, Barclays no longer benefits from the presumptions of § 7(b) of the Trademark Act, 15 U.S.C. § 1057(b), and must rely on its common law use to prove priority. *Kemi Organics, LLC v. Gupta*, 126 USPQ2d 1601, 1606 (TTAB 2018). Similarly, Tiger Lily does not own any registrations for the mark LEHMAN BROTHERS, arguing instead that it has priority based on the filing date of its earliest filed application, namely March 6, 2013. Although Tiger Lily argues that the priority issue is rendered moot by Barclays abandonment of its rights in the LEHMAN BROTHERS mark thereby depriving it of the ability to establish priority, as addressed above, Barclays previously used and licensed and did not abandon its LEHMAN BROTHERS mark and trade name.

Inasmuch as neither Barclays nor Tiger Lily owns an existing registration, in order to show that they have priority under § 2(d), Barclays and Tiger Lily must rely on their common law rights, and show that they established such rights through prior use of a mark or trade name that has not been abandoned. *Threshold.TV, Inc. v. Metronome Enters., Inc.*, 96 USPQ2d 1031, 1036 (TTAB 2010).

Although Tiger Lily argues that the priority issue is rendered moot by Barclays abandonment of its rights in the LEHMAN BROTHERS mark thereby depriving it of the ability to establish priority, as addressed above, Barclays used and licensed and did not abandon the LEHMAN BROTHERS mark and trade name.

Serial No. 88242849

Because Tiger Lily has submitted no evidence of use of its mark prior to the filing date of its first LEHMAN BROTHERS application, the earliest date on which it may rely is March 6, 2013, the filing date of its earliest-filed application for beer and spirits.[66] *Orange Bang, Inc. v. Olé Mexican Foods, Inc.*, 116 USPQ2d 1102, 1115 (TTAB 2015); *Joel Gott Wines LLC v. Rehoboth Von Gott Inc.*, 107 USPQ2d 1424, 1429 (TTAB 2013). Inasmuch as this date is subsequent to the long-prior used LEHMAN BROTHERS mark by Lehman Brothers since long prior to Barclays acquisition of the trademark rights in 2008, which Barclays has not abandoned, Barclays has shown prior use.

### 3.    Likelihood of Confusion

In determining the likelihood of confusion, we must analyze all of the probative facts in evidence that are relevant to the factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1800 (Fed. Cir. 2018) (*DuPont* "articulated thirteen factors to consider when determining likelihood of confusion"). "'Not all of the *DuPont* factors are relevant to every case, and only factors of significance to the particular mark need be considered,'" *id.* (quoting *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010)); *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 78 USPQ2d 1944, 1947 (Fed. Cir. 2006) (even within *DuPont* list, only factors that are "relevant and of record" need be considered).

---

[66] See Tiger Lily's Application Serial No. 85868892; Green Testimony Declaration ¶¶ 8, 15 (Tiger Lily applied for the LEHMAN BROTHERS mark in March of 2013; Tiger Lily's whisky has been selling since early 2016 in both the UK and the USA).

Serial No. 88242849

Two key considerations are the similarities between the marks and the similarities between the goods and/or services. *See In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017) (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002)); *Federated Foods, Inc. v. Fort Howard Paper Co.* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). We consider other *DuPont* factors for which the parties have submitted evidence or argument.

### a.    Similarity of the Marks

To the extent that Tiger Lily's mark is identical to Barclays' mark, they are similar overall in sound, appearance and meaning. "When word marks are identical but neither suggestive nor descriptive of the goods associated with them, the first *DuPont* factor weighs heavily against the applicant." *In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003); *see also In re i.am.symbolic*, 123 USPQ2d at 1748; *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984). Even when goods or services are not competitive or intrinsically related, the use of identical marks can lead to the assumption that there is a common source. *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993).

"[A]n applicant's or registrant's intended interpretation of the mark is not necessarily the same as the consumer's perception of it." *In re Yale Sportswear Corp.*, 88 USPQ2d 1121, 1125 (TTAB 2008); *see also Interpayment Servs. Ltd. v. Docters & Thiede*, 66 USPQ2d 1463, 1465 (TTAB 2003) ("In short, it does not matter what

applicant's intentions were in creating its mark or what its characterization of its mark is.").

Because Applicant's mark is identical to the cited mark, this strongly supports a likelihood of confusion.

### b.    Similarity of the Goods/Services

The second *DuPont* factor involves consideration of the "similarity or dissimilarity and nature of the goods or services as described in an application or registration." *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1159 (Fed. Cir. 2014); *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). Where the marks of the respective parties are identical, as we have here, the degree of similarity or relatedness between the goods or services needed to support a finding of likelihood of confusion declines. *See In re i.am.symbolic, llc*, 116 USPQ2d 1406, 1411 (TTAB 2015) (citing *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688-89 (Fed. Cir. 1993) ("even when the goods or services are not competitive or intrinsically related, the use of identical marks can lead to the assumption that there is a common source")), *aff'd*, 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017). It is only necessary that there be a "viable relationship between the goods" to support a finding of likelihood of confusion. *In re Thor Tech Inc.*, 90 USPQ2d 1634, 1636 (TTAB 2009).

The goods and services identified in Tiger Lily's applications are beer and spirits, and bar services and restaurant services. Barclays' services are various financial and investment related services. While the parties goods and services are distinctly

different, goods and services need not be identical or even competitive in nature to support a finding of likelihood of confusion. Customers encountering Tiger Lily's goods and services under the well-known LEHMAN BROTHERS mark would be likely to mistakenly assume that Tiger Lily's goods are in some way related to Barclays. *Gen. Mills Fun Grp., Inc. v. Tuxedo Monopoly, Inc.*, 204 USPQ 396 (TTAB 1979) ("Moreover, it is a matter of common knowledge that famous marks are frequently used on certain types of items, such as clothing, glassware, trash cans, pillows, etc., which are unrelated in nature to those goods on which the marks are normally used; such use has become a part of everyday life which we cannot ignore.") *aff'd* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (finding no error in the Board's finding that it is common knowledge that famous marks are frequently used on diverse and "novelty" items).

As shown by the evidence submitted by Barclays, it is commonplace for owners of well-known marks to expand their product lines to incorporate a diverse set of goods to capitalize on the renown of their names and brands. *In re Jackson Int'l Trading Co. Kurt D. Bruhl GmbH & Co. KG*, 103 USPQ2d 1417, 1419-20 (TTAB 2012); *In re Phillips-Van Heusen Corp.*, 228 USPQ 949, 951 (TTAB 1986) ("The licensing of commercial trademarks for use on 'collateral' products (such as clothing, glassware, linens, etc.) which are unrelated in nature to those goods or services on which the marks are normally used, has become a common practice in recent years."); *see also Source Servs. Corp. v. Chicagoland JobSource, Inc.*, 643 F. Supp. 1523, 1 USPQ2d 1048, 1052 (N.D. Ill. 1986) ("As product lines become increasingly diversified, and as

Serial No. 88242849

'labels' having sales prestige of their own are affixed to products as diverse as clothes and cigarettes, the significance of product dissimilarity have become attenuated.").

Prior to 2008, Lehman Brothers distributed to its clients, business associates and employees, various promotional merchandise branded with LEHMAN BROTHERS such as hats, bags, umbrellas, apparel, jackets, pens, calculators, cigar humidors, water pitchers, bowls, mouse pads, luggage tags, trays, paperweights, key chains, mugs, water bottles, whiskey decanters, wine gift sets, wine books, wine carriers and coasters, including as shown below:



These goods still are collected, sold and traded by members of the consuming public.[67]

In support of the common use of well-known marks on certain types of goods and services, including clothing, glassware, alcohol related products, restaurant services, etc., which are unrelated in nature to those goods or services on which the marks are normally used, Barclays submits evidence of several well-known third-party marks registered and used for financial and related services including news on the one hand,

---

[67] Greenberg Testimony Declaration ¶ 5 and Exhibit 2 (86 TTABVUE 7, 137-158); Barclays Third Notice of Reliance Exhibits 10-11 (82 TTABVUE 3-167); Barclays Opening Brief p. 7 (148 TTABVUE 15).

and food, alcoholic beverage, and bar and restaurant services on the other hand,

under the same mark or family of marks.[68]

---

[68] Barclays submitted the following evidence showing third-party registrations and use of third-party marks. *See* Barclays' First Notice of Reliance, Exhibit 9 (78 TTABVUE 37-368):

HARLEY DAVIDSON CAFE & Design (Reg. No. 2011337 for "restaurant and bar services") at 78 TTABVUE 46-54 and 90 TTABVUE 1985-1993; HARLEY DAVIDSON MOTOR CYCLES & Des. (Reg. No. 3756505 for "financial services including financing, issuance of credit cards, electronic processing and transmission of bill payment data . . . ") at 78 TTABVUE 55-63 and 90 TTABVUE 1994-2002; HARLEY-DAVIDSON (Reg. No. 3756506 for credit card and debit card services, loan financing services and financing of purchases . . . ) 78 TTABVUE 64-68 and 90 TTABVUE 2003-2008; HARLEY DAVIDSON (Reg. No. 4983904 for alcoholic beverages) 78 TTABVUE 69-70, 254-258 and 90 TTABVUE 2008-2009, 2503-2507; copies of webpages showing use of HARLEY DAVIDSON mark in connection with financial services 90 TTABVUE 2010-2011, 2038 and use of HARLEY DAVIDSON in connection with HARLEY DAVIDSON CAFÉ offering food and drinks, venue for ceremonies, 90 TTABVUE 2012-2037, 2039-2074;

SOTHEBY'S (Reg. No. 1638329 for decorative art, T-shirts, appraisal services and financial services namely providing loans to others relating to purchase of fine furniture, fine and decorative art, jewelry, stamps, coins, books and other valuable personal property, etc.) 78 TTABVUE 71-80 and 90 TTABVUE 2086-2095, Sotheby's Financial Services website 90 TTABVUE 2117-2118, SOTHEBY'S (Reg. No. 2228963 for collectible wines and distilled spirits) 78 TTABVUE 81-88 and 90 TTABVUE 2096-2103, Sotheby's Wine website offering wines for events and wine auctions, and travel related to wine 90 TTABVUE 2107 and 90 TTABVUE 2119-2143, Sotheby's Est. 1744 website offering wine for sale 90 TTABVUE 2108-2114, Sotheby's Est. 1744 website offering supper club services 90 TTABVUE 2115-2116; SOTHEBY'S EST. 1744 COLLECTORS GATHER HERE. (Reg. No. 6029407 for books, magazines, auction and art brokerage services, providing loans to others relating to purchase of fine and decorative art, antique and collectible articles and other valuable persona property, art exhibition services, etc.) 78 TTABVUE 89-91 and 90 TTABVUE 2104-2107;

THE NEW YORK TIMES WINE CLUB & Design (Reg. No. 3884856 for wine club services featuring periodic shipments of wine to members) at 78 TTABVUE 92-95 and 90 TTABVUE 2144-2147 and 90 TTABVUE 2158-2166, August 13, 2009 Times Company Creating a Wine Club media release 90 TTABVUE 2170-2172, Groupon webpage offering The New York Times Wine Club Coupons & Promo Codes 90 TTABVUE 2173-2175; The New York Times webpages dated March 14, 2016, 90 TTABVUE 2148-2157, New York Times Books and News;

TRUMP NATIONAL GOLF CLUB (Reg. No. 2269568 for clothing, golf club services, social club and restaurant services) 78 TTABVUE 96-103 and 90 TTABVUE 2184-2191, Trip Advisor: Trump Sunday Brunch Review of Trump National Golf Club 90 TTABVUE 2230-2233, Trump National Golf Club Los Angeles, California website 90 TTABVUE 2248, 2272-2273, 2286-2287, Café Pacific at Trump National Golf Club 90 TTABVUE 2261-2264, Yelp Trump National Golf Club Restaurant 2288-2302, Open Table Trump National Golf Club Restaurant 2303-2321; TRUMP INTERNATIONAL HOTEL & TOWER Reg. No. 226174 for postcards, greeting cards, clothing, leasing and managing commercial and residential

property, hotel services, restaurant services, etc.  78 TTABVUE 104-112 and 90 TTABVUE 2192-2200; TRUMP PLAZA (Reg. No. 2577243 for hotel, bar and restaurant services) 78 TTABVUE 113-116 and 90 TTABVUE 2201-2204, Oyster.com listing for Trump Plaza Hotel and Casino 90 TTABVUE 2251-2253; TRUMP & Des. (Reg. No. 3456506 for vodka) 78 TTABVUE 117-120 and 90 TTABVUE 2205-2208, 2268-2269; TRUMP (Reg. No. 3456507 for vodka) 78 TTABVUE 121-127 and 90 TTABVUE 2209-2215; TRUMP (Reg. No. 4325053 for wine and cultivation of grapes for others) 78 TTABVUE 128-131 and 90 TTABVUE 2216-2219, Trip Advisor: Trump Winery 90 TTABVUE 2234-2239, Trip Advisory: Trump Tower Bar and Grill 90 TTABVUE 2240-2247, Trump Winery 2274-2278, 2322-2324; TRUMP NEW WORLD RESERVE (Reg. No. 4950588 for wine) 78 TTABVUE 132-133 and 90 TTABVUE 2220-2223, Trump Winery New World Reserve webpage offering information regarding the wine 90 TTABVUE 2224-2225 and offering the wine for sale 90 TTABVUE 2254-2259; TRUMP (Reg. No. 5080397 for stickers and decals, T-shirts, headwear, hats, sweatshirts, providing online information regarding political issues and the 2016 presidential elections, retail store services etc.) 78 TTABVUE 259-265 and 90 TTABVUE 2508-2514; TRUMP (Reg. No. 4874427 for promoting public awareness of political issues, fundraising in field of politics) 78 TTABVUE 266-271 and 90 TTABVUE 2515-2520; TRUMP HOLLYWOOD & Design (Reg. No. 3332123 for leasing and managing commercial and residential properties, real estate development and construction of commercial and residential properties) 78 TTABVUE 272-275 and 90 TTABVUE 2521-2524; TRUMP PARC (Reg. No. 3225217 for leasing, brokerage, financing and managing commercial, residential and hotel property, real estate development and construction of commercial, residential and hotel property) 78 TTABVUE 276-280 and 90 TTABVUE 2525-2529; TRUMP PARK (Reg. No. 3342135 for leasing, financing and managing residential property and real estate development and construction of residential property) 78 TTABVUE 281-284 and 90 TTABVUE 2530-2533; TRUMP HOLLYWOOD (Reg. No. 3345687 for leasing and managing commercial and residential properties, real estate development and construction of commercial and residential properties) 78 TTABVUE 285-288 and 90 TTABVUE 2534-2537; TRUMP OCEAN CLUB (Reg. No. 3403195 for leasing commercial and residential properties) 78 TTABVUE 289-292 and 90 TTABVUE 2538-2541; TRUMP PLACE (Reg. No. 3079805 for leasing and managing residential condominiums) 78 TTABVUE 293-296 and 90 TTABVUE 2542-2545; TRUMP PLAZA (Reg. No. 3231060 for leasing, and managing residential property, real estate development of commercial and residential property) 78 TTABVUE 297-300 and 90 TTABVUE 2546-2549; TRUMP PLAZA (Reg. No. 3079610 for leasing and managing commercial property) 78 TTABVUE 301-304 and 90 TTABVUE 2550-2553; TRUMP TOWER TAMPA A DONALD J. TRUMP SIGNATURE PROPERTY & Design (Reg. No. 3298890 for leasing, and managing residential property including condominiums, real estate development of residential property including condominiums) 78 TTABVUE 305-309 and 90 TTABVUE 2554-2558; TRUMP TOWER AT CITY CENTER (Reg. No. 3046990 for leasing and managing commercial and residential property) 78 TTABVUE 310-313 and 90 TTABVUE 2559-2562; TRUMP GRANDE OCEAN RESORT & RESIDENCES (Reg. No.  3136576 for leasing, and managing commercial and residential properties, real estate development and construction of commercial and residential properties) 78 TTABVUE 314-318 and 90 TTABVUE 2563-2567; THE RIVER WALK SHOPS AT TRUMP INTERNATIONAL (Reg. No. 3998446 for management or retail stores and restaurants for others, leasing of restaurants and retail stores) 78 TTABVUE 319-324 and 90 TTABVUE 2568-2573; TRUMP (Reg. No. 3526411 for leasing, financing, and managing commercial, residential, and hotel properties) 78 TTABVUE 325-328 and 90

TTABVUE 2574-2577, Trump Hotel Central Park 90 TTABVUE 2226-2229, 2249-2250, 2265-2267, 2270-2271, 2284-2285, Trump Plaza in Atlantic City website 90 TTABVUE 2259-2260; THE ESTATES AT TRUMP NATIONAL GOLF COURSE (Reg. No. 3456312 for leasing, and managing residential property) 78 TTABVUE 329-332 and 90 TTABVUE 2578-2581; TRUMP PALACE (Reg. No. 2858404 for leasing and managing residential condominiums, real estate development and construction of residential condominiums) 78 TTABVUE 333-336 and 90 TTABVUE 2582-2585; TRUMP PARK AVENUE (Reg. No. 2823836 for leasing and managing condominiums) 78 TTABVUE 337-340 and 90 TTABVUE 2586-2589; TRUMP ROYALE (Reg. No. 2854411 for managing residential condominiums, construction of residential condominium) 78 TTABVUE 341-345 and 90 TTABVUE 2590-2594; THE TRUMP WORLD TOWER AT UNITED NATIONS PLAZA & Design (Reg. No. 2421936 for leasing, and managing commercial and residential property including condominiums) 78 TTABVUE 346-350 and 90 TTABVUE 2595-2599; THE TRUMP WORLD TOWER (Reg. No. 2421844 for leasing, and managing commercial and residential property including condominiums) 78 TTABVUE 351-354 and 90 TTABVUE 2600-2603; TRUMP INTERNATIONAL HOTEL & TOWER (Reg. No. 2226174 for postcards, T-shirts, caps, sweat pants, leasing and managing commercial and residential property, and hotel, restaurant and health spa services) 78 TTABVUE 355-363 and 90 TTABVUE 2604-2612; TRUMP TOWER (Reg. No. 1688083 for selling, leasing and managing commercial and residential property) 78 TTABVUE 364-368 and 90 TTABVUE 2613-2617, Trump Tower New York website featuring Trump Bar, Trump's Ice Cream Parlor, Trump Café On-the-Go 90 TTABVUE 2280-2282;

THE WALL STREET JOURNAL (Reg. No. 408379 for daily newspaper) 78 TTABVUE 136-145 and 90 TTABVUE 2324-2333; THE WALL STREET JOURNAL REPORT (Reg. No. 1220347 for providing radio news programming featuring business reports) 78 TTABVUE 146-152 and 90 TTABVUE 2334-2340; THE WALL STREET JOURNAL (Reg. No. 1368347 for providing access to electronic database containing contents of daily newspaper) 78 TTABVUE 153-158 and 90 TTABVUE 2341-2346; THE WALL STREET JOURNAL (Reg. No. 1498049 for television broadcasting services) 78 TTABVUE 159-164 and 90 TTABVUE 2347-2352; THE WALL STREET JOURNAL (Reg. No. 1960159 for newspapers) 78 TTABVUE 165-170 and 90 TTABVUE 2353-2358; THE WALL STREET JOURNAL SUNDAY (Reg. No. 2466488 for newspaper) 78 TTABVUE 171-175 and 90 TTABVUE 2359-2363; WSJWINE (Reg. No. 3631273 for promoting and advertising the wine of others, wine club services, providing advice on wine) 78 TTABVUE 176-179 and 90 TTABVUE 2364-2367, Offers.com WSJwine Offer Codes 90 TTABVUE 2442-2445, Wine Club Reviews WSJwine Wine Club 90 TTABVUE 2445-2454, WSJwine internet article offering wine for sale 90 TTABVUE 2471-2483, WSJ Wine Review of WSJwine 90 TTABVUE 2494-2502; THE WALL STREET JOURNAL OFFICE NETWORK (Reg. No. 3320625 for video broadcasting, transmission of information through video communication systems, transmission of news via video streaming, news, current events and business broadcast over video media, providing news in nature of current event reporting on-line, over video media) 78 TTABVUE 180-185 and 90 TTABVUE 2368-2373; WSJ (Reg. No. 3981663 for newspapers) 78 TTABVUE 186-188 and 90 TTABVUE 2374-2376; THE WALL STREET JOURNAL (Reg. No. 4104191 for application for obtaining news found in general interest publications on mobile and stationary electronic devices) 78 TTABVUE 189-194 and 90 TTABVUE 2377-2382; THE WALL STREET JOURNAL (Reg. No. 4313528 for retail store services featuring wide variety of consumer goods of others) 78 TTABVUE 195-200 and 90 TTABVUE 2383-2388, photo of The Wall Street Journal/Starbucks retail store 90 TTABVUE 2484-2486, Yelp The Wall Street Journal

Additionally, Lehman Brothers and its business dealings, financial troubles and bankruptcy have been the subject of several major films and television shows over the years, including: *Inside Job* (Sony Pictures Classics, 2010), which won an

---

airport retail store/gift shop 90 TTABVUE 2487-2489, information regarding The Wall Street Journal travelers store at Salt Lake International Airport carries books, magazines and newspapers, cosmetics, over-the-counter medicines, snacks and beverages 90 TTABVUE 2490-2492; THE WALL STREET JOURNAL (Reg. No. 4297318 for downloadable electronic publications in nature of newspapers) 78 TTABVUE 201-204 and 90 TTABVUE 2389-2392; THE WALL STREET JOURNAL (Reg. No. 4297319 for magazines, newspapers, finance books) 78 TTABVUE 205-208 and 90 TTABVUE 2393-2396; THE WALL STREET JOURNAL (Reg. No. 4345130 for providing financial news delivered to mobile devices, providing news and information in the field of finance) 78 TTABVUE 209-213 and 90 TTABVUE 2397-2401; THE WALL STREET JOURNAL (Reg. No. 4297321 for providing website featuring online general interest newspaper in fields of entertainment, culture, sports, education and current events relating to technology and finance) 78 TTABVUE 214-217 and 90 TTABVUE 2402-2406; THE WALL STREET JOURNAL (Reg. No. 4291165 for providing access to database containing news and information, video broadcasting services, transmission of podcasts, etc.) 78 TTABVUE 219-223 and 90 TTABVUE 2407-2411; WSJ (Reg. No. 4813188 for providing news, information, opinion and commentary relating to business, politics and career via internet and on-line etc., providing financial information services, etc. 78 TTABVUE 224-232 and 90 TTABVUE 2412-2420; THE WALL STREET JOURNAL (Reg. No. 4472244 for providing financial information services, etc.) 78 TTABVUE 233-237 and 90 TTABVUE 2421-2425; THE WALL STREET JOURNAL (Reg. No. 4298327 for providing information and news to mobile devices in the fields of entertainment, culture, sports, education and current events relating to technology and finance, etc.) 78 TTABVUE 238-243 and 90 TTABVUE 2426-2431; THE WALL STREET JOURNAL (Reg. No. 4342765 for providing financial information services, etc.) 78 TTABVUE 244-248 and 90 TTABVUE 2432-2436; THE WALL STREET JOURNAL (Reg. No. 4472634 for shirts and T-shirts) 78 TTABVUE 249-253 and 90 TTABVUE 2437-2441; internet article on CBSDetroit entitled Metro Retailers Flying High At Airport Concessions Awards Ceremony about The Wall Street Journal/Starbucks store winning first place in the "Best New News and Gift Concept" category 90 TTABVUE 2455-2458; March 14, 2016 website printout from The Wall Street Journal newspaper 90 TTABVUE 2458-2470;

Time Inc. Network TIME webpage of news items 90 TTABVUE 2176-2180, webpage with photo of TIME Newsstand offering books, food, snacks and beverages 90 TTABVUE 2181-2183;

The evidence regarding the registration for FORBES WINE CLUB & Design (Reg. No. 4600019 for "administering a wine club . . . , registered on September 9, 2014) at 78 TTABVUE 38-43, 90 TTABVUE 1950-55, was not considered inasmuch as the time for filing the § 8 declaration is in the grace period; additionally, the evidence of record for Application No. 86678012 for the FORBES mark 78 TTABVUE 44-45, 90 TTABVUE 1956-57, was not considered as the application was abandoned on February 18, 2019.

Serial No. 88242849

Academy Award for Best Documentary; *The Last Days of Lehman Brothers* (BBC/CNBC 2010); *Too Big to Fail* (HBO 2011); *Margin Call* (Lionsgate 2011), which portrayed a fictionalized Wall Street firm based on and likened in the press to Lehman Brothers; *The Case Against Lehman Brothers* (CBS 60 Minutes 2012); and *The Big Short* (Paramount, 2015), which was nominated for a 2016 Academy Award for Best Picture and won a 2016 Academy Award for Best Adapted Screenplay. Lehman Brothers also has been parodied in various media. For example, in the 2010 film, *Despicable Me*, the lead character visits a bank for super-villains named the "Bank of Evil." Above the doors and beneath the name of the bank hangs a sign that states: "FORMERLY LEHMAN BROTHERS."[69] In the 2016 animated film *Zootopia*, the primary characters visit the "Lemming Brothers Bank."[70]

In 2009, the American popular rap musical group the Black Eyed Peas, came out with a song entitled Imma Be which has a lyric that says: "Imma be a brother, but my name ain't Lehman."[71] In 2012, a YouTube user published a video entitled "Lehman in too Deep (We could have had a bail-out)," set to the music of and sung in

---

[69]   Greenberg Trial Declaration ¶¶ 25-26 (86 TTABVUE 12) and Exhibit 14, webpages identifying motion picture films and for television: The Big Short, 2015, a comedy-drama based on non-fiction book about the financial crises of 2007-2008 (87 TTABVUE 44-55), The Last Days of Lehman Brothers, 2009/2010 (87 TTABVUE 57-74), Inside Job, 2010 (87 TTABVUE 75-106), Too Big to Fail, 2011 (87 TTABVUE 107-126), Margin Call, 2011 (87 TTABVUE 130-165) and TV show(s): 60 Minutes "The Case Against Lehman Brothers", 2012 (87 TTABVUE 127-129); Exhibit 15, webpages identifying 2010 film Despicable Me featuring a scene from the movie showing a sign below the "Bank of Evil" that says "FORMERLY LEHMAN BROTHERS" (87 TTABVUE 166-168, 169-172).

[70] Greenberg Trial Declaration ¶ 28 (86 TTABVUE 13) and Exhibit 17 copies of webpages and other documents concerning the 2016 animated film Zootopia (87 TTABVUE 176-203).

[71] Greenberg Trial Declaration ¶ 29 (86 TTABVUE 13) and Exhibit 18: webpages of the lyrics for 2009 Black Eyed Peas' song entitled "Imma Be." (87 TTABVUE 204).

Serial No. 88242849

the style of Adele's "Rolling In The Deep," satirizing Lehman Brothers' pre-bankruptcy business dealings and financial troubles.[72]

While Tiger Lily admits the past "legacy" of LEHMAN BROTHERS, it argues that it is a "posthumous legacy" inasmuch as LEHMAN BROTHERS "has undergone such a radical transformation, from being one of the largest banks in the [world] to being the embodiment of all that was wrong in the banking industry in 2008."[73] However, Tiger Lily also admits that it seeks to draw a connection between its goods and services and the financial and investment business LEHMAN BROTHERS, and only filed its application when it believed that the LEHMAN BROTHERS mark was abandoned.[74]

Based on the evidence, Tiger Lily's goods and services are the types of goods and services that owners of well-known trademarks have expanded into to capitalize on the renown of their trademarks. Thus, consumers would view Tiger Lily's goods and services as the types of goods and services that owners of well-known marks, such as Barclays, could expand their product lines to cover.

---

[72] Greenberg Trial Declaration ¶ 27 (86 TTABVUE 13) and Exhibit 16: YouTube screen captures concerning the 2012 YouTube video entitled "Lehman in too Deep (We could have had a bail-out)." (87 TTABVUE 173).

[73] Green Testimony Declaration ¶¶ 1, 3 (124 TTABVUE 2-3).

[74] Tiger Lily's director, Chaim Aaron James Green, testified that Tiger Lily is involved in a business venture "which is the alcohol enterprise squarely themed obliquely on the posthumous legacy of LEHMAN BROTHERS" and that "Barclays had abandoned the mark." Green Testimony Declaration ¶¶ 1, 3, 7 (124 TTABVUE 2-4).

c.    Channels of Trade and Classes of Purchasers

Next, we consider whether Applicant's and Opposer's services travel in the same

trade channels to the same class of purchasers. Tiger Lily argues that it and Barclays

provide their goods and services in different trade channels to different classes of

customers. Apart from Tiger Lily's argument, there is no evidence supporting

different channels of trade or different purchasers for Tiger Lily's goods and services

and Barclays' services so this factor is neutral.

d.    Parody

Tiger Lily argues that its LEHMAN BROTHERS mark:

> is a true parody as it seeks to market goods in channels of
> commerce that are alien to the name previously associated
> with it. "A true parody actually decreases the likelihood of
> confusion because the effect of the parody is to create a
> distinction in the viewer's mind between the actual product
> and the joke." *Mutual of Omaha Ins. Co. v. Novak*, 648 F.
> Supp. 905, 231 USPQ 963, 965 (D. Neb. 1986), *aff'd*, 836
> F.2d 397, 5 USPQ2d 1314 (8th Cir. 1987). Therefore,
> "[w]hile a parody must call to mind the actual product to
> be successful, the same success also necessarily
> distinguishes the parody from the actual product." *Id.*
> Further, noting in *Tommy Hilfiger Licensing, Inc. v.
> Nature Labs*, 221 F.Supp.2d 410 at 425 (S.D.N.Y. 2002), it
> was held that because of the mark's fame and popularity,
> confusion is avoided, and the parodist is able to achieve the
> parody.[75]

Tiger Lily's parody defense[76] is merely another way of arguing that confusion is

not likely. S*ee, e.g., Starbucks U.S. Brands v. Ruben*, 78 USPQ2d 1741, 1754 (TTAB

2006); *Columbia Pictures Indus., Inc. v. Miller*, 211 USPQ 816, 820 (TTAB 1981)

---

[75] Tiger Lily's Opening Brief p. 28 (150 TTABVUE 34).

[76] Tiger Lily's Opening Brief at pp. 22, 28-31 (150 TTABVUE 28, 34-37).

Serial No. 88242849

("The right of the public to use words in the English language in a humorous and parodic manner does not extend to use of such words as trademarks if such use conflicts with the prior use and/or registration of the substantially same mark by another.").

Parody is a potential defense only if the involved marks otherwise would not be found confusingly similar. In other words, parody is not a defense to claims of likelihood of confusion under § 2(d) where, as here, the marks are otherwise confusingly similar. *See, e.g., Research in Motion Ltd. v. Defining Presence Marketing Grp. Inc.*, 102 USPQ2d 1187, 1191-92 (TTAB 2012) (rejecting applicant's claims that its mark CRACKBERRY was parody of opposer's BLACKBERRY mark, finding likely confusion where marks were highly similar and opposer's mark was famous); *Nike, Inc. v. Maher*, 100 USPQ2d 1018, 1023 (TTAB 2011) ("To the extent applicants argue that their mark is a protected parody, we note that parody is not a defense if the marks would otherwise be considered confusingly similar"); *Boston Red Sox Baseball Club LP v. Sherman*, 88 USPQ2d 1581, 1592 (TTAB 2008) ("In finding that the marks are not similar, we have given no weight to applicant's argument that his mark is a parody. Parody is not a defense if the marks would otherwise be considered confusingly similar."); *see also* MCCARTHY § 31.153 ("a successful parody [means] the ordinary observer can perceive that the defendant is not connected in any way with the owner of the target trademark.").

Inasmuch as a parody conveys a double meaning, Tiger Lily's mark which is identical to Barclays mark does not convey that it is not the original but is instead a

parody. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, LLC, 507 F.3d 252, 84 USPQ2d 1969, 1973 (4th Cir. 2007) ("a parody relies upon a difference from the original mark, presumably a humorous difference, in order to produce its desired effect"); *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 12 USPQ2d 1289, 1291 (2d Cir. 1989) ("A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody").[77]

While the fame and renown of the name of an institution such as LEHMAN BROTHERS may recede after a period of time when it is of more limited use, LEHMAN BROTHERS is still sufficiently known in the United States such that Tiger Lily's use of LEHMAN BROTHERS would lead to a presumption that Barclays and Tiger Lily are somehow connected. In view of the fact that Tiger Lily's mark is identical to the LEHMAN BROTHERS trademark and tradename, consumers would associate the well-known LEHMAN BROTHERS financial services business when seeing the name LEHMAN BROTHERS used in connection with whiskey and restaurant services to the detriment of Barclays as the trademark owner.

---

[77] As noted by Barclays, "[n]one of Tiger Lily's cited cases involve claims of parody by using an identical mark without any modification. *See, e.g., Louis Vuitton Malletier v. Haute Diggity Dog*, 84 USPQ2d 1969 (4th Cir. 2007) ('Chewy Vuitton' vs. LOUIS VUITTON); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198,108 USPQ2d 1581 (2d Cir. 2013) ('Charbucks' vs. STARBUCKS); *Mutual of Omaha v. Novak*, 231 USPQ 963 (D. Neb. 1986) ('Mutant of Omaha' vs. MUTUAL OF OMAHA); *N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel, LLC*, 293 F.3d 550, 62 USPQ2d 1260 (2d Cir. 2002) ('New York $lot Exchange' vs. NEW YORK STOCK EXCHANGE; *Tommy Hilfiger Licensing v. Nature Labs,* 221 F. Supp.2d 410 (S.D.N.Y. 2002) ('Tommy Holedigger' vs. TOMMY HILFIGER)." *See* Barclays Combined Reply Brief p. 27 n. 2 (152 TTABVUE 34).

Serial No. 88242849

### B.    False Suggestion of a Connection

Even if Barclays abandoned the LEHMAN BROTHERS trademark this would not preclude its false suggestion of a connection claim, which does not require a party to establish actual trademark rights. Barclays can still prevail under § 2(a) if Tiger Lily's use of the LEHMAN BROTHERS mark falsely suggests a connection with Barclays. Thus, Barclays must prove that Tiger Lily's mark points "uniquely and unmistakably" to the identity or persona of Barclays. *See Hornby v. TJX Cos. Inc.*, 87 USPQ2d 1411 (TTAB 2008) (although petitioner, the celebrity model "Twiggy," abandoned use in the United States of her personal name mark and was unable to prevail on likelihood of confusion or dilution claims, she had sufficient fame in the United States when respondent's mark was registered for clothing that she prevailed on claim of false suggestion of a connection with her persona as purchasers would presume an association with her); *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985) (prior trademark use not required for false suggestion claim).

Section 2(a) of the Trademark Act prohibits registration of a mark that may falsely suggest a connection with "persons, living or dead, institutions, beliefs, or national symbols . . . ." 15 U.S.C. § 1052(a). False suggestion of a connection under the Trademark Act is intended to preclude registration of a mark that conflicts with another's rights in one's persona or identity. *Pierce-Arrow Soc. v. Spintek Filtration, Inc.*, 2019 USPQ2d 471774 at *4 (TTAB 2019) (citing *Univ. of Notre Dame v. J.C. Gourmet Food*, 217 USPQ at 509); *see also Bridgestone/Firestone Research Inc. v. Auto. Club de L'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1463 (Fed. Cir.

2001) ("The rights protected under the § 2(a) false suggestion provision are not designed primarily to protect the public, but to protect persons and institutions from exploitation of their persona.").

To prevail on its claim of false suggestion of a connection under § 2(a), Barclays must prove: (1) that Tiger Lily's LEHMAN BROTHERS mark is the same as, or is a close approximation of, Barclays' previously used name or identity; (2) that Tiger Lily's mark would be recognized as such by purchasers of its goods and services, in that it points uniquely and unmistakably to the institution named or identified as LEHMAN BROTHERS, i.e., Barclays; (3) that Barclays' LEHMAN BROTHERS is not connected with the services that are provided or will be provided by Tiger Lily under the LEHMAN BROTHERS mark; and (4) that LEHMAN BROTHERS is of sufficient fame or reputation that when used by Tiger Lily as a mark for its goods and services, a connection with the institution identified, i.e., Barclays, would be presumed. *See Univ. of Notre Dame v. J.C. Food Imports*, 217 USPQ at 508-510, *aff'g* 213 USPQ 594 (TTAB 1982); *Bos. Athletic Ass'n v. Velocity*, LLC, 117 USPQ2d 1492, 1495 (TTAB 2015); *Boston Red Sox v. Sherman*, 88 USPQ2d at 1593; *Ass'n pour la Defense et la Promotion de L'Oeuvre de Marc Chagall dite Comite Marc Chagall v. Bondarchuk*, 82 USPQ2d 1838, 1842 (TTAB 2007).

The protection afforded a name or its equivalent under § 2(a) is acquired only when the name claimed to be appropriated points "uniquely and unmistakably" to the plaintiff's "persona," that is the personal or trade identity of the claimant. *Bos. Athletic v. Velocity*, 117 USPQ2d at 1497 citing *Buffett v. Chi-Chi's*, 226 USPQ at 429.

Serial No. 88242849

Turing to the first element, the determination of whether Tiger Lily's LEHMAN BROTHERS mark is a "close approximation" of Barclays' identity is a stringent requirement. The fact that LEHMAN BROTHERS is not Barclays' official name is not dispositive. "[T]he protection afforded by the relevant portion of § 2(a) is not strictly limited to the unauthorized use of a 'name or likeness.'" *Buffett v. Chi-Chi's*, 226 USPQ at 429 n. 4 (MARGARITAVILLE falsely suggested connection with the public persona of singer-songwriter Jimmy Buffett); *see also In re Sauer*, 27 USPQ2d 1073 (TTAB 1993), *aff'd*, 26 F.3d 140 (Fed. Cir. 1994) (finding that a wide variety of products bearing the name Bo Jackson establish that "Bo" is Mr. Jackson's name or identity); *Bd. of Trs. of Univ. of Ala. v. BAMA-Werke Curt Baumann*, 231 USPQ 408 (TTAB 1986) (BAMA well-known as University's nickname).

While LEHMAN BROTHERS may be a well-known name among the general public, and Barclays acquired the LEHMAN BROHERS trademark rights, there is no evidence showing that Barclays has developed a public identity or persona as LEHMAN BROTHERS. Because the first element of the test for false suggestion of a connection has not been met, Barclays has failed to prove that Tiger Lily's mark falsely suggests a connection with Barclays. Thus, it is not necessary to address the other elements of a § 2(a) claim.

C.    Dilution

Even if we found that Barclays abandoned its trademark rights, that would not preclude Barclays' dilution claim, which, like false suggestion of a connection, does not require a party to establish actual trademark rights. *See Fiat Grp. Autos. S.p.A.*

Serial No. 88242849

*v. ISM, Inc.*, 94 USPQ2d 1111, 1114 n.5 (TTAB 2010) (party asserting dilution may rely on fame established by use analogous to trademark use, including as trade name, or by public reference).

The Trademark Act defines dilution by blurring as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). To succeed on its dilution by blurring claim Barclays must show that: (1) it owns a famous distinctive trademark or tradename; (2) its mark and tradename became famous prior to the use or constructive use of Tiger Lily's mark; and (3) Tiger Lily's use of its LEHMAN BROTHERS mark is likely to cause dilution by blurring. *Coach Services Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1723-24 (Fed. Cir. 2012).

We begin by looking at whether Barclays LEHMAN BROTHERS mark is a famous mark. While there is little doubt that the LEHMAN BROTHERS mark was made famous by Barclays' predecessor-in-interest, the question is whether the mark is famous now. The fact that Lehman Brothers filed for bankruptcy does not erase the fame that was developed in LEHMAN BROTHERS. However, Barclays has the burden of establishing that its LEHMAN BROTHERS mark is still famous. The requirements for proving fame for purposes of dilution are "stringent." *Coach Services*, 96 USPQ2d at 1610, citing *Toro Co. v. ToroHead Inc.*, 61 USPQ2d 1164, 1170 (TTAB 2001).

In determining whether a mark possesses the requisite degree of recognition to be found to be a famous mark, we may consider the following factors:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

Inasmuch as Barclays presented no evidence regarding the current advertising and publicity under the mark, the amount, volume and geographic extent of services provided under the mark, and little evidence regarding the extent of actual recognition of the mark, Barclays has not shown that its LEHMAN BROTHERS mark is famous for dilution purposes. In order to be "famous," the mark (or trade name) must be "widely recognized by the general consuming public of the United States" as a designation indicating a single source of goods or services. 15 U.S.C. § 1125(c)(2).

Accordingly, Barclays' dilution count is dismissed.

D.    Lack of a Bona Fide Intent

Barclays bears the burden of proof on its claim of Tiger Lily's lack of a bona fide intent to use the mark. Looking at the unchallenged testimony of Tiger Lily's director, Chaim Green[78], we do not find that Tiger Lily lacked the intention required by § 1(b). Tiger Lily's British limited liability company was established in February 2013 to pursue various business ventures, one of which was the alcohol enterprise themed on

---

[78] 124 TTABVUE 2-6.

the "posthumous legacy of LEHMAN BROTHERS."[79] Mr. Green began to investigate Barclays and found that it had purchased some of the Lehman Brothers U.S. assets. He found that Barclays rebranded away from Lehman Brothers, renaming its indexes.[80] He also looked at the "trademark register and saw that Barclays were [sic] not maintaining the LEHMAN BROTHERS trademarks at all and had let them all lapse through lack of use and maintenance."[81] Tiger Lily filed its application for LEHMAN BROTHERS in March 2013 and Mr. Green "set about curating the spirit with a focus on whisky."[82] It is clear that Tiger Lily intended to make "commercial use" of Barclays' LEHMAN BROTHERS mark.[83]

An applicant's mere statement that it intends to use the mark, and its denial that it lacked a bona fide intent, do not establish, in fact, that it had a bona fide intent to use the mark in commerce when it filed the involved application. However, evidence bearing on bona fide intent is "objective" in the sense that it is evidence in the form of real life facts and by the actions of the applicant, not by the applicant's testimony as to its subjective state of mind. That is, Congress did not intend the issue to be resolved simply by an officer of applicant later testifying, "Yes, indeed, at the time we filed that application, I did truly intend to use the mark at some time in the future."

---

[79] Green Declaration ¶ 1 (124 TTABVUE 2).

[80] Green Declaration ¶ 6 (124 TTABVUE 3).

[81] Green Declaration ¶ 7 (124 TTABVUE 4).

[82] Green Declaration ¶ 8 (124 TTABVUE 4).

[83] Green Testimony Declaration ¶ 15 (124 TTABVUE 6).

Serial No. 88242849

*Research In Motion Ltd. v. NBOR Corp.*, 92 USPQ2d 1926, 1931 (TTAB 2009), quoted in MCCARTHY § 19:14 (4th ed. 2009).

The Trademark Act provides that "[a] person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register . . . . " Trademark Act Section 1(b)(1), 15 U.S.C. §1051(b)(1). The determination of whether an applicant has a bona fide intent to use the mark in commerce is an objective determination based on all the circumstances. *See Bos. Red Sox v. Sherman*, 88 USPQ2d at 1586; *see also Rolex Watch U.S.A., Inc. v. AFP Imaging Corp.*, 101 USPQ2d 1188, 1197 (TTAB 2011) *vacated on other grounds*, 107 USPQ2d 1626 (TTAB 2013) (not a precedent); *Lane Ltd. v. Jackson Int'l Trading Co.*, 33 USPQ2d 1351, 1355 (TTAB 1994).

Inasmuch as Barclays did not seek to challenge the testimony of Tiger Lily's witness, we deem his testimony to be enough to establish a bona fide intent to use the LEHMAN BROTHERS mark. Therefore, Barclays claim for a lack of bona fide intent is dismissed.

## VIII.    Tiger Lily's Opposition to Barclays' Application

We now turn to Tiger Lily's claims as the Opposer in Opposition No. 91219549.

### A.  No Bona Fide Intent

Tiger Lily alleges that Barclays lacked a bona fide intent to use the mark LEHMAN BROTHERS for the services identified in its application at the time of filing its application.

As noted above, the Trademark Act provides that "[a] person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register . . . . " Trademark Act Section 1(b)(1), 15 U.S.C. § 1051(b)(1). As noted above, the determination of whether an applicant has a bona fide intent to use the mark in commerce is an objective determination based on all the circumstances. *See Bos. Red Sox v. Sherman*, 88 USPQ2d at 1586; *see also Rolex Watch v. AFP Imaging*, 101 USPQ2d at 1197; *Lane v. Jackson Int'l Trading*, 33 USPQ2d at 1355.

While the absence of any documentary evidence regarding an applicant's bona fide intention to use a mark in commerce is sufficient to prove that an applicant lacks the intention required by § 1(b) of the Trademark Act, unless other facts are presented which adequately explain or outweigh applicant's failure to provide such documentary evidence, we find that to be the case here. *See Honda Motor Co. v. Winkelmann*, 90 USPQ2d 1660, 1662 (TTAB 2009); *L.C. Licensing Inc. v. Berman*, 86 USPQ2d 1883, 1891 (TTAB 2008).

The facts in this case are quite different from those presented in *Honda Motor v. Winkelmann*, 90 USPQ2d at 1664, where the individual applicant sought to register the mark V.I.C. for "vehicles for transport" but provided no evidence to demonstrate "that he manufactures vehicles in Germany or elsewhere." By contrast, the facts here are more similar to those in *Lane v. Jackson Int'l Trading*, 33 USPQ2d 1351, where the evidence that the applicant "was engaged in the tobacco marketing business" supported a bona fide intention to use the mark in commerce. This is not to say that

"capability" alone is necessarily sufficient; however, the existence of a successful ongoing concern such as Barclays has in the United States albeit under its other marks, combines to create a totality of circumstances that support a bona fide intention to use. Additionally, the licenses that Barclays has involving the LEHMAN BROTHERS mark provide additional support. In short, the evidence points to a good faith intention to eventually use the mark in a commercial sense as to the services listed in the application and does not reveal that the application was made merely to reserve a right in the mark. *Lane v. Jackson Int'l Trading*, 33 USPQ2d at 1355; *Commodore Elecs. Ltd. v. CBM Kabushiki Kaisha*, 26 USPQ2d at 1507.

Barclays' witness, Alexander Greenberg, testified that, since 1932, Barclays has operated in over fifty countries, including the United States, engaging in a wide range of financial services, including commercial and corporate banking, retail banking, investment banking, research, private banking, cash management, credit and debit cards and mortgage banking. Given that Barclays has an established financial business and experience in the financial and investment industry demonstrates that Barclays has the capacity to market and provide the services identified in its application. This suggests that Barclays has been acting in good faith and not merely trying to reserve a right in the LEHMAN BROTHERS mark. *Rolex Watch v. AFP Imaging*, 101 USPQ2d at 1197 (prima facie lack of bona fide intent from no documentary evidence overcome by showing capacity to market and manufacture the goods identified in its application, which applicant proved were an extension of its current product line) (citing *Commodore Elecs.*, 26 USPQ2d at 1507).

The absence of documentary evidence, however, must be considered in context of the evidentiary record as a whole. *M.Z. Berger & Co. v. Swatch AG,* 787 F.3d 1368, 114 USPQ2d 1892, 1898 (Fed. Cir. 2015) (the determination of objective intent is made on a case-by-case basis considering totality of circumstances). An applicant's capacity to market and manufacture the identified goods consistent with the natural extension of its current product line can rebut the lack of documentary evidence. *Rolex Watch v. AFP Imaging*, 101 USPQ 2d at 1197-98; *see also Wet Seal Inc. v. FD Mgt. Inc.*, 82 USPQ2d 1629, 1643 (TTAB 2007) (applicant's capacity to market or manufacture goods, having produced them in the past under different marks, rebuts a claim that applicant lacked a bona fide intent to use).

Thus, the preponderance of the evidence does not establish that Barclays lacked the requisite bona fide intention to use the LEHMAN BROTHERS mark in commerce when it filed its intent-to-use application.

### B.    Fraud

Tiger Lily's fraud claim is based on Barclays' alleged lack of bona fide intention to use the LEHMAN BROTHERS mark at the time of filing its application.

Fraud in procuring a trademark registration occurs when an applicant for registration knowingly makes a false, material representation of fact in connection with an application to register with the intent of obtaining a registration to which it is otherwise not entitled. *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938, 1939-40, (Fed. Cir. 2009) ("[W]e hold that a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material

representation with the intent to deceive the PTO."); *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986); *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1501 (TTAB 2017); *Embarcadero Techs., Inc. v. Delphix Corp.*, 117 USPQ2d 1518, 1521 (TTAB 2016).

The relevant standard for proving fraud requires a showing of the following four elements:

> (1) applicant/registrant made a false representation to the USPTO;
>
> (2) the false representation is material to the registrability of the mark;
>
> (3) applicant/registrant had knowledge of the falsity of the representation; and
>
> (4) applicant/registrant made the representation with the intent to deceive the USPTO.

*In re Bose*, 91 USPQ2d at 1941.

Tiger Lily, as the party alleging fraud in Barclays' attempted procurement of a registration, "bears the heavy burden of proving fraud with clear and convincing evidence." *In re Bose*, 91 USPQ2d at 1243 (quoting *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981)). *See Daniel J. Quirk, Inc. v. Village Car Co.*, 120 USPQ2d 1146, 1148 (TTAB 2016) (fraud must be proven "to the hilt" with clear and convincing evidence); *Enbridge, Inc. v. Excelerate Energy Ltd. Partnership*, 92 USPQ2d 1537, (TTAB 2009) ("[E]vidence of deceptive intent must be clear and convincing. The rigorous clear and convincing evidence standard is strictly applied.").

Tiger Lily's fraud claim is based on Barclays' alleged lack of a bona fide intention to use the LEHMAN BROTHERS mark at the time of filing its application.[84] In view of our finding above that Barclays' lack of a bona fide intention to use the mark has not been shown, Tiger Lily cannot prevail on its fraud claim. Further, Tiger Lily did not provide clear evidence that Barclays made false statements in support of its application. Moreover, even assuming Barclays' statements were false, Tiger Lily has not established that Barclays submitted any material statements to the USPTO with intent to deceive the USPTO. The evidence before us does not provide a sufficient basis for finding that Barclays' actions in connection with the filing of its application were with fraudulent intent. Without evidence of intent to deceive the USPTO, Tiger Lily's allegations of fraud fail. Accordingly, Tiger Lily has not met its burden of proof to show that Barclays committed fraud when it filed its application.

C.    Likelihood of Confusion

Tiger Lily did not show priority of use of the LEHMAN BROTHERS mark which precludes it from succeeding on its likelihood of confusion claim.

**Decision**: Barclays' opposition to Tiger Lily's Application Serial Nos. 85868892 and 8629806 on the grounds of likelihood of confusion is sustained; and is dismissed on the grounds of false suggestion of a connection, dilution and lack of bona fide intent. Tiger Lily's opposition to Barclays' Application Serial No. 86081143 is dismissed on the grounds of lack of intent to use, likelihood of confusion, and fraud.

---

[84] Tiger Lily's Opening Brief p. 43 (150 TTABVUE 49).

**Appendix**

The record includes the pleadings and, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), the file histories for Tiger Lily's Application Serial Nos. 86298069 and 85868892, and Barclays' Application Serial No. 86081143, which are the subjects of this consolidated proceeding.

The record also includes the following evidence submitted by Barclays:

1. Barclays' First Notice of Reliance (77-78 TTABVUE):

    - Exhibit 1: USPTO TSDR record for Tiger Lily's Application No. 85868892 (77 TTABVUE 6-12);

    - Exhibit 2: USPTO TSDR record for Tiger Lily's Application No. 86298069 (77 TTABVUE 13-17);

    - Exhibit 3: June 17, 2013 Office Action for Serial No. 85868892 and Tiger Lily's December 12, 2013 Response (77 TTABVUE 18-96);

    - Exhibit 4: December 23, 2013 Final Office Action for Serial No. 85868892 and Tiger Lily's February 6, 2014 Request for Reconsideration (77 TTABVUE 97-243);

    - Exhibit 5: USPTO TSDR records for Barclays' expired Registration Nos. 1717171 and 1755687 for LEHMAN BROTHERS (78 TTABVUE 3-11)

    - Exhibit 6: USPTO TSDR record for Barclays' Application Serial No. 86081143 for LEHMAN BROTHERS and the Declaration of Alexander L. Greenberg, Esq. in Response to Office Action Dated January 22, 2014 (without exhibits) (78 TTABVUE 12-30)

    - Exhibit 7: NYS Department of State Division of Corporations record for Lehman Brothers Holdings Inc. (78 TTABVUE 31-33);

    - Exhibit 8: NYS Department of State Division of Corporations record identifying Lehman Brothers Inc. as an active Delaware corporation (78 TTABVUE 34-36);

- Exhibit 9: TSDR records and copies of registration certificates for third party registrations for financial reporting, education and advice, wine clubs and retail services, including retail markets that sell food and beverages (78 TTABVUE 37-368);

- Exhibit 10: WhoIs database record for Tiger Lily's domain name LEHMANBROTHE.RS, (78 TTABVUE 369-370).

2. Barclays' Amended Second Notice of Reliance (79-80 TTABVUE)[85] (99 TTABVUE):

- Exhibit 1: Representative news articles published between October 1888 - September 2008 from various publications including *The New York Times* and *The Wall Street Journal* concerning Lehman Brothers Holdings Inc., its present and former subsidiaries and affiliates, and/or their predecessors, licensees, assignors and assigns (79 TTABVUE 115-247);

- Exhibit 2: Representative news articles published between September 2008 -December 2008 from various publications including *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* concerning Lehman Brothers (79 TTABVUE 248-915);

- Exhibit 3: News articles published between January 2009 - March 2016 from various publications including *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *Bloomberg BusinessWeek*, *Fortune*, *CNN*, *The Los Angeles Times*, *Fortune* and *The Chicago Tribune* concerning Lehman Brothers (80 TTABVUE 3-2112);

- Exhibit 4: Press releases and other printed notices issued by Lehman Brothers from 1985 to 2015 (80 TTABVUE 2113-2236);

- Exhibit 5: Printouts from Amazon.com concerning books published about Lehman Brothers (80 TTABVUE 2237-2420);

---

[85] On September 20, 2017, the Board granted Tiger Lily's Motion to Strike in part allowing Barclays to file revised notices of reliance relating to Exhibits 1-4 in its Second Notice of Reliance and Exhibit 9 of its Third Notice of Reliance. *See* 98 TTABVUE. On October 10, 2017, Barclays filed its Amended Second and Third Notices of Reliance Upon Printed Publications and Internet Materials (99, 100 TTABVUE). The documents identified in the Amended Second and Third Notices of Reliance are produced at 79-83 TTABVUE.

- Exhibit 6:  *The Wall Street Journal* news article concerning the trademark dispute between Barclays and Tiger Lily (80 TTABVUE 2421-2428);

3. Barclays' Third Notice of Reliance (81-83 TTABVUE) (100 TTABVUE):

- Exhibit 1: one news article from marketwatch.com Wall St Journal dated May 9, 2007 printed 6/4/2014; Barclays' Third Notice of Reliance mistakenly identifies this Exhibit as containing: news articles published between October 1888 and September 2008 from various publications such as *The New York Times* and *The Wall Street Journal* concerning Lehman Brothers Holdings Inc., its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns (81 TTABVUE 35-38);

- Exhibit 2: one article dated September 21, 2008 from CNN Money (CNNMoney.com Market Report) and a graph entitled Dow Jones Industrial Average Jan 2006-Nov 2008; Barclays' Third Notice of Reliance mistakenly identifies this Exhibit as containing: news articles published between September 2008- December 2008 from various publications such as such as *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* concerning Lehman Brothers (81 TTABVUE 39-44);

- Exhibit 3: online articles dated September 14, 2010 from PostBulletin entitled Lehman Brothers is dead; long live Lehman, October 10, 2012 from Zacks Investment Research regarding LBHI's naming of Executive Vice President, September 16, 2013 from CNN Money entitled Surprise! Lehman Brothers is still big, September 26, 2013 from The Economist entitled The meaning of Lehman, March 27, 2014 from Forbes entitled Revealed: Lehman Brothers Makes 550% Return from Formula One, September 18, 2015 from Fortune entitled Hear are the crazy stocks Lehman Brothers is still trading, February 10, 2016 from Fortune entitled Here's Why John Kasich Has a Great Shot at Being the Business Candidate and February 2, 2016 from Fortune entitled How Surviving Lehman Brothers Made Me A Better CEO, December 16, 2015 from Fortune entitled Mike Bloomberg Just Picked up This Key Barclays Unit, October 16, 2015 from Fortune entitled In his new memoir, Ben Bernanke is wrong about the fall of Lehman, and other articles mentioning Lehman Brothers; Barclays' Third Notice of Reliance mistakenly identifies this Exhibit as containing news articles published between January 2009-March 2016 from various major publications such as *The New York Times*, *The Wall Street Journal*, *The Washington Post*,

Serial No. 88242849

*Bloomberg BusinessWeek*, *Fortune*, *CNN*, *The Los Angeles Times*, *Fortune* and *The Chicago Tribune* concerning Lehman Brothers (81 TTABVUE 45-190);

- Exhibit 4: printouts from the Wikipedia website entitled "Lehman Brothers," available at <http://en.wikipedia.org/wiki/Lehman Brothers> (81 TTABVUE 191-211);

- Exhibit 5: printouts from the Wikipedia website entitled "Bankruptcy of Lehman Brothers," available at <http://en.wikipedia .org/wiki/Bankruptcy_of_Lehman_Brothers> (81 TTABVUE 212-234);

- Exhibit 6: printouts from the Wikinvest website entitled "Lehman Brothers (LEHMQ)," available at <http://www.wikinvest.com/stock /Lehman_Brothers_(LEHMQ)> (81 TTABVUE 235-247);

- Exhibit 7: printouts from the Investopedia website entitled "Case Study: The Collapse of Lehman Brothers," available at <http://www.investopedia.com/articles/economics/09/lehman-brothe rscollapse.asp> (81 TTABVUE 248-260);

- Exhibit 8: printout from the Bloomberg website entitled "Lehman Brothers' Corporate History and Chronology: Timeline," available at http://www.bloomberg.com/apps/news?pid=21070001&sid=a63mWc 3ILlTo (81 TTABVUE 261-266);

- Exhibit 9: Harvard Business School Baker Library Historical Collections' Lehman Brothers Collection, which can be accessed via the website located at http://www.library.hbs.edu/hc/lehman/ (81 TTABVUE 267-1982);

- Exhibit 10: various webpages showing LEHMAN BROTHERS branded merchandise currently or previously offered for sale (82 TTABVUE 3-144);

- Exhibit 11: various news articles and webpages concerning LEHMAN BROTHERS branded merchandise originally published after 2008 (82 TTABVUE 145-167);

- Exhibit 12: printouts from Amazon.com concerning the following books: *Lehman Brothers' Dance with Delusion: Wrestling Wall Street* (2010); *The Devil's Casino: Friendship, Betrayal, and the High Stakes Games Played Inside Lehman Brothers* (2011); *Uncontrolled Risk:*

*Lessons of Lehman Brothers and How Systemic Risk Can Still Bring Down the World Financial System* (2010); *The Last of the Imperious Rich: Lehman Brothers, 1844-2008* (2012); *Street Freak: Money and Madness at Lehman Brothers* (2011); *Lehman Brothers: Politics, Law & Business* (2010); *Gorillas, markets and the search for economic values - Rethinking Lehman Brothers and the Global Financial Crises. A Nyenrode Perspective* (2013); *A Colossal Failure of Common Sense: The Inside Story of the Collapse of Lehman Brothers* (2010); and *The Murder of Lehman Brothers, An Insider's Look at the Global Meltdown* (2009) (82 TTABVUE 168-175);

- Exhibit 13: news articles concerning the trademark dispute between Barclays and Tiger Lily (82 TTABVUE 176-217);

- Exhibit 14: printouts from Tiger Lily's website, available at http://lehmanbrothe.rs (83 TTABVUE 3-59);

- Exhibit 15: printouts from Tiger Lily's Facebook page, available at https://www.facebook.com/LehmanBrotherswhiskey/ (83 TTABVUE 60-147);

- Exhibit 16: printouts from Tiger Lily's Twitter page, available at https://twitter.com/lehmanbrothersx (83 TTABVUE 148-158);

- Exhibit 17: copies of articles about the sale of Barclays' bond indices business to Bloomberg (83 TTABVUE 159-173);

4. Barclays' Fourth Notice of Reliance (84 TTABVUE):

- Exhibit 1: Barclays' First Set of Document Request Nos. 5-6, 8, 10-12, 15, 17, 22, 28-30 and 42 and Interrogatory Nos. 1, 20-21, and Tiger Lily's responses thereto (84 TTABVUE 6-55);

- Exhibit 2: Tiger Lily's authenticated produced documents (Bates Nos. Tiger Lily Prod1002534-Tiger LilyProd1002543; Tiger Lily Prod1005209-Tiger Lily Prod1005213; and Tiger Lily Prod1005218-Tiger Lily Prod1005235) (84 TTABVUE 56); FILED UNDER SEAL (85 TTABVUE 3-36);

- Exhibit 3: Barclays' First Set of Requests to Admit Nos. 30 and 31, and Tiger Lily's responses thereto (84 TTABVUE 57-94);

- Exhibit 4: Tiger Lily's authenticated produced documents (Bates Nos. Tiger Lily Prod1002517, Tiger Lily Prod1002544-Tiger Lily

Prod1002547; Tiger Lily Prod1002578-Tiger Lily Prod1002580; Tiger Lily Prod1002734; Tiger Lily Prod1002800-Tiger Lily Prod1002801; Tiger Lily Prod1005217; Tiger Lily Prod1005236; and Tiger Lily Prod1005271-Tiger Lily Prod1006711 (84 TTABVUE 95); FILED UNDER SEAL (85 TTABVUE 37-1492);

5.  Trial Testimony Declaration of Alexander L. Greenberg, Esq., Vice President, Legal, for Barclays Capital Inc. (86 TTABVUE), with Exhibits 1-28 (86-88 TTABVUE):

- Exhibit 1: Lehman Brothers Holdings Inc.'s Form 10-Q Quarterly Status Reports Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for period ending May 31, 2008 (86 TTABVUE 20-136);

- Exhibit 2: March 18, 2009 Stipulation between Lehman Brothers and Barclays concerning certain gift merchandise (86 TTABVUE 137-158);

- Exhibit 3: September 16, 2008 Asset Purchase Agreement (ASA) between Barclays and Lehman Brothers (86 TTABVUE 159-208);

- Exhibit 4: September 20, 2008 Letter agreement between Barclays and Lehman Brothers clarifying and amending the parties' intention with respect to certain provisions of the September 16, 2008 ASA regarding among other things, Lehman Brothers license of the LEHMAN names and marks, including LEHMAN BROTHERS (86 TTABVUE 209-225);

- Exhibit 5: September 22, 2008 intellectual property assignment from Lehman Brothers to Barclays (86 TTABVUE 226); FILED UNDER SEAL (88 TTABVUE 5-79);

- Exhibit 6: copies of photographs taken at Lehman Brothers headquarters on or about November 24, 2014 (86 TTABVUE 227-272);

- Exhibit 7: copies of webpages showing use of lehmanholdings.com domain name as part of email addresses for Lehman officers and employees (86 TTABVUE 273-293);

- Exhibit 8: copy of WhoIs search for lehmanholdings.com (86 TTABVUE 294-296);

- Exhibit 9: redacted copies of envelopes, business cards, request for courier services and a visitor badge in use by Lehman Brothers' employees, staff and visitors (86 TTABVUE 297-305);

- Exhibit 10: copies of webpages and various public filings from <http://dm.epiq11.com/LBI/Project> concerning LBI's bankruptcy (86 TTABVUE 306-1105);

- Exhibit 11: copies of webpages and various filings from <http://dm.epiq11.com/LBI/Project> concerning LBI's bankruptcy (86 TTABVUE 1106-2033);

- Exhibit 12: copies of a WhoIs search for domain name Lehmantrustee.com and webpages referencing the domain (87 TTBVUE 3-27);

- Exhibit 13: copies of webpages from the MSN website concerning publicly traded Lehman Brothers stocks (87 TTABVUE 28-42);

- Exhibit 14: copies of webpages regarding movies and TV show 60 Minutes regarding the subject of Lehman Brothers and its business dealings, financial troubles and bankruptcy (87 TTABVUE 43-165);

- Exhibit 15: copies of documents concerning the 2010 file *Despicable Me* and a scene from the movie showing a bank sign reading: "FORMERLY LEHMAN BROTHERS" (87 TTABVUE 166-172);

- Exhibit 16: copies of YouTube screen captures regarding the 2012 YouTube video entitled "Lehman Brothers-We could have had a Bailout!"  (87 TTABVUE 173-175);

- Exhibit 17: copies of webpages and other documents concerning the 2016 animated film *Zootopia* where the primary characters visit the "Lemming Brothers Bank" (87 TTABVUE 176-203);

- Exhibit 18: copies of webpages concerning the lyrics of the 2009 Black Eyed Peas song *Imma Be* which state: "Imma be a brother, but my name ain't Lehman." (87 TTABVUE 204-213);

- Exhibit 19: WhoIs History for Lehmanlive.com and copies of web screen captures showing the LEHMAN LIVE portal, operated by Barclays (from September 2008-2010) (87 TTABVUE 214-226);

Serial No. 88242849

- Exhibit 20: printout from the website located at <www.lehman.com> and a printouts of the WhoIs Record and WhoIs History for the domain name lehman.com (87 TTABVUE 227-240);

- Exhibit 21: copies of representative samples of LEHMAN BROTHERS legacy materials (87 TTABVUE 241); FILED UNDER SEAL (88 TTABVUE 80-1458);

- Exhibit 22: copies of representative samples of correspondence concerning these LEHMAN BROTHERS legacy materials, with attachments (87 TTABVUE 242); FILED UNDER SEAL (88 TTABVUE 1459-1657);

- Exhibit 23: copy of the full list of Market Participant Identifier codes from <www.nasdaqtrader.com> (87 TTABVUE 243-308);

- Exhibit 24: copy of the agreement between Barclays and Bloomberg regarding Barclays sale of its bond indices business known as Barclays Risk Analytics and Index Solutions Ltd. and maintenance of ownership of the LEHMAN Names and Marks, and licensing such marks to Bloomberg for use in connection with the bond index business (87 TTABVUE 309); FILED UNDER SEAL (88 TTABVUE 1658-1780);

- Exhibit 25: copies of articles about the sale of Barclays' bond indices business to Bloomberg (87 TTABVUE 310-324);

- Exhibit 26: copy of a list of Barclays worldwide domain name registrations for its LEHMAN Names and Marks, including LEHMAN BROTHERS (87 TTABVUE 325-334);

- Exhibit 27: copies of official records and a docket summary concerning numerous worldwide trademark registrations for Barclays' LEHMAN (87 TTABVUE 335-430);

- Exhibit 28: copy of European Union Intellectual Property Office's decision denying the revocation of EUTM No. 83261 for Barclays' LEHMAN BROTHERS mark in the European Union based on Trademarkers N.V.'s allegations of non-use and abandonment (87 TTABVUE 431-451);

6. Trial Testimony Declaration of Ignacio V. Duran, paralegal at Cowan, Liebowitz & Latman P.C. (89 TTABVUE) with Exhibits 29-45 (89-90):

- Exhibit 29: copies of searches conducted on or about March 2016 on Lexis-Nexis Courtlink and PACER concerning various lawsuits since September 2008 involving Lehman Brothers Holdings Inc. ("LBHI"), its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns (89 TTABVUE 18-382);

- Exhibit 30: copies of publicly available documents concerning Lehman Brothers' regulatory filings, including with FINRA and the SEC (89 TTABVUE 383-584);

- Exhibit 31: copies of a printout of the first page of search results of a search conducted on June 5, 2014 on the LinkedIn website for users who list Lehman Brothers anywhere in their user profile, yielding over 55,900 results; a printout of the first page of search results for a search conducted on May 26, 2016 on the LinkedIn website for users who list Lehman Brothers anywhere in their user profile, yielding over 48,900 results; a printout of the first page of search results of a search conducted on December 9, 2016 on the LinkedIn website for users who list Lehman Brothers anywhere in their user profile, which search yielded over 46,800 results (89 TTABVUE 585-590);

- Exhibit 32: printouts of the first pages of the results of video searches conducted on June 11, 2014, May 26, 2016 and February 1, 2017 on the YouTube website for the term "Lehman Brothers," respectively yielding approximately 47,400 results, approximately 44,200 results, and approximately 37,100 results (89 TTABVUE 591-600);

- Exhibit 33: copy of printouts of the first pages of the results of searches conducted on June 11, 2014, May 26, 2016 and December 9, 2016 in Google's webpage search engine for the term "Lehman Brothers," respectively yielding over 1,900,000 results, over 4,900,000 results and over 5,170,000 results (89 TTABVUE 601-620);

- Exhibit 34: printouts of the first pages of the results of searches conducted on June 11, 2014, May 26, 2016 and December 9, 2016 in Google's news search engine for the term "Lehman Brothers," yielding respectively over 7,300 results, over 213,000 results and over 191,000 results (89 TTABVUE 621-645);

- Exhibit 35: printout of the first page of the results of a search conducted on June 17, 2014 in the Lexis-Nexis databases covering *The Wall Street Journal*, *The Wall Street Journal Online*, *The New*

*York Times*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* for articles first published between January 1, 2008 and September 14, 2008 for the term "Lehman Brothers," which search yielded 1,818 results (89 TTABVUE 646-649);

- Exhibit 36: copy of a printout of the first three pages of the results of a search conducted on June 17, 2014 in the Lexis-Nexis database covering *The New York Times* for articles first published between January 1, 2008 and September 14, 2008 for the term "Lehman Brothers," which search yielded 401 results (89 TTABVUE 650-653);

- Exhibit 37: copy of a printout of the first three pages of results of a search conducted on June 17, 2014 in the Lexis-Nexis database covering *The Wall Street Journal* and *The Wall Street Journal Online* for articles first published between January 1, 2008 and September 14, 2008 for the term "Lehman Brothers," which search yielded 994 results (89 TTABVUE 654-657);

- Exhibit 38: copy of a printout of the first couple of pages of results of a search conducted on June 17, 2014 in the Lexis-Nexis databases covering *The Wall Street Journal*, *The Wall Street Journal Online*, *The New York Times*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* for articles first published between September 15, 2008 and December 31, 2008 for the term "Lehman Brothers," which search yielded 1,857 results (89 TTABVUE 658-661);

- Exhibit 39 a printout of the first couple of pages of the search results conducted on June 18, 2014 in the Lexis-Nexis database covering *The New York Times* for articles first published between September 15, 2008 and December 31, 2008 for the term "Lehman Brothers," which search yielded 547 results (89 TTABVUE 662-664);

- Exhibit 40: a printout of the first page of the search results conducted on June 18, 2014 in the Lexis-Nexis database covering *The Wall Street Journal* and *The Wall Street Journal Online* for articles first published between September 15, 2008 and December 31, 2008 for the term "Lehman Brothers," which search yielded 783 results (89 TTABVUE 665-668);

- Exhibit 41: printouts of the first pages of search results conducted on June 11, 2014 in the Lexis-Nexis databases covering *The Wall Street Journal*, *The Wall Street Journal Online*, *The New York Times*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune*

for articles first published in 2009-2013 for the term "Lehman Brothers" respectively yielding 2,412 results, 2,064 results, 2018 results, 1480 results, 924 results (89 TTABVUE 669-680),

- printouts of the first pages of the search results conducted on March 14, 2016 in the Lexis-Nexis databases covering *The Wall Street Journal*, *The Wall Street Journal Online*, *The New York Times*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* for articles first published in 2014-2015 for the term "Lehman Brothers" respectively yielding 804 results and 633 results (89 TTABVUE 681-686),

- printouts of the first pages of the search results conducted on February 1, 2017 in the Lexis-Nexis databases covering *The Wall Street Journal*, *The Wall Street Journal Online*, *The New York Times*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* for articles first published in 2016 for the term "Lehman Brothers" yielding 652 results (89 TTABVUE 687);

- Exhibit 42: a printout of the first couple of pages of search results conducted on March 18, 2016 in the Lexis-Nexis databases covering *The Wall Street Journal*, *The Wall Street Journal Online*, *The New York Times*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* for articles first published between September 15, 2008 and December 31, 2008 for the terms "Lehman Brothers" and "bankruptcy," which search yielded 951 results (89 TTABVUE 688-692);

- Exhibit 43: printouts of the first pages of search results conducted on March 17, 2016 in the Lexis-Nexis databases covering *The Wall Street Journal*, *The Wall Street Journal Online*, *The New York Times*, *The Washington Post*, *The Los Angeles Times* and *The Chicago Tribune* for articles first published in 2009-2016 for the terms "Lehman Brothers" and "bankruptcy," respectively yielding 856 results, 716 results, 660 results, 465 results, 309 results, 286 results, 239 results and 216 results (89 TTABVUE 693-726);

- Exhibit 44: printouts of May 31, 2016 search results in the Lexis-Nexis databases covering:

  o *The New York Times* articles first published between January 1, 2006-December 31, 2007; January 1, 2003-December 31, 2005; January 1, 2001-December 31, 2002; January 1, 2000-December 31, 2000, for the term "Lehman Brothers" yielding 722 results,

938 results, 800 results and 337 results respectively (90 TTABVUE 3-438),

o *The Washington Post* articles first published between January 1, 2000 and December 31, 2007 for the term "Lehman Brothers" which search yielded 825 results (90 TTABVUE 439-553),

o *Los Angeles Times* articles first published between January 1, 2004-December 31, 2007 and January 1, 2000-December 31, 2003 for the term "Lehman Brothers" yielding respectively 825 results and 700 results (90 TTABVUE 554-728),

o *The Chicago Tribune* articles first published between January 1, 2000 and December 31, 2007 for the term "Lehman Brothers" which search yielded 934 results (90 TTABVUE 729-866),

o *The Wall Street Journal Online* articles first published between January 1, 2000 and December 31, 2007 for the term "Lehman Brothers" which search yielded 134 results (90 TTABVUE 867-885);

o *The Wall Street Journal* articles first published between January 1, 2007-December 31, 2007, January 1, 2006-December 31, 2006, January 1, 2005-December 31, 2005, January 1, 2004-December 31, 2004, January 1, 2003-December 31, 2003, January 1, 2002-November 30, 2002, December 1, 2002-December 31, 2003, January 1, 2001-November 30, 2001, December 1, 2001-December 31, 2001, January 1, 2000-September 30, 2000, October 1, 2000-December 31, 2000, for the term "Lehman Brothers" which search yielded 845 results, 744 results, 757 results, 805 results, 816 results, 931 results, 77 results, 978 results, 58 results, 939 results and 265 results (90 TTABVUE 886-1948);

- Exhibit 45: copies of trademark registration records from the USPTO and other documents concerning goods and services offered and/or registered under the marks FORBES, HARLEY DAVIDSON, SOTHEBY'S, THE NEW YORK TIMES, NBC, TIME, TRUMP and THE WALL STREET JOURNAL/WSJ (90 TTABVUE 1949-2617);

7.  Barclays' Fifth Notice of Reliance Upon Registrations and Official Records (140 TTABVUE):

- Exhibit 1: TSDR records for numerous third-party registrations evidencing registration of the same mark for financial services (Int.

Class 36) and beer or non-alcoholic beverages (Int. Class 32) (140 TTABVUE 42-75);

- Exhibit 2: TSDR records for numerous third-party registrations evidencing registration of the same mark for financial services (Int. Class 36) and wine or liquors (Int. Class 33) (140 TTABVUE 76-88);

- Exhibit 3: TSDR records for numerous third-party registrations evidencing registration of the same mark for financial services (Int. Class 36) and food, bar and/or restaurant related services (Int. Class 43) (140 TTABVUE 89-248);

- Exhibit 4: confirmatory assignment of the LEHMAN trademarks defined in the Notice of Opposition and Application Serial No. 86081143 from Barclays' Capital, Inc. to Barclays PLC recorded with USPTO on March 12, 2018 (140 TTABVUE 249-253);

- Exhibit 5: copies of corporate certificates of good standing from the State of Delaware for Lehman Brothers Holdings Inc. and Lehman Brothers Inc. (140 TTABVUE 254-256);

- Exhibit 6: copies of TSDR records for numerous third-party registrations evidencing financial services companies registration of their marks in connection with financial services, and stadiums, sporting events, entertainment services and/or food and beverage related goods and services, including alcoholic and no-alcoholic beverages, concession stands, food preparation services and/or catering and restaurant services on the other hand (140 TTABVUE 257-418);

- Exhibit 7: copies of TSDR records for various registrations owned by Capital One Financial Corporation evidencing registration of marks containing the words "Capital One" for financial-related services, athletics, arena services and/or entertainment (140 TTABVUE 419-492);

8. Barclays' Sixth Notice of Reliance Upon Printed Publications (141 TTABVUE):

- Exhibit 1: representative news articles first published between May 2016 and April 2019 from various major publications such as *The New York Times*, *The Wall Street Journal*, and *The Washington Post*, concerning Lehman Brothers Holdings Inc., its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns (141 TTABVUE 10-52);

- Exhibit 2: representative news articles first published between May 2015 and the present from various major publications such as *The Boston Globe*, *Chicago Tribune*, *The Denver Post*, *The New York Times*, *Tampa Bay Times* and *The Washington Post*, concerning cafes owned by Capital One bearing the name "Capital One Café" (141 TTABVUE 53-70);

- Exhibit 3: copy of an article from *The New York Times* concerning the dramatic play "The Lehman Trilogy" (141 TTABVUE 71-73);

9. Barclays' Seventh Notice of Reliance Upon Internet Materials (142-143 TTABVUE):

- Exhibit 1: copies of representative internet news articles first published between June 2016 and April 2019 from various major news organizations such as *Bloomberg*, *CNN*, *The New York Times*, and *The Wall Street Journal* concerning Lehman Brothers Holdings Inc. ("LBHI"), its present and former subsidiaries and affiliates, and/or each of their predecessors, licensees, assignors and assigns (142 TTABVUE 19-54);

- Exhibit 2: representative internet news articles first published between January 2019 and April 2109 from various major publications such as such as *The New York Times*, *The New Yorker*, *The Washington Post*, concerning Lehman Brothers in popular culture (142 TTABVUE 55-104);

- Exhibit 3: representative internet news articles, YouTube videos, and a Capital One bank website concerning Capital One's "Capital One Café" (142 TTABVUE 105-264);

- Exhibit 4: copies of internet printouts from Tiger Lily's website <http://lehmanbrothe.rs/> (143 TTABVUE 3-8);

- Exhibit 5: copy of a printout from Tiger Lily's Facebook page, available at <https://www.facebook.com/LehmanBrotherswhiskey/> (143 TTABVUE 9-19);

- Exhibit 6: copies of printouts of websites showing the use of financial institution names in connection with stadiums offering food and beverage services (143 TTABVUE 20-101);

- Exhibit 7: copies of printouts of internet news articles concerning Tiger Lily first published between February 2016 and April 2019 (143 TTABVUE 102-113);

10. Amended Trial Testimony Declaration of Marcus A. Southerden, Head of IP Legal, EME and APC, for Barclays PLC and its affiliates (146 TTABVUE 6-8)[86], with Exhibits at (144 TTABVUE) and Confidential (145 TTABVUE):

- Exhibit 46: Master Assignment Agreement Assignment of Brand IP between Barclays Capital Inc. and Barclays PLC dated August 31, 2017 (144 TTABVUE 8), Confidential (145 TTABVUE 3-30);

- Exhibit 47: copies of Trademark Assignment Cover Sheet and Assignment of Trademarks from Barclays Capital Inc. to Barclays PLC recorded with Assignment Division of USPTO on March 18, 2018, Reel/Frame: 6289/0791(144 TTABVUE 9-13).

The record also includes the following evidence submitted by Tiger Lily:

1. Cross-Examination Testimony of Alexander L. Greenberg by Tiger Lily (139 TTABVUE and 116 TTABVUE) and Exhibits A-S (115 TTABVUE), (Confidential 114 TTABVUE):

- Defendant's Exhibit A: Trial Declaration of Alexander L. Greenberg, Esq. (115 TTABVUE 2-16);

- Defendant's Exhibit B: webpage of lyrics of the 2009 Black Eyed Peas song *Imma Be* which state: "Imma be a brother, but my name ain't Lehman." (115 TTABVUE 17), (*see also* Barclays' Exhibit 18 to Greenberg Trial Declaration 87 TTABVUE 204-213);

- Defendant's Exhibit C: Recorded September 22, 2008 Trademark Assignment from Lehman Brothers Inc. to Barclays Capital Inc. (115 TTABVUE 18-35);

- Defendant's Exhibit D: February 4, 2014 emails between Tiger Lily's counsel Robert Garson and Barclays' in-house counsel Alexander Greenberg (115 TTABVUE 36-37);

- EXCLUDED Defendant's Exhibit E: TMview printout for French Registration No. 4123417 in name of M. David Tordjman, Agissant

---

[86] The Amended Trial Testimony Declaration of Marcus A. Southerden was filed as an Exhibit to Barclays' Motion on Consent to Correct (146 TTABVUE 6-8).

pour le compte do la societe "lehman brothers" en cours de formation (115 TTABVUE 38-41);

- Defendant's Exhibit F: list of products and quantities (115 TTABVUE 42);

- Defendant's Exhibit G: Lehman Brothers Holdings Inc. Notes to Consolidated Financial Statements (115 TTABVUE 43-44);

- Defendant's Exhibit H: Foreign Trademark Registration No. 19762364 issued to Tiger Lily Ventures Ltd. for LEHMAN BROTHERS mark (115 TTABVUE 45);

- Defendant's Exhibit I: copy of p. 15 from an agreement including Article IV CLOSING AND TERMINATION (115 TTABVUE 46);

- Defendant's Exhibit J: copy of pp. 29-30 of an agreement including paragraphs 8.8 Publicity, 8.9 Trademark License and 8.10 Use of Purchased Intellectual Property (115 TTABVUE 47-48);

- Defendant's Exhibit K: copy of p. 4 of an agreement including paragraphs 5. License, 6. Subordinated Notes of LBI, 7. Breakup Fee, 8. Transfer of Customer Accounts, 9. Deletion of Purchase Price Adjustment Provisions, 10. Payables, Deposits and Receivables and 11. Intercompany Obligations (115 TTABVUE 49);

- Defendant's Exhibit L: printout from pp. 1-2 of <http://dmepiq11.com/LBH/Project> identifying members of Lehman Brothers Estate Teams (115 TTABVUE 50-51);

- Defendant's Exhibit M: copy of DOMAINTOOLS WhoIs Record for LehmanHoldings.com (115 TTABVUE 52-53);

- Defendant's Exhibit N: Cowan, Liebowitz & Latman, P.C. BARCLAYS World Wide Registrations for the LEHMAN BROTHERS Marks as of April 19, 2016 (115 TTABVUE 54-57);

- Defendant's Exhibit O: Barclays Brand License Agreement (115 TTABVUE 58-63), Confidential (114 TTABVUE 59-64);

- Defendant's Exhibit P: Exhibit 24 to Trial Declaration of Alexander L. Greenberg, Esq. including pp. 1-29 of August 24, 2016 Barclays Brand Licence Agreement between Barclays Bank PLC and Barclays

Risk Analytics and Index Solutions Limited (115 TTABVUE 64-96), Confidential (TTABVUE 65-97);

- Defendant's Exhibit Q: Trademark Chart pp. 33-50 (115 TTABVUE 97-114), Confidential (114 TTABVUE 98-115);

- Defendant's Exhibit R: emails of Barclays employees regarding Global Weekly Economic Monitor and Lehman U.S. Rates Strategy Weekly (115 TTABVUE 115-117), Confidential (114 TTABVUE 116-118);

- Defendant's Exhibit S: email regarding Lehman index data still provided on Lehman website (115 TTABVUE 118), Confidential (114 TTABVUE 119);

2.  Cross-Examination of Testimony of Ignacio V. Duran by Tiger Lily (138 TTABVUE, Testimony with Exhibits at 117 TTABVUE), Confidential (118 TTABVUE 31, 92-93):

- Exhibit Declaration: Trial Declaration of Ignacio V. Duran (117 TTABVUE 237-249);

- Exhibit 29 (excerpt): partial list of lawsuits involving Lehman Brothers Holdings (117 TTABVUE 250);

- Exhibit 30 (excerpt): Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers (117 TTABVUE 251-264);

- Exhibit 30 (excerpt 2): Finra firm profile regarding Lehman Brothers Inc. Direct Owners and Executive Officers (117 TTABVUE 265);

- Exhibit 31 (excerpt): LinkedIn search results for people having Lehman Brothers on their profile (117 TTABVUE 266);

- Exhibit 32 (excerpt): "lehman brothers" - YouTube (117 TTABVUE 267-268);

- Exhibit 33 (excerpt): "lehman brothers" – Google Search (117 TTABVUE 269-270);

- Exhibit 35 (excerpt): Lexis search results for "lehman brothers" (117 TTABVUE 271-272);

- Exhibit 36 (excerpt): Lexis search results for "lehman brothers" (117 TTABVUE 273-274);

- Exhibit 38 (excerpt): Lexis search results for "Lehman Brothers" (117 TTABVUE 275-277);

- Exhibit Re Harley Davidson (XX ref 187 et seq.): copy of U.S. Trademark Registration No. 2,011,337 for HARLEY-DAVIDSON CAFE and Design in Classes 25 and 42 (117 TTABVUE 278);

- Exhibit Re Harley Davidson (XX ref 190 et seq.): copy of U.S. Trademark Registration No. 3,756,506 for HARLEY-DAVIDSON in Class 36 (117 TTABVUE 279);

- Exhibit Re Sotheby's (XX ref 190 et seq.): copy of page from Sotheby's website regarding wines (117 TTABVUE 280);

- Exhibit Re Sotheby's (XX ref 192 et seq.): copy of page from Sotheby's website regarding its financial services (117 TTABVUE 281);

- Exhibit Re Forbes (XX ref 200 et seq.): copy of page from Petersen Companies Inc. website featuring Forbes Travel Store (117 TTABVUE 282);

- Exhibit Re New York Times (XX ref 200 et seq.): copy of page from Petersen Companies Inc. website featuring The New York Times store (117 TTABVUE 283);

- Exhibit Re CNBC (XX ref 200 et seq.): copy of page from Petersen Companies Inc. website featuring CNBC smartshop store (117 TTABVUE 284);

- Exhibit Re Trump (XX ref 207 et seq.): copies of partial Trademark Electronic Search System (TESS) reports for Serial No. 86724574 in Classes 16, 25, 26, 35, 36, 41 and 45, Registration No. 4874427 for TRUMP in Classes 35 and 36, and unidentified application or registration in Classes 16, 25, 26, 35, 36, 41 and 45 (117 TTABVUE 285-287);

- Exhibit Re Trump (2) (XX ref 207 et seq.): copy of webpage of Quality Liquor Store for TRUMP Super Premium Vodka (117 TTABVUE 288);

3.  Tiger Lily's Amended Notice of Reliance No. 1 (133 TTABVUE, Exhibits submitted with Notice of Reliance at 119 TTABVUE):

- Applicant's Trial Exhibit 1: TSDR for Registration No. 3141963 for LEHMAN BROTHERS ASSET MANAGEMENT (119 TTABVUE 5-7);

- Applicant's Trial Exhibit 2: TSDR for Registration No. 2832374 for LEHMANLIVE (119 TTABVUE 8-10);

- Applicant's Trial Exhibit 3: TSDR for Registration No. 2529704 for LEHMAN FUTURES LIVE (119 TTABVUE 11-13);

- Applicant's Trial Exhibit 4: TSDR for Registration No. 2519808 for LEHMAN BANK (119 TTABVUE 14-16);

- Applicant's Trial Exhibit 5: TSDR for Registration No. 2539396 for LEHMAN BROTHERS PRIMEPLUS (119 TTABVUE 17-19);

- Applicant's Trial Exhibit 6: TSDR for Registration No. 2549090 for LEHMAN PRIMEPLUS (119 TTABVUE 20-22);

- Applicant's Trial Exhibit 7: TSDR for Registration No. 2381464 for LEHMAN BROTHERS BANK (119 TTABVUE 23-25);

- Applicant's Trial Exhibit 8: TSDR for Registration No. 1755687 for LEHMAN BROTHERS (119 TTABVUE 26-28);

- Applicant's Trial Exhibit 9: TSDR for Registration No. 1717171 for LEHMAN BROTHERS (119 TTABVUE 29-33);

- Applicant's Trial Exhibit 10: TSDR for Registration No. 1796071 for LEHMAN-LOGIC (119 TTABVUE 34-36);

- Applicant's Trial Exhibit 11: TSDR for Registration No. 3552162 for LCX (119 TTABVUE 37-39);

- Applicant's Trial Exhibit 12: TSDR for Registration No. 3097412 for LMX (119 TTABVUE 40-44);

- Applicant's Trial Exhibit 13: TSDR for Registration No. 2656151 for LEHMANLIVE (119 TTABVUE 45-47);

Serial No. 88242849

4. Tiger Lily's Amended Notice of Reliance No. 2 (134 TTABVUE, Exhibits submitted with Notice of Reliance No. 2 at 120 TTABVUE):

    - EXCLUDED Exhibit 14: New York Department of State Certificate of Trademark Registration Certificate of LBW LLC's, a wholly owned subsidiary of Tiger Lily, for LEHMAN BROTHERS (120 TTABVUE 5-6);

    - Exhibit 15: Peoples Republic of China (PRC) Trademark Registration Certificate No. 19762364 of Tiger Lily, for LEHMAN BROTHERS in International Class 33 (Liqueurs; Spirits [beverages]; vodka; alcoholic essences; alcoholic beverages, except beer) (120 TTABVUE 7-8);

    - EXCLUDED Exhibit 16: Institut national de la propriété industrielle ("INPI") trademark status and Document records from TM View showing the trademark registration in International Classes 30, 35, 43 of LEHMAN BROTHERS in France in the name of M. David Tordjman, Agissant pour le compte de la saciete "lehman brothers" en cours de formation (120 TTABVUE 9-12);

5. Tiger Lily's Amended Notice of Reliance No. 3 – Internet Materials (135 TTABVUE, Exhibits submitted with Notice of Reliance No. 3 at 121 TTABVUE)[87]:

    - Exhibit 17.1-17.4: representative articles from websites featuring the demise of Lehman Brothers bank and its banking business (121 TTABVUE 8-24);

    - Exhibit 18.1-18.10: representative materials from websites reporting or commenting upon Barclays' or its affiliates' rebranding away from the LEHMAN BROTHERS mark (121 TTABVUE 25-63);

    - Exhibit 19.1-19.4: representative materials from websites describing the sale of the former Lehman Brothers business to Stifel (121 TTABVUE 64-72);

---

[87] The descriptions of Exhibits 23-24 submitted with Tiger Lily's Notice of Reliance No. 3 do not correspond with the attached documents (121 TTABVUE 253-271); Tiger Lily requested time to cure the defect and filed an Amended Notice of Reliance No. 3 – Internet Materials (135 TTABVUE).

Serial No. 88242849

- Exhibit 20.1-20.4: representative materials from websites describing the sale of the former Lehman Brothers business or assets to Bloomberg (121 TTABVUE 73-208);

- Exhibit 21.1-21.5: representative internet materials showing the commercial legacy of LEHMAN BROTHERS to the consuming public (121 TTABVUE 209-240);

- Exhibit 22.1-22.4: internet materials reporting on the instant case before the TTAB (121 TTABVUE 241-252);

- Exhibit 23.1-23.2: website(s) controlled by Barclays (showing no product or service offerings in connection with the LEHMAN BROTHERS mark) (121 TTABVUE 253-254);

- Exhibit 24.1-24.3: websites or social medial accounts controlled by Tiger Lily (showing the branding and product offerings in connection with the LEHMAN BROTHERS mark for whisky) (121 TTABVUE 255-271);

6. Tiger Lily's Amended Notice of Reliance No. 4 (136 TTABVUE, Exhibits submitted with Notice of Reliance No. 4 at 122 TTABVUE):

- Exhibit 25: Barclays (BCI's) Responses and Objections to Tiger Lily's First Set of Interrogatories (122 TTABVUE 4-14);

- WITHDRAWN (see 136 TTABVUE) Exhibit 26: Barclays (BCI's) Responses and Objections to Tiger Lily's First Set of Document Requests (122 TTABVUE 15-28);

7. Tiger Lily's Notice of Reliance No. 5 – Printed Materials and Public Documents (137 TTABVUE, Exhibits submitted with Notice of Reliance No. 5 – Printed Materials and Public Documents at 123 TTABVUE):

- EXCLUDED Exhibit 27.1-27.5: copies of documents filed by Tiger Lily with the U.S. District Court for the Southern District of New York in support of its Motion to Compel Ignacio Duran (proffered by Barclays) to answer questions posed by Tiger Lily during testimonial cross-examination (123 TTABVUE 5-63);

- Exhibit 28.1-28.3: materials published on the Lehman Brothers Holdings Inc. (Chapter 11) Case # 08-13555 bankruptcy website which is publicly available at <http://dm.epiq11.com/#/case/LBH /documents>, including September 16, 2008 Asset Purchase

Serial No. 88242849

Agreement among Lehman Brothers Holdings Inc. and Lehman Brothers Inc. and Barclays Capital Inc. and amendments thereto (123 TTABVUE 64-132);

8.  Declaration of Chaim Aaron James Green, director of Tiger Lily Ventures, Ltd. (124 TTABVUE);

9.  Declaration of Christopher Kiplok, lawyer serving as lead counsel to the Trustee in the liquidation of Lehman Brothers Inc., including copies of Order Commencing Liquidation and First through Eighteenth Interim Reports (127 TTABVUE).

***