# EXHIBIT 23

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------X
FORTUNATE DRIFT LIMITED and         :
YANGTZE RIVER PORT and LOGISTICS       Index No.:
LIMITED,                            :
       Petitioners,
                                            :       Hon.
  -against-
                                            :
AMERICA 2030 CAPITAL, LLC,
                                            :
       Respondent, and
                                            :
VSTOCK TRANSFER, LLC,
                                            :
       Nominal Respondent.
------------------------------------------------------X

## VERIFIED PETITION

Petitioners, Fortunate Drift Limited ("FDL") and Yangtze River Port and Logistics Limited ("YRIV"), by their attorneys, Phillipson & Uretsky, LLP, as and for their Verified Petition, allege as follows:

## PRELIMINARY STATEMENT

1.    Petitioners submit this Petition seeking a temporary restraining order and preliminary injunction pending arbitration of a dispute between the parties, pursuant to CPLR 7502(c). The requested TRO and preliminary injunction would enjoin Respondent America 2030 Capital Limited ("America 2030"), America 2030's agents, servants, employees, attorneys and affiliates, and Nominal Respondent VStock Transfer LLC ("VStock") from selling, transferring, assigning, encumbering, or otherwise disposing of America 2030's purported shares of stock in YRIV, or taking any action that would enable America 2030 to sell, transfer, assign, encumber, or otherwise dispose of its purported YRIV stock, pending the determination of an arbitration to be commenced

1

between FDL and America 2030 before the Hong Kong International Arbitration Centre ("HKIAC").

2. Petitioners seek this temporary and preliminary injunctive relief pending arbitration to prevent America 2030 from acquiring one million shares of YRIV stock pending arbitration of FDL's dispute with America 2030 concerning whether America 2030 is the rightful owner of such shares and has the right to sell them.

3. The dispute arises out of a Master Loan Agreement entered into between FDL and America 2030 dated April 13, 2018 (the "Agreement"), in which America 2030 agreed to lend FDL funds equal to up to $8 million, in exchange for YRIV shares (which trade on the NASDAQ).

4. America 2030 received 2 million YRIV shares, but America 2030 has not provided any funding whatsoever. Due to this breach, FDL cancelled the Agreement. Despite all this, America 2030 has now asked YRIV's transfer agent, VStock, to transfer the shares to America 2030's account with Royal Bank of Canada ("RBC") so that America 2030 can sell them to one or more third parties.

5. Petitioners, however, assert that America 2030 is not entitled to own or to sell the shares because, inter alia, the Agreement was induced by misrepresentations and omissions by America 2030; the Agreement is unenforceable as a matter of Hong Kong law; the Agreement has been cancelled; the issuance of shares is subject to rescission because FDL did not receive actual consideration for such shares and/or was fraudulently induced into entering into the Agreement; and, in any event, America 2030 materially breached the Consulting Agreement by failing to provide any funds. As a result, FDL will show in the arbitration that the shares issued to America 2030 must be cancelled and returned to FDL.

2

6. FDL's claims against America 2030, arising out of the Agreement, are subject to mandatory arbitration before the HKIAC pursuant to a broad arbitration agreement contained therein. FDL intends to commence such arbitration promptly, and in any event within thirty days of the Court's order, in accordance with CPLR 7502(c), but accounting for the fact that the Agreement requires the parties to engage in a 30 day "Consultation Period" during which the parties must attempt to resolve the dispute by direct negotiations. This process has already begun, and is ongoing, but an injunction keeping the status quo while this occurs is essential.

7. FDL will also assert and establish in arbitration that America 2030 has repeatedly violated Hong Kong laws in connection with the Agreement. America 2030 is not properly licensed as a lender pursuant to Hong Kong law, and the Hong Kong authorities have an open investigation into this matter.

8. If this Court does not grant Petitioners temporary or preliminary injunctive relief in aid of arbitration, America 2030 will soon force VStock to transfer America 2030's purported YRIV shares, thereby making it impossible for Petitioners to reclaim those shares even if FDL ultimately prevails on the merits in the arbitration. Such an outcome would render an arbitration panel's ultimate award in favor of FDL ineffectual and would irreparably harm FDL, YRIV, and YRIV's public investors.

9. Under all the circumstances, the Court should grant Petitioners temporary and preliminary injunctive relief pending resolution of the dispute before the HKIAC as required under the Agreement, pursuant to CPLR 7502(c).

3

## PARTIES

10.     Petitioner, FDL is an investment company with a principal place of business in Hong Kong, but which at times transacts business in New York, working out of 41 John Street, New York, NY 10038.

11.     FDL is itself one of the largest shareholders in YRIV.  Chen LinYu, the owner of FDL, has also been involved with YRIV since 2006.  He is a friend and business associate of YRIV's CEO and Chair of the Board of Directors.   With regard to the Agreement, the intent between FDL and YRIV was for YRIV to be a third party beneficiary of the Agreement, as discussed in more detail below.

12.     YRIV is a publicly traded company, trading on the Nasdaq exchange, with an office in New York at 41 John Street, New York, NY 10038.

13.     Upon information and belief, Respondent America 2030 is an investment banking and M&A Advisory company, with offices in Illinois, New York, Georgia, Ukraine, and Hong Kong.  America 2030 attempted to operate as "New York Services Enterprise," using the "NYSE" name, but recently lost its case to NYSE Group, Inc., the owner of the rights to use the iconic NYSE (as well as the actual exchange).

14.     Upon information and belief, VStock Transfer operates as a transfer agent company with a principal place of business in the state of New York.  VStock is Petitioners' stock transfer agent.  VStock is not accused of any wrongdoing by virtue of being named as a respondent in this Petition, and is named as a party herein for the purpose of ensuring that it is on notice of the proceedings and of any order the Court may make herein.

4

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this special proceeding because all involved parties transact business in the state of New York, have offices in the state of New York, and most importantly, because the shares that are the subject matter of this dispute are with VStock, meaning the shares themselves are currently in the state of New York.

16. Venue is proper in the county of New York as multiple parties reside in the county of New York, and YRIV stock – ie. the shares at issue – are traded on the Nasdaq, which is based in the county of New York.

## BACKGROUND FACTS

17. The first week of April 2018, representatives of FDL and YRIV were introduced to Val Sklarov, the President and CEO of America 2030.

18. On April 10, 2018, Petitioners sent Mr. Sklarov the executed Term Sheet and support document he had requested. He advised loan documents would be provided that evening. Indeed they were, and the fully executed loan documents were returned to Mr. Sklarov on April 13, 2018.

19. Mr. Sklarov provided the DWAC delivery instructions for FDL to deliver 1,000,000 shares of YRIV shares to America 2030's brokerage account at Fidelity. On Monday April 16, 2018, Fortunate Drift Limited delivered via DWAC transfer 1,000,000 shares of YRIV to the America 2030 account at Fidelity in accordance to the instructions provided.

20. The shares were received and held in this account. On either April 18, 2017 or April 19, America 2030 sold 6,800 shares of YRIV. This confirmed that the shares were delivered and the "Transferred Collateral has been delivered to and confirmed by the Depository" in accordance with the Agreement. At the time, the trading volume for the previous four (4) weeks was:

```
Apr 13, 2018   4.00   4.08   4.00   4.08   4.08   2,800
Apr 12, 2018   4.00   4.05   4.00   4.01   4.01   5,800
```

5

```
Apr 11, 2018   4.01   4.03   4.01   4.01   4.01   1,400
Apr 10, 2018   4.03   4.16   4.01   4.05   4.05   1,700
Apr 09, 2018   4.07   4.24   4.00   4.03   4.03   5,300
Apr 06, 2018   4.05   4.09   4.00   4.00   4.00   4,700
Apr 05, 2018   4.13   4.14   4.00   4.05   4.05   3,500
Apr 04, 2018   4.09   4.22   3.97   4.07   4.07   7,900
Apr 03, 2018   4.17   4.19   4.10   4.13   4.13   4,800
Apr 02, 2018   4.11   4.11   4.10   4.10   4.10   1,500
Mar 29, 2018   4.17   4.29   3.85   4.11   4.11   21,700
Mar 28, 2018   4.40   4.40   4.07   4.08   4.08   18,400
Mar 27, 2018   4.47   4.55   4.26   4.41   4.41   20,900
Mar 26, 2018   4.36   4.55   4.31   4.38   4.38   5,500
Mar 23, 2018   4.52   4.55   4.40   4.40   4.40   8,600
Mar 22, 2018   4.52   4.62   4.40   4.40   4.40   7,000
Mar 21, 2018   4.37   4.62   4.37   4.57   4.57   14,000
Mar 20, 2018   4.45   4.55   4.34   4.34   4.34   6,100
Mar 19, 2018   4.40   4.54   4.40   4.40   4.40   5,900
Mar 16, 2018   4.35   4.46   4.25   4.45   4.45   2,900
Mar 15, 2018   4.38   4.44   4.29   4.44   4.44   3,300
Mar 14, 2018   4.56   4.62   4.36   4.50   4.50   3,000
Mar 13, 2018   4.83   4.83   4.51   4.55   4.55   7,300
```

21.     Mr. Sklarov was aware of this trading volume when the Agreement was executed. He verbally repeated to Petitioners on numerous occasions that the low volume was not going to be a problem. Mr. Sklarov was fully apprised that YRIV was battling a short seller and as a result steps were taken to "dry up" the volume. The volume since executing the Agreement has been consistent with the previous 4 weeks:

Volume
```
May 01, 2018   4.05   4.05   4.00   4.01   4.01   910
Apr 30, 2018   4.02   4.11   4.02   4.10   4.10   3,500
Apr 27, 2018   4.02   4.07   4.02   4.07   4.07   2,200
Apr 26, 2018   4.10   4.10   4.03   4.03   4.03   500
Apr 25, 2018   4.02   4.06   4.02   4.06   4.06   4,400
Apr 24, 2018   4.02   4.05   4.02   4.03   4.03   3,000
Apr 23, 2018   4.02   4.02   4.02   4.02   4.02   800
Apr 20, 2018   4.00   4.05   4.00   4.01   4.01   1,100
Apr 19, 2018   4.04   4.17   4.00   4.01   4.01   4,700
Apr 18, 2018   4.00   4.15   4.00   4.15   4.15   9,200
```

Apr 17, 2018  4.08  4.16  4.00  4.00  4.00  19,000
Apr 16, 2018  4.03  4.11  4.00  4.09  4.09  3,700

22. Although the Agreement accounts for the possibility of more, the understanding was that FDL would deliver one (1) million shares of YRIV and America 2030 would provide a $2 million loan. This money was being borrowed by FDL so as to assist YRIV with an acquisition of the Wuhan Economic Development Port, which has already been publicly announced. This money was critical for an extension of the time to close the transaction. Critically, there are already 8Ks filed for this acquisition, which 8Ks were filed in reliance on the America 2030 funds.

23. YRIV's stock price is also critical for YRIV's ability to obtain financing in order to finish the above-described acquisition. If America 2030 is able to effectively steal one million YRIV shares, and dump them into the market, crushing YRIV's share price, YRIV will not be able to finance the completion of the acquisition. Without completing the acquisition, YRIV could be permanently damaged to the point of bankruptcy or simply going out of business. This specific acquisition is not replaceable. Allowing America 2030 to complete its theft of YRIV shares and to then dump these shares into the market will irreparably harm YRIV.

24. FDL complied with all the terms and conditions and delivered the shares as instructed.

25. During this period of time, America 2030 claimed that there was a holdup with Fidelity (the firm to which America 2030 had the shares delivered). While this appears to be false, when America 2030 asked to swap the 1 million YRIV shares that were sent to Fidelity for a separate, distinct tranche of 1 million shares from one VStock account (FDL's) to another VStock account (America 2030's), Petitioners complied. They had no reason not to act in good faith at the time.

26. Although FDL had performed under the Agreement, sending two separate tranches of 1 million YRIV shares as per America 2030's requests, America 2030 failed to perform.

7

27. America 2030 was supposed to fund the loan within 3 business days of receipt of the collateral shares in its designated account. America 2030 never sent any funds to FDL.

28. 6,800 shares from that first tranche had already been sold.

29. FDL also worked in good faith on the second tranche of shares, providing requested support documentation to America 2030 for it to be able to deliver the shares to a Forrest Securities account that clears through RBC, as per America 2030's request.

30. Thus, FDL had effectively fully performed twice under the Agreement, having issued two separate tranches of 1 million YRIV shares each to America 2030, for a total 2 million shares.

31. On April 27, 2018, Petitioners were first advised about the sale of the 6,800 shares that had been sold.

32. The Petitioners requested that America 2030 return the 6,800 shares, since the full 1 million of the first tranche should have been returned.[1] Petitioners suggested that America 2030 buy them back if necessary, but Petitioners were rebuffed.

33. It was at this point, once America 2030 had refused to actually (a) lend the funds and (b) failed return the full amount of the first tranche, that FDL's owner, Linyu Chen first became disturbed with the situation and realized he could not trust America 2030. It was not until much later that Petitioners realized the full 2 million shares had been stolen.

34. FDL contacted Mr. Sklarov, the head of America 2030, on a number of occasions on Monday, April 30th, hoping to resolve the situation. Mr. Sklarov repeatedly replied that if he wanted to cancel the transaction, that FDL had the right to do so. Mr. Sklarov never said anything about invoking any penalty or still transferring the second tranche of 1,000,000 shares to America 2030's account at RBC. Given that the shares were supposed to be collateral for a loan of $2

---

[1] At this point Petitioners still thought the two tranches were being swapped for each other, although this was really just a misrepresentation designed to dupe FDL into providing 2 million shares rather than 1 million shares.

8

million, and that America 2030 never provided the $2 million, it is unclear on what grounds Mr. Sklarov believes America 2030 is entitled to any YRIV shares.

35. It appears that America 2030's justification for stealing an additional 1.9 million shares is that they successfully stole 6,800 already.

36. FDL sent an email terminating the Agreement on April 30th, 2018. Mr. Sklarov replied that he was turning it over to his legal and compliance department. FDL then followed up with a second email on May 1, 2018 advising Mr. Sklarov not to transfer the shares to RBC. As a follow-up to that, America 2030's lawyer/legal and compliance department sent a default notice letter.

37. At no time has America 2030 ever provided even one penny of either a loan or payment to FDL. There has been absolutely no funding in any form by America2030.

38. America 2030 entered into this contract illegally. The Agreement specifies that Hong Kong law governs. America 2030 is not licensed to lend money in Hong Kong. This is a violation of Hong Kong law, and the authorities there have opened an investigation into the matter.

39. In summary, FDL complied with the Agreement and America 2030 has not; America 2030 has been unjustly enriched and FDL has been harmed.

40. That concerns the 6,800. Far more important right now is the entire 1.9 million remaining shares. It is bad enough that America 2030 already stole 6,800 shares; absent an injunction it will have stolen the full 2 million.

**ABSENT AN INJUNCTION IN AID OF ARBITRATION, ANY
AWARD IN THE ARBITRATION WILL LIKELY BE RENDERED INEFFECTUAL**

41. The Agreement contains a broad arbitration clause requiring arbitration before the HKIAC of "any dispute, controversy or claim arising out of or relating to" the Agreement. (See <u>Agreement</u>, Section 8, p. 12)

42. However, also pursuant to Section 8.1, the parties fist must negotiate directly with each other for 30 days, and only file with the HKIAC after that period ends without a resolution. Id.

43. This period of time has only recently started to run; accordingly, no arbitration claim has yet been filed. With that said, once permitted to file, FDL will file an arbitration claim seeking to recover, inter alia, possession of the 1.9 million remaining shares (as well as the monetary value of the 6,800 shares that America 2030 sold).

44. It is unclear whether the Hong Kong criminal authorities' investigation will itself cause a resolution to this matter prior to the HKIAC, but it appears those two proceedings will run on parallel tracks.

45. With that said, before either the Hong Kong authorities or the HKIAC has an opportunity to complete its process, America 2030 is pressuring VStock to transfer the 1.9 million shares to America 2030s RBC account.

46. VStock has notified Petitioners that, unless it obtains an appropriate court order, VStock will have no choice but to process America 2030's request and transfer the 1.9 million shares to America 2030s RBC account.

47. If that occurs, America 2030 will sell or otherwise transfer these 1.9 million shares to one or more third parties, just as it already did with the 6,800 YRIV shares. Once America 2030 sells the shares to one or more third parties, America 2030 would no longer have possession or ownership of the shares or the ability to return possession of the shares to Petitioners, just as it has no ability to return the 6,800 shares.

48. Thus, absent the injunctive relief sought herein, which VStock requires, any arbitration award (or Hong Kong criminal authorities conviction or penalty) directing America 2030 to return possession of the shares to Petitioners would be rendered ineffectual.

10

49. Further, Petitioners have demonstrated a likelihood of success on the merits of their claims against America 2030. Although FDL is still preparing its Statement of Claim against America 2030 since it must wait 30 days before filing, the facts set forth herein clearly demonstrate that the Agreement is subject to rescission, thus mandating a return of the shares to FDL.

50. First, Petitioners have shown that the Agreement is subject to rescission because it was wrongfully induced by misrepresentations and misleadingly omissive statements made to Petitioners by America 2030.

51. Next, given that Hong Kong law governs, and America 2030 has no lending license under Hong Kong law, America 2030 has no ability to lend anything.[2]

52. Moreover, even assuming arguendo that the Agreement was legitimate at the time America 2030 induced FDL to enter into it, America 2030 materially breached the Agreement by, inter alia, failing to provide the $2 million in exchange for the YRIV shares. Simply put, FDL received no consideration.

53. If America 2030 understood that FDL was providing 2 million shares in exchange for nothing, then there was no meeting of the minds, because FDL understood that a "loan" requires a "lender" to provide funds to the borrower.

54. Further, Petitioners will suffer irreparable harm in the absence of the requested injunction in aid of arbitration. If VStock transfers the shares it would cause irreparable harm to Petitioners and their investors for which money damages would not compensate.

55. Both YRIV and FDL would face insolvency, potentially bankruptcy, and potentially completely going out of business if the acquisition described above is not completed. Public filings

---

[2] Perhaps this is why America 2030 technically did not lend even one penny to FDL; rather than lend in exchange for collateral shares, America 2030 skipped the lending portion and just took shares in exchange for nothing.

11

already detailed this deal. If America 2030 steals the additional 1.9 million shares as it did with the 6,800 shares, that harm will occur.

56. If after that, FDL prevails before the HKIAC arbitrators, it will be far too late for Petitioners.

57. A monetary award against America 2030 by the arbitrators, as opposed to the return of the stock, would not adequately protect or compensate Petitioners. Petitioners would still have lost the ability to complete the acquisition right now. The damage caused by the loss of such a significant acquisition cannot be adequately compensated through money damages. In addition, Petitioners are at best dubious that America 2030 would pay any Arbitration Award – it is likely more concerned with the criminal investigation at this point.

58. Moreover, both YRIV and its investors will suffer serious, irrecoverable damage if America 2030 is allowed to dump 1.9 million shares of FDL's stock onto the market. Selling off this amount of shares – compared to the low trading volume detailed above – as a block would almost inevitably result in YRIV's share price dropping sharply and rapidly as panicked investors respond with a run of sales of their own.

59. This would deter future capital investment in YRIV (especially when synced in timing with the loss of the significant acquisition referenced above). The result would be a "death spiral."

60. This should not be allowed to happen without first allowing the dispute between America 2030 and Petitioners to be heard and determined by the HKIAC, as per the Agreement.

61. Finally, a balancing of the equities weighs in favor of granting the injunctive relief sought in this application.

62. As explained above, Petitioners and their investors are likely to suffer irreparable harm if America 2030 is allowed to sell the disputed shares before the HKIAC arbitration can be heard and decided.

63. Allowing America 2030 to steal another 1.9 million YRIV shares on top of the 6,800 shares already stolen would be highly inequitable. As a general precept of equity, "you can't get something for nothing." Yet that is precisely what has already occurred here. America 2030 obtained and sold 6,800 YRIV shares of FDL's for nothing.

64. By contrast, FDL lost 6,800 shares, and received nothing in return.

65. This is bad enough, but when balancing the equities, it is inconceivable that the result would ever be to reward that theft of 6,800 shares by permitting it to happen again, but this time with 1.9 million shares.

66. Further, as discussed above, the Hong Kong authorities are investigating this as a crime. Denying this injunction would allow the alleged crime to grow far larger while their investigation is still pending. Thus, denying the injunction in aid of arbitration sought here would directly contravene the public interest by potentially permitting an ongoing crime to continue.

67. Petitioners are unaware of any equities that balance in favor of America 2030.

68. If, after a full arbitration of the merits, the arbitration panel determines that America 2030 is entitled to ownership of the shares, and that it should be allowed to sell such shares, then it will be able to do so at that time. Petitioners are not asking for the stock back at this time; the shares could be held in escrow with VStock until the arbitration is concluded. There is simply no urgency requiring America 2030 to be able to sell the disputed Petitioners stock immediately.

69. No prior application has been made for the relief requested herein.

13

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that:

(a) this Court issue a preliminary injunction in aid of arbitration pursuant to CPLR 7502(c) enjoining Respondent America 2030, America 2030's agents, servants, employees, attorneys, and affiliates, and Nominal Respondent VStock from selling, transferring, assigning, encumbering, or otherwise disposing of America 2030's purported shares of YRIV stock or taking any action that would enable America 2030 to sell, transfer, assign, encumber, or otherwise dispose of YRIV stock;

(b) pending the hearing of this Petition, this Court temporarily restrain Respondent America 2030, America 2030's agents, servants, employees, attorneys, and affiliates, and Nominal Respondent VStock from selling, transferring, assigning, encumbering, or otherwise disposing of America 2030's purported shares of YRIV stock or taking any action that would enable America 2030 to sell, transfer, assign, encumber, or otherwise dispose of YRIV stock, including but not be limited to specifically instructing VStock to hold the shares in escrow pending further instruction from this Court and/or the arbitration panel; and

(c) this Court grant such other and further relief as to this Court deems just and proper, including the costs, disbursements and attorneys' fees of this proceeding.

Dated: New York, New York
May 2, 2018

                          Yours etc.,
                          PHILLIPSON & URETSKY, LLP

By:  _____
      Jonathan C. Uretsky

Phillipson & Uretsky, LLP
111 Broadway, 8th Floor
New York, New York 10006
(212) 571-1164
*Attorneys for Petitioners*

15

16